**UNITED STATES of America, Plaintiff,**

**v.**

**Gary FEOLA, et al., Defendants.**

**No. 85 Cr. 1109–CLB.**

United States District Court,
S.D. New York.

Jan. 12, 1987.

---

Rudolph Giuliani, U.S. Atty., S.D.N.Y., Franklin H. Stone, Asst. U.S. Atty., New York City, for plaintiff.

Frank A. Lopez, Brooklyn Heights, N.Y., for Gary Feola.

Maurice H. Sercarz, Brooklyn Heights, N.Y., for Art Torsone.

Stanley A. Teitler and Michael J. Coyle, New York City, for Edmund Rosner.

William I. Aronwald, White Plains, N.Y., for John Farese.

Dominick Porco, Eastchester, N.Y., for John Cercena.

Ivan Fisher, New York City, for Steven Gallo.

Joseph S. Lyons, Baltimore, Md., for Solomon Gumpricht.

Robert J. Ponzini, Tarrytown, N.Y., for George Acevedo.

Robert I. Kalina, New York City, for Mark Dratch.

Marion Seltzer, New York City, for Arthur McGuire.

John Jacobs, New York City, for Daniel Wall.

Roger J. Schwarz, New York City, for Noemi Fernandez.

Barry Asness, New York City, for Rubiel Marin.

Harvey A. Kaminsky, Hartsdale, N.Y., for Ira Neuringer.

John C. McBride, Boston, Mass., for Robert Marrama.

Joseph M. Flak, Boston, Mass., for Richard Sullivan.

Martin Stewart, New York City, for Luz Arteago.

Vincent W. Lanna, Yonkers, N.Y., for Louis Tarantelli.

Michael F. Natola, Boston, Mass., for Doug MacLennan.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

Defendants in this case stand charged, by first superseding indictment filed on March 27, 1986, with having operated a cocaine and marijuana trafficking ring, centered in Westchester County and Manhattan, which distributed narcotics during 1985. Defendant Luz Arteago has heretofore been granted a severance from her co-defendants by order of this Court on May 13, 1986, and nothing contained herein applies to her. Count One of the Indictment charges nineteen defendants—Gary Feola, Edmund Rosner, Noemi Fernandez, Rubiel Marin, Jaime Arango, John Farese, Ira Neuringer, Louis Tarantelli, John Cercena, Stephen Gallo, Arthur Torsone, Daniel Wall, Solomon Gumpricht, George Acevedo, Robert Marrama, Doug MacLennan, Richard Sullivan, Mark Dratch, and Arthur McGuire—with conspiracy to distribute cocaine between January 1, 1985 and November 26, 1985, in violation of 21 U.S.C. § 846 (1982). Count Two charges Feola, Rosner, Torsone, and Dratch with conspiracy to distribute marijuana and possess marijuana with intent to distribute during the same period, again in violation of § 846. Count Three charges Fernandez with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 821 and 841 on November 26, 1985. Counts Four, Five, and Six charge Gallo with the posses-

sion of three separate firearms as a convicted felon, in violation of 18 U.S.C.App. I, § 1202 (1982). Counts Seven through Seventeen seek the forfeiture of several items of real and personal property, including interests in apartments, various automobiles, and cash, all pursuant to 21 U.S.C. § 843 (1982).

These defendants have made numerous pre-trial motions, discussed below, which became fully submitted to the Court for decision on December 23, 1986 with the docketing of a letter to this Court by counsel for Defendant Rosner, seeking its review of a composite tape recording and transcripts for certain wiretap conversations, which materials were prepared in conjunction with the Government and submitted by the Government on December 15, after being requested by Defendant Rosner by letter docketed December 3, 1986. The Court has been receiving submissions continually from the parties since the original motions were filed in June and July of 1986, including the Government's Reply Brief filed on October 14, 1986 and the wiretap logs received from the Government on November 18, 1986. Also received from the Government, in late November and early December of 1986, were sealing orders in connection with the intercepted conversations discussed below, and a letter of certification as to statements made by certain defendants. All of the above materials were, of course, necessary to the Court's determination of the motions herein.

The within motions fall primarily into four broad categories, and this decision seeks, so far as is practicable, to dispose of the motions by category:

1. *Suppression Motions.* The evidence in this case derives largely from eleven eavesdropping orders issued by two justices of the New York Supreme Court between August 14 and November 8, 1985. Those orders will henceforth be referred to as Orders A–K. All defendants contest the propriety of these orders, on as many as fifteen separate grounds, and seek suppression of their fruits.

Defendants were arrested on November 26, 1985. As detailed below, numerous items including drugs and drug paraphernalia were seized at the time. The defendants from whom they were seized seek to suppress this physical evidence.

Three defendants, Tarantelli, Gumpricht, and Cercena, have moved for a pre-trial hearing concerning the voluntariness of their statements.

2. *Severance Motions.* Acevedo, Dratch, Farese, Fernandez, Gallo, MacLennan, Marrama, Neuringer, Sullivan, and Tarantelli move to sever their trials or specific counts in the indictment. In particular, defendants move to sever the weapons counts against Stephen Gallo, and Gallo himself seeks such a severance. Others move to sever the two conspiracy counts, Counts One and Two, which cover different illicit merchandise, from each other.

3. *Evidentiary Motions, Including Discovery.* Defendants including Cercena, MacLennan, Sullivan, Marrama, Dratch, Acevedo, Marin, and Tarantelli have moved for rulings in limine with respect to specific evidentiary issues, such as admissibility of evidence of prior convictions. Combinations of defendants seek discovery on a broad front.

4. *Miscellaneous Motions.* Other significant motions are discussed below as a miscellany.

### FACTS

This necessarily abbreviated statement of facts, assumed to be true for purposes of this decision only, is drawn primarily from the various affidavits of Detective Robert Magaletti in support of Orders A–K. The account of events after Magaletti's last affidavit is drawn from the Government's brief.

The 1985 investigation that led to this indictment was not the principal defendants' first encounter with our criminal justice system. A 1978 joint investigation by the Drug Enforcement Administration and the New York City Police Department led to John Farese's conviction, and imprison-

ment, for selling cocaine. Farese implicated Gary Feola as a "partner" who could acquire cocaine and heroin. Feola was arrested in the course of a 1981 investigation of John Cercena, a search of whose home yielded cocaine and marijuana. Feola was convicted of conspiracy in the fourth degree in connection with an attempted sale of three kilograms of cocaine in 1982, and imprisoned.

ORDER A

The initial steps of the 1985 investigation, from Detective Magaletti's account, involved pen register surveillance, and information gained from named and unnamed confidential informants. Pen register surveillance of Farese's telephone in April-May and June-August revealed that thirty percent of outgoing calls were to telephones listed to individuals with known criminal records, or persons who were believed to be dealing in narcotics, including 64 calls to Cercena's phone and 47 to Feola's.

*The Named Informants.*

Detective Magaletti refers to two named informants in his first application. In a September 1982 prison interrogation, Dominic Carbone, a target of the 1981 Cercena investigation, implicated Feola, Farese, Cercena, and others in a drug trafficking ring for which Carbone said that he acted as "enforcer." Vincent James Tarantelli, brother of defendant Louis Tarantelli, was arrested for selling cocaine in February 1984: soon after his arrest, he told Detective Magaletti that he had received the cocaine from one John Colletti, who had told him that he had received it from Feola.

*The Confidential Informants*

Possibly the single most important component of Magaletti's first application is the information he received from his so-called Confidential Informant 1, or "CI # 1." CI # 1 claimed to have lived in Farese's house "for several years between 1977 and 1984" and to have gained personal knowledge of the workings of the organization by working as a "mule," a courier of drugs between Florida and Westchester County, New York. According to CI # 1,

Farese, Feola, or Cercena would negotiate a cocaine purchase from New York, then travel to Florida to pay the supplier, and return, leaving it to CI # 1 to transport the cocaine back to Westchester, where it would be distributed to trusted local dealers. Neither Feola, Farese, nor Cercena ever personally handled the cocaine in transit. Detective Magaletti claims that CI # 1's account is corroborated by the transaction for which Feola was arrested in 1981, for which Cercena acted as "mule." He goes on to cite two other transactions involving CI # 1. In March 1984 investigators took CI # 1 up on his claim that he could succeed in a controlled buy of cocaine from Farese. CI # 1 returned with marijuana, claiming that if he had bought cocaine Farese would have been arrested immediately by the New York police, would have realized that CI # 1 had set him up, and would have had CI # 1 killed. Finally, in August 1985 CI # 1 informed authorities that he had been ordered to go to Fort Lauderdale for one week in the usual manner for making a cocaine pick-up. A check of his airplane and hotel reservations confirmed his story at least in part. On this basis, Detective Magaletti represented that CI # 1 was a reliable informant.

CI # 2 told the investigators of a 1984 conversation in which John Farese offered him a job as an "enforcer," or debt collector, showing him a list of names, from which he remembered one "Nancy." Detective Magaletti believed this person to be Nancy Mazza, who was believed to have lived at Farese's home and owed him $9,000 for cocaine. Although Ms. Mazza is not a defendant in this case, Detective Magaletti believed and represented that the conversation, along with pen register records of 64 calls between the Farese and Mazza telephones in 1985, offers reason to believe that Farese was dealing in cocaine with Mazza.

CI # 3, finally, claimed to have been approached by Ernest Iarussi, an associate of Farese, to help Farese distribute a shipment of 600 pounds of marijuana received in June 1985. CI # 3 also reported having

seen two kilograms of cocaine in Farese's "boathouse" during 1985.

All these facts presented by Detective Magaletti persuaded Justice Dachenhausen that there was probable cause to justify tapping John Farese's telephone. The order (Order A) issued on August 14, 1985. One of the conversations intercepted under Order A actually occurred in Farese's apartment while the phone was off the hook because someone was trying to call defendant McGuire. In this August 25th conversation, the unidentified caller (whom Detective Magaletti later tentatively identified as Daniel Wall) discussed the financial implications of Feola's imminent return from Europe. Detective Magaletti believed that when Feola called Farese from Europe on July 19th, Farese asked Feola to supply him with drugs (complaining that he was "dry") and that Feola agreed to do so, on Farese's assurance that he was "covered" (that is, in Magaletti's opinion, that Farese could come up with the money). Against a background of calls in which Farese had been trying to collect money from various individuals, Detective Magaletti took the August 25th conversation to show that the reason Farese was trying to collect money was to have it available to pay for the drugs he had arranged to get from Feola upon Feola's return.

### ORDER B

Order B, issued on August 26, 1985, amended Order A *nunc pro tunc* to authorize the interception of a communication occurring within the premises of John Farese's apartment, which was overheard and intercepted while the telephone had been taken off the hook to make an outgoing call. It is discussed in greater detail below.

### ORDER C

Order C, on Feola's telephone, was issued on September 5th. Feola had just returned from Europe from whence he called Farese on August 19th and September 2nd. The latter conversation, lasting twenty minutes, involved discussions of business associates, including "Danny," and at least two coded references to drugs

for personal consumption ("babana," or heroin, and "wacky weed"). Magaletti also reports that CI # 1 indeed went to Florida (*supra*, p. 1081), but returned empty-handed because Feola's agents were unable to complete the transaction. CI # 1 also said that Feola had ordered him to go to Florida in mid-September and to call him for further instructions on September 5th.

### ORDER D

This Order, issued on September 12th, was a thirty-day extension of the tap on Farese's phone. By this time, the investigative net had been cast wide. Conversations between Farese and non-defendants Kevin Lubic and Glenn Wagner, whom Detective Magaletti alleges were distributors for Farese, first implicated Mark Dratch. Dratch was secretive in his telephone discourse, expressing anger at Lubic's attempts to call him directly, and asking Farese to return a call without telling him the area code. Conversations between Farese and Wagner contain allegedly coded references to "the one thing you wanted to sell" or "presents." Detective Magaletti was able to identify the person who tried to call Arthur McGuire on August 25th as Daniel Wall by comparing that conversation to a known interception of Wall. Several conversations were intercepted in which Farese ordered Louis Tarantelli to come to his house immediately with "greenies," which Detective Magaletti interprets, reasonably, to mean money. Finally, physical surveillance disclosed meetings between Farese, Feola, and Wall, between Feola, Wall, Dratch, and McGuire, and between Feola and, among others, Cercena and Gumpricht.

### ORDER E

Order E issued on September 24th for a wiretap on Arthur McGuire's telephone. McGuire, a nephew of Feola, had shown up early, with his telephone the recipient of seven calls in the pen register surveillance of John Farese's telephone. Subsequent pen register surveillance of McGuire's phone revealed 69 calls to Daniel Wall between June 1985 and September 23, 1985, and a total of 168 calls to the Boston de-

fendant(s) "Bo" or "Doug" (see *infra*), as well as 23 calls to Ira Neuringer—who, according to an informant, had been selling him small quantities of cocaine since February on a regular basis. McGuire had also been intercepted over Feola's phone.

On September 9th, Feola angrily accused McGuire of not returning calls, not paying money he owed, ("fifteen," which Detective Magaletti interprets to mean $15,000), and not doing what he was supposed to. Feola also demanded that McGuire get in touch with his "fat friend," following up this call with a visit, within the hour, accompanied by Wall.

That afternoon, McGuire made numerous calls to Massachusetts and apparently tried to fly there: that evening he called Feola to say that he couldn't make the trip.

By September 11th he had made the trip, arriving at Feola's in time to be present during a call from "Doug" in Boston, in which Feola said he wanted to settle matters about the "car" or "corvette," but refused to go into detail on his private phone—furtive behavior that leads Detective Magaletti to infer the "car" and "corvette" are code words for cocaine here. That afternoon, one "Bo," whom Detective Magaletti identifies with "Doug," called McGuire at Feola's to say he was coming to New York [from Boston] on a 5:30 flight. When Bo did not arrive promptly, McGuire called several Massachusetts numbers, remarking to one that he was in a "heck of a lot of trouble." Detective Magaletti concluded from all this that Feola had fronted cocaine to Bo through McGuire and that when Bo failed to pay, Feola put pressure on McGuire.

Meanwhile, electronic surveillance of the other alleged conspirators yielded further results. On his return to New York, Feola discussed money owed him by one "Steve" and arranged a meeting between one "Vinny" and "Yvonne" in which Vinny asked for something other than money. The next day, Wall talked to an unidentified man about selling 15 or 20 "tickets" (quantities of cocaine, in Detective Magaletti's opinion): the following day Feola asked Wall to bring over the "green" so he could "check it out." Also on September 9th, Gumpricht said that he was on his way to New York to visit Feola and discussed money Gumpricht owed to an "Uncle Bill." Gumpricht arrived in New York around 11:45 that evening.

Physical surveillance that day revealed meetings between Feola, Wall, Dratch, Ralph Feola, Sr., and Farese. These meetings were followed by an angry telephone conversation on September 11th between Wall and Feola involving a dispute about money with Feola Sr. shouting in the background. Physical surveillance revealed a visit to Feola's apartment house on September 9th by two unidentified men driving a car registered to Stephen Gallo's brother: one of the men dropped off a small brown package, which Magaletti believed to be money. Finally, Edmund Rosner called Feola to say that he had to meet "Uncle" the next day: the next evening Rosner called Wall and asked for "two."

On September 12, 1985, Gumpricht called Feola to tell him that unidentified "Robert" had been arrested in Miami. Feola called Rosner several times; they and Dratch agreed to meet at Feola's at 4 P.M. McGuire, Gumpricht, and one "William" were also said to be on their way to this meeting. McGuire and a male Hispanic recognized that they were being "tailed": they called Feola and insisted that he call them back from a public phone.

On September 12, 1985, after this week of frenetic telephone calls and meetings, Feola returned to Europe.

ORDER F

Order F, issued on October 3, 1985, amended and extended the wiretap on Feola's phone and authorized the use of bugging devices in Feola's apartment. Because of technical difficulties, the bugging devices were never installed. The amendment added Wall, Gumpricht, George "LNU," Rosner, Dratch, McGuire and "Bo" a/k/a "Doug" as interceptible parties. On October 3rd, Feola had not yet returned from Europe. Detective Magaletti's affida-

vit recapitulates the events described in his September 12 affidavit, concluding that there is probable cause to believe that Feola will, upon his return, continue to use his telephone and apartment to carry on illegal activities. Only further electronic surveillance, Detective Magaletti affirms, can determine the precise scope of those activities and the meaning of mysterious key matters such as the identity of "uncle" and the identity of the arrested "Robert."

ORDER G

Order G, issued on October 4, 1985, renewed the wiretap on Farese's telephone, added Ralph Feola Sr., Anthony Napolisso and Joseph Cordano as interceptible parties, and authorized internal electronic surveillance of Farese's apartment. The basis for adding these parties is discussed below.

After the September 11th series of meetings which Detective Magaletti interpreted as involving disputes over money, and which left Ralph Feola Sr. unsatisfied, Feola Sr. and Farese spoke several times. On September 12, Feola Sr. called to advise Farese to be careful in light of recent drug arrests, which he referred to in code as "AIDS." On October 1st, Farese called Feola Sr., expressing serious fear that he would be arrested while "sitting on a prince's estate" with "green walls." Feola Sr. advised him to bring over his "green clothes," which Detective Magaletti interpreted to mean a substantial sum of money, which Farese did not wish to possess in the event of his arrest.

Napolisso, an associate of Farese, served as a so-called "house sitter" for him in his apartment in Mahopac, while Farese took a short vacation in late September. On September 22, 1985, Napolisso took a call from one "Sal" who expressed intense concern about the activities of a "rat," "somebody with a big mouth" who was "very very close" to Napolisso and Farese. Detective Magaletti concluded, and advised the Court, that Napolisso is a "trusted associate" of Farese, whose role needs further exploration.

A series of intercepted conversations indicate that Cordano was involved in obtaining genuine Quaaludes for Farese, something that can only be done overseas now that methaqualone is no longer manufactured in the United States.

Detective Magaletti also noted that Farese remained in contact with Tarantelli, Dratch, and Feola, and recited incidents at Farese's apartment that make it probable that he would use the apartment for illegal activity.

ORDER H

Order H, issued October 31, 1985, renews the wiretap authorization for Feola and adds Neuringer and "Allen a/k/a/ Art [Torsone]" as interceptible parties. Detective Magaletti's affidavit in support of Order H recites the results of surveillance of the defendants between October 6th and October 23rd in great detail. This decision next recounts the most significant results.

On October 6, 1985, Feola returned to New York from Europe. That evening, among other things, he had what Magaletti calls a guarded conversation with Rosner about the arrest of "Robert" in Miami in September, in which Rosner refers to "the guy seeing your uncle tomorrow morning." The next morning, at 7:30 A.M., Feola called Rosner, who said that he was just about to call "Uncle." Feola expressed a desire to meet "Uncle," whom Rosner said was going to see "the tall guy" upstate. (Detective Magaletti interprets this as a reference to Dratch, who is six feet, four inches tall.) That afternoon Rosner and Feola lunched and were later observed meeting with McGuire and one Joseph Kasak. Later Wall called Feola from Massachusetts. Feola said that he was sending McGuire to "drive the car" to Massachusetts, that Wall should make sure McGuire "drove it back" and took care of the problem with "Bo," and that he, Feola, had to see his "uncle."

On October 10th, John Cercena called one "Chris," who asked him whether he had any of the "cookies" they had gotten the previous night. The conversation is significant because Cercena in his motion papers admits Detective Magaletti's con-

tention that "cookies" is code for "Quaaludes." This argument is made by Cercena in the course of claiming that his possession of Quaaludes was not a serious offense because they were for his personal consumption. Affirmation of D. Porco, Esq. at 4 n. *.

On October 11th, among other things, Feola had a conversation with one "Jimmy" at Ira Neuringer's, which Detective Magaletti interprets as involving a shipment of marijuana.

The next significant activity occurred on October 14th. That day, "Art" called Feola, apparently from a pay phone, and engaged in a lengthy discussion of the choice among three or four "golf courses" on which to schedule a "tournament" with some "very professional" golfers, the first indication in this record that Feola has any involvement in sports organizational activities. Later that morning Feola spoke to Farese, who said he had "15" for "the shirt"—a reference, according to Detective Magaletti, to $15,000 for a pound of cocaine. Later that evening Feola solicited an "oriental job" ("nothing serious, just for myself," which Detective Magaletti takes to mean marijuana or hashish for personal consumption) from "Art" and a "doob" (a common code word for marijuana, according to Magaletti) from Neuringer.

The next evening, October 15th, Rosner spoke to "Allen," that is, Arthur Torsone, from Feola's, about how he had waited long enough for someone, presumably Feola, to show up, and was going home. This is the "shapes/tapes" conversation Rosner stresses so heavily in his brief to cast doubt on the Government's case, and is discussed in some detail below.

The morning of October 16th saw a flurry of activity, with meetings arranged between Cercena and Wall at 288 Lexington Avenue, and between Rosner, Allen, Feola, and an unidentified man at a Japanese restaurant in the vicinity of 73rd Street and Columbus Avenue. In arranging the meeting, Allen asked Feola to bring "a sample of that wallpaper," which Detective Magaletti interpreted to mean money. Rosner's

charge that the prosecutor's failure to inform the grand jury that physical surveillance in the vicinity of the restaurant revealed no money is discussed below.

The following evening, Farese called Feola, apparently from a pay telephone. He was angry, insisting that Feola "cancel the shirts" and give his money back. A telephone call and meeting between Farese and Wall later that evening apparently patched up what Detective Magaletti interprets as a near botch of Farese's $15,000 cocaine deal.

Most of the remaining conversations in the Order H affidavit are cumulative for purposes of this opinion. Thus, for example, on October 18th Rosner inquires of Feola about the mysterious "Uncle". So too, on October 20th Rosner calls Feola to tell him that a friend wants to see his "property," which "Bo" characterized as "swampland" on October 23rd. Detective Magaletti took this to be Bo's disparagement of the "property," that is, marijuana, and the failure of physical surveillance to reveal marijuana at Rosner's lunch with Feola the next day draws another charge of prosecutorial misconduct. Physical surveillance did, however, reveal a significant remark. The third member and organizer of the lunch party, one "Bobby," asked Feola "Why not do 'it' by car?," and Feola responded that he didn't want to, mentioning "the guy" in Florida and that "the other time that's what happened there too." Though Detective Magaletti does not draw the conclusion, one can interpret this as an allusion to the Florida drug run that resulted in Feola's 1981 arrest, permitting an inference that Feola is discussing another drug run.

ORDERS I–K

Orders I and J issued on November 4, 1985. Order I authorized wiretapping and internal surveillance on the telephone and apartment of one "R. Smith" at 288 Lexington Avenue, Apartment 11F, New York City. Detective Magaletti early speculated that "R. Smith" was in fact Daniel Wall, and considerable wiretap evidence, recapitulated in Magaletti's affidavit in support

of Order I, indicated that the apartment on Lexington Avenue was a focal point for dealings among the defendants. Order J authorized the wiretap on Rosner's phone. Detective Magaletti's affidavit introduces no new conversations involving Rosner after October 24th, instead recapitulating the significant involvement of Rosner in intercepted conversations described in the Order H affidavit. (Indeed, Magaletti says in Order H that one reason he has submitted the affidavit is in anticipation of an application of a tap on Rosner's phone.) Finally, Order K, issued on November 8, 1985, extended the Farese wiretap and electronic surveillance authorization, reporting no conversations involving new parties.

### Events After the Orders

No eavesdropping orders were applied for after November 5th, but events proceeded. The account of the defendants' November activities is drawn from complaints sworn by Detective Magaletti against Feola and eight others on November 21st, and against Dratch and Fernandez on November 22nd.

On November 5th, Feola had two significant contacts with other defendants. He called Steven Gallo to collect money from him. Gallo did not have the money because he had "four given out" and "eleven at his mother's," in Detective Magaletti's opinion referring to quantities of cocaine he had sold or failed to sell. Feola threatened to "make a scene" when Gallo offered to give back the eleven, if Gallo continued to talk on "this" phone about such matters. Later that evening Acevedo called from Florida to say he had spoken to his "sister"—one of the more common code words for cocaine. Feola said that she was getting too expensive and had to "come around in a lot of [other] areas"—complaining, Magaletti says, about both the quality and price of the cocaine.

On November 6th, Fernandez called Wall at Feola's, saying that she had "spent" only "thirty-five" of the "forty-eight': on November 8th she told Feola that she had "five" left. Magaletti believed that these referred to quantities of cocaine she had

sold: Feola expressed no interest in the remaining "five." That afternoon, Rosner called: Feola told him that he, Feola, had to see "Uncle" now. About fifteen minutes later, Acevedo called from Florida to report that everything was negotiable as to his sister: Feola told him to come up right away. That evening, Feola, Dratch, and an unidentified man met at P.J. Clarke's Restaurant in Manhattan. Feola later spoke to Neuringer on the street in front of the restaurant.

Acevedo had returned to New York by November 11th, when Feola called him at 288 Lexington Avenue to learn that he had spoken to his "sister." That evening, Gallo called Feola, who expressed anger about Gallo's "big mouth" the other day. The next morning Fernandez called Feola, asking whether his "friend" had come in (the answer was "No") and saying she had a friend who wanted to go to a party and bring "two girlfriends": Magaletti interpreted this to mean that she had sold her last consignment and was looking for another. That evening, Acevedo spoke to "Jimmy," expressing worry about losing "these people," that is, as potential customers.

The next day, November 13th, Acevedo arranged a meeting between Feola and Jimmy: a Hispanic-looking man was seen leaving Feola's building that afternoon. When Fernandez called on November 14th, Feola told her in substance that she was too late.

November 15th was apparently taken up with matters of finance. Dratch called Feola to tell him that he had seen "Uncle" and had gotten Feola's "three" ($300,000 according to Magaletti); Feola expressed relief that he wouldn't have to visit "Uncle" himself. Later, Jimmy spoke to Acevedo at Feola's, apparently negotiating the price at which to offer a quantity of cocaine to Feola.

On the morning of November 18th, Fernandez called Feola again to ask whether his "friends" had arrived and to say she knew a lady who needed a date. Feola invited her to come around and talk. De-

tective Magaletti takes this to mean that Feola is ready to discuss a consignment of cocaine from the new shipment arranged by Jimmy and Acevedo. In the early afternoon, Acevedo called Feola to complain that "your numbers weren't right": Feola responded that "the phone numbers I gave you were exactly right," trying to cover up a reference to the money involved in the cocaine deal, according to Magaletti.

On November 19th, Feola and Rosner have what this decision will later discuss as the "six broads" conversation. Rosner then immediately called "Art" (Torsone) to ask when he wanted to start "auditioning" these six "figures." Art replied that he might read one of their resumes the next Thursday afternoon. Magaletti takes this to mean that the transaction with Jimmy is complete and Feola is ready to sell to Torsone after an "audition," or sampling, some of the six quantities of cocaine (the "six broads").

That afternoon Jimmy called Acevedo at 288 Lexington Avenue to say he had had the "girls" ready since Saturday, and to suggest that he come over the next morning.

Finally, that night Wall called Acevedo to ask where were the keys Acevedo had picked up on 45th Street. Feola got on with Acevedo to say that they were under the sweaters. Detective Magaletti detected an attempt to cover up this reference to keys, or kilograms, one of the best-known of all drug code terms.

On November 21st, Rosner called Torsone at about 8:00 A.M. to arrange their meeting. At about 9:30, Torsone called back to say he had to cancel because of "car trouble" unless there was an "emergency." Rosner advised Feola of the cancellation at about 10:30.

All of the wiretapping operations not otherwise terminated earlier ended on November 26, 1985.

The wiretaps on the Farese, Feola, McGuire, Rosner and Smith telephones, and the surveillances of the defendants conducted therewith over the course of the investigation, suggested to the government investigators that Gary Feola acquired cocaine and other controlled substances and marijuana from several sources, drugs which were then distributed by other members of his organization in Northern Westchester, Putnam and New York Counties, as well as Massachusetts, Long Island, Connecticut, New Jersey and Maryland.

*Search Warrants*

On November 21, 1985, Justice Dachenhausen of the New York Supreme Court, Westchester County, issued search warrants for fifteen residences, and for the persons of certain of their occupants, in New York, Westchester and Putnam Counties and on November 22, 1985, Judge Harold A. Ackerman, United States District Judge for the District of New Jersey, issued a search warrant for the residence of Noemi Fernandez. The searches, most or all of which were executed on or about November 21, 1985, uncovered drugs and/or drug paraphernalia at every search location, as well as cash, large quantities of narcotics diluents and explicit narcotics records.

Seized from Noemi Fernandez' apartment at 113 River Road, Apartment C2, Nutley, New Jersey, were nearly two kilograms of high purity cocaine, 48.2 grams of marijuana, $82,730 in United States currency, a considerable collection of expensive narcotics paraphernalia, and an extensive collection of jewelry and furs.

Uncovered from the search of Gary Feola's apartment at 300 East 54th Street in New York City in this District, were $35,000 in United States currency, approximately 4.3 grams of cocaine, cocaine diluents, and narcotics paraphernalia. Extensive, explicit drug records containing clear references to narcotics trafficking and detailing narcotics sales by Feola to several of the defendants were also found.

The search of the residence of Steven and Michael Gallo at 1616 4th Street, Brooklyn, revealed large quantities of common diluents for cocaine, a cocaine grinder with 99.6 grams of cocaine, numerous safe deposit box keys, a telephone beeper of the

sort now affected in the narcotics trade, and ammunition. The search of Steven Gallo's residence at 96 Grandview Drive, Shirley, Long Island, revealed the three firearms mentioned in the indictment, as well as narcotics paraphernalia, including a triple beam balance scale, and marijuana.

The search warrant executed at the residence of Edmund Rosner, Apt. 37L, 80 North Moore Street, in New York City in this District, uncovered $119,002 in United States currency in a bureau drawer, a $20 bill containing 400 mg. of cocaine and a $1 bill containing 90 mg. of cocaine. Cocaine paraphernalia, including a razor blade and a mirror, were also found.

At the time of his arrest at LaGuardia Airport in Queens, on December 5, 1985, Daniel Wall had in his possession $74,920 in United States currency and $1 bill containing 25 grams of cocaine. A search of his apartment at 288 Lexington Avenue, Apartment 11F, in New York City in this District, revealed various drug utensils and paraphernalia, including two triple beam balance scales, a Deering mixer, a strainer, quantities of cocaine diluents and explicit drug records, some of which were in Gary Feola's handwriting.

At the residence of Ralph Feola, Sr., 4 Stebbins Road, Carmel, Putnam County, New York, $2,395.00 in United States currency, and a notebook in Gary Feola's handwriting detailing narcotics sales and loansharking activity over a several year period were seized. A safe deposit box key issued by an as yet unidentified bank was found taped under the kitchen sink.

At Ira Neuringer's residence at 1841 Central Park Avenue, Yonkers, Westchester County, New York, agents retrieved a total of 2,724.89 grams of marijuana, 90.26 grams of cocaine, and .05 grams of heroin. Processing equipment, as well as numerous articles of drug paraphernalia, including a strainer with residue, a cocaine grinder with residue, a razor and mirror for cocaine use, numerous bongs, pipes and cigarette papers for marijuana use, and a spoon with residue were also found.

Seized from John Cercena's residence at Route 22, Croton Falls, Westchester County, New York, were a quantity of marijuana, a triple beam balance scale, a .22 caliber Remington firearm and a 12 gauge Remington shotgun.

The search of the home of Arthur McGuire on December 5, 1985 at 1155 Warburton Avenue, Yonkers, Westchester County, New York, uncovered marijuana, cocaine, and mannitol, a common diluent. Various cutting tools with cocaine residue and a strainer with such residue were also found.

Items seized from John Farese's residence at 141 East Lake Blvd., Apartment G2, Mahopac, Putnam County, New York, included 306 grams of marijuana and a page of narcotics records.

Various items were also seized from a search of the residence of Louis Tarantelli, at 3319 Stoney Street, First Floor Apartment, Shrub Oak, Westchester County, New York.

In November 1985, in conjunction with the searches conducted in this case, the Government executed arrest warrants for the principal defendants named in the indictment charging conspiracy to distribute cocaine and marijuana.

## I. MOTION TO JOIN ALL MOTIONS

◼ Defendants Cercena, Farese, Neuringer, MacLennan, McGuire, Sullivan, Marrama, Dratch, Wall, Gumpricht, Acevedo, Marin, Feola, Torsone, and Fernandez make motions to join in any and all pretrial and trial motions and requests for relief filed by any co-defendant and to adopt the legal contentions incorporated therein, to the extent such motions are applicable to, and not inconsistent with the additional motions of, each defendant so moving. Defendant Marrama exempts from his request to join, any motions for continuance or waivers of speedy trial.

This motion of the above defendants is hereby granted in the interests of judicial economy and justice, to allow defendants to raise every feasible motion on their behalf,

and there being no opposition to this motion by the Government. The following motions will be considered to be joined by each of these defendants if applicable to that defendant, except where therein noted by the Court.

## II. MOTIONS TO SUPPRESS WIRETAPS

*Probable Cause*

Virtually all defendants move to suppress the fruits of eavesdropping in this case, asserting that the various eavesdropping orders were issued without probable cause. The issue is most hotly contested with respect to the first such order, issued August 14, 1985, for the wiretap on John Farese's telephone. Because information obtained through the Farese order, as the Government does not dispute, is the principal basis for the showing of probable cause for all the subsequent orders, if it must be suppressed all the others must also be, as fruits of the so-called poisonous tree. Conversely, absent further specific allegations of illegality such as Rosner makes with respect to the tap on his phone, if this Court upholds the Farese order none of the others, or their fruits, are to be suppressed. *United States v. Hall,* 724 F.2d 1055, 1060 (2d Cir.1983) (Friendly, J.).

■■■ The standard for probable cause in a wiretap case is the same as that for a search warrant. *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). Under that standard, probable cause exists when the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense is being committed, has been committed, or is about to be committed. *United States v. Harvey,* 560 F.Supp. 1040, 1051 (S.D.Fla.1982), *aff'd sub nom. United States v. Van Horn,* 789 F.2d 1492 (11th Cir.1986). Probable cause is a "practical, non-technical conception." *Illinois v.*

*Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). "[P]robable cause ... as the very name implies, [deals] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). The affidavit must be read as a whole and in light of common sense, taking into account the totality of the circumstances: "In issuing the order the judge must exercise his own judgment, gleaned from a common-sense reading of the entire affidavit, as to whether the facts alleged constitute probable cause." *Harvey,* 560 F.Supp. at 1051. *See Gates,* 462 U.S. at 230–32, 103 S.Ct. at 2328–29.

Defendants maintain that there was no present probable cause for the issuance of Order A for three reasons: (1) the result of pen register surveillance of Farese's phone is insufficient in itself to create probable cause; (2) information provided by the named informants in Detective Magaletti's affidavit, Dominic Carbone and Vincent James Tarantelli, was stale; (3) the concededly fresh information provided by CI #1 was not buttressed by sufficient assurances of his reliability, credibility, and veracity. In this connection defendants argue that the *Aguilar-Spinelli* "two-pronged test" for informant reliability, developed by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), applies here rather than the "totality of the circumstances" test enunciated in *Gates. See generally* Rosner Memorandum of Law at 18–60.

*Pen Register Surveillance*

A pen register is a mechanical device that records telephone numbers of outgoing calls dialed on the line to which it is attached. *See Application of United States in the Matter of an Order Autho-*

*rizing the Use of a Pen Register,* 538 F.2d 956, 957 (2d Cir.1976), *rev'd sub nom. United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). It does not monitor the contents of a call. *Id.* Neither does it identify who is using the phone. Thus, "pen register surveillance shows only that a conversation may have occurred over two [identified] telephones." Rosner Memorandum of Law 57. In consequence, Rosner contends, pen register surveillance standing alone is insufficient for probable cause. Even the fact that about a third of outgoing calls over Farese's telephone were to persons with past criminal records or presently suspected of dealing in illegal drugs is claimed not to show that the instrument was used for illegal activity, because it does not show who the conversationalists were or what was discussed. *Id.* at 57–58.

■ Rosner's contention is arguably correct, although the sheer volume of calls made between a large group of ex-convicts and known narcotics dealers, standing alone, may give rise to an adverse inference. Nonetheless, pen register data can form an important part of a probable cause determination from an affidavit given a practical, common-sense reading as a whole. *See, e.g., United States v. Todisco,* 667 F.2d 255, 258 (2d Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982) (pen register and other contacts "subject to an innocent interpretation when viewed in isolation" supported probable cause finding when set in context). Thus, Rosner's argument only requires that this Court give the pen register data its proper weight, not that it ignore such information altogether.

*Staleness*

Defendants, most notably Rosner, contend that one reason there was no present probable cause for the issuance of Order A is that the information provided by all of Magaletti's informants except CI # 1 was stale. *See Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), and Rosner Memorandum of Law at 21 (re-

counting time lapse between informers' reports of defendants' drug-related activities and issuance of Farese wiretap warrant). *Sgro* did indeed hold that "the proof must be of facts so closely related to the time of issue of the warrant as to justify a finding of probable cause at that time." 287 U.S. at 210, 53 S.Ct. at 140. The *Sgro* Court continued, however, by observing that "[w]hether the proof meets this test must be determined by the circumstances of each case." *Id.* at 210–11, 53 S.Ct. at 140. In this light, the federal courts have refused to impose a "mechanical count of days" in determining staleness. *United States v. Hyde,* 574 F.2d 856 (5th Cir.1978). "[T]he vitality of probable cause cannot be quantified simply by counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit." *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972), quoted in *United States v. DePalma,* 461 F.Supp. 800, 809 (S.D.N.Y.1978) (Sweet, J.). Instead, the courts have regarded "[t]he currency and specificity of the information forming the basis for the issuance of a search warrant [as] just two of a variety of factors which must be weighed in determining whether or not there is probable cause in the individual case." *United States v. McGrath,* 622 F.2d 36, 41–42 (2d Cir.1980). "Also relevant are the reliability of the sources of information, the nature of the alleged illegal activity, the duration of that activity in the location in question, and the nature of the evidence being sought." *Id.* at 42. The significant nature and greater duration of the illegal activity may lead courts to minimize the importance of the passage of time. "When the affidavit describes a continuing course of illegal conduct, the passage of time between the last described act and the application for the warrant becomes less significant." *United States v. Payden,* 613 F.Supp. 800, 814 n. 10 (S.D.N.Y.1985) (Edelstein, J.), *aff'd* 768 F.2d 487 (2d Cir.1985).

Narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness. *See, e.g.,*

*Hyde, supra; DePalma, supra.* Indeed, if a criminal enterprise is appropriately extended, information can remain fresh for probable cause purposes for years. *See, e.g., United States v. Castellano,* 610 F.Supp. 1359, 1437 (S.D.N.Y.1985) (Sofaer, J.) (holding that information about prostitution carried at a hotel as long as eight years before the hotel's forfeiture was fresh for purposes of that forfeiture). And as the *Hyde* court observed, wiretap information has an even longer shelf life in a continuing course of criminal conduct:

> The upshot of this rule in practical application has been to allow fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity. This result is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought. 574 F.2d at 865.

■ Against this background of law we can measure Rosner's claim of staleness:

> Without C.I. # 1's late summer 1985 reports, the information provided by other informants was unconstitutionally stale. Informant Dominic Carbone relayed his facts to the government in 1982—almost four years before the 8/14/85 Farese Order was sought (and the information itself was undoubtedly more stale); informant Vincent James Tarantelli relayed his information in February 1984—eighteen months before the 8/14/85 Farese Order was sought; informant John Hayes relayed his information in October 1983—almost three years before the 8/14/85 Farese Order was sought; C.I. # 2 relayed his information in July 1985, but the events about which he spoke had occurred in the Summer 1984—a full year before the 8/14/85 Farese Order was sought; and finally, C.I. # 3 reported his information in early June 1985—two and a half months before the 8/14/85/ Farese Order was sought,

Rosner Memorandum of Law at 21–22. To be sure, these intervals occupy a longer time than is typical of wiretap operation. They are, however, well within the limits of tolerance for an alleged ongoing conspiracy. Indeed, they are reasonably congruent with the facts in *Hyde* (let alone with *Castellano*):

> Here, the affidavit alleged a conspiracy that had continued for at least two years. It included information considerably less than two months old as well as the most recent telephone records available. It was permissible for the justice to infer that if criminal conversations had been occurring over this telephone line over the past two years, they had not mysteriously stopped within the past month. 574 F.2d at 865.

Here too, it is important to remember that the Government is alleging a criminal conspiracy of extended magnitude. The Government's theory is not that defendants have only recently begun dealing in illegal drugs: it is that they have been doing so, on a systematic and ongoing basis, as continuous as their various incarcerations permit, since the late 1970s. Viewing each transaction between defendants, as well as the informants' transactions with the police, in isolation, one might conclude that some of the informants' data was stale, not simply because they were old but because they were not part of a pattern of ongoing criminal conduct. Viewing the evidence as a whole, however, the Court can reasonably discern the outlines of a single continuing course of criminal activity, extending well over six years. Information about any aspect of these ongoing activities is unlikely to be stale no matter how old.

### Informant Reliability

■ Rosner and Dratch contend that a federal court should apply New York state probable cause standards to these challenged wiretap orders because they were sought by New York law enforcement officers acting pursuant to New York law, and issued by New York courts. Rosner and Dratch further argue that the New York probable cause standard is now more stringent than the corresponding federal standard, so that this Court should suppress

the electronic surveillance evidence in this case, although it could find that there was probable cause for the orders under federal standards.

Defendants rely primarily on *United States v. Vasquez,* 605 F.2d 1269, 1276–77 (2d Cir.), *cert. denied* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) and *United States v. Sotomayor,* 592 F.2d 1219 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979), each decided before *Gates. Sotomayor,* the leading case in our Court of Appeals on federal court admissibility of state-authorized electronic surveillance, involved transcripts of wiretaps authorized by New York courts that were sealed one day after the expiration of the last extension order, consistently with 18 U.S.C. § 2518(8)(a) (1982) but inconsistently with N.Y. Crim.Proc.L. § 700.50(2) (McKinney 1984) (requiring sealing at expiration of each order or extension). Noting an "impressive line of authority," 592 F.2d at 1223, for the application of federal standards for the admissibility of evidence in a federal trial, the court nonetheless discerned in its own precedents some tendency to apply, in such situations, state wiretap authorization procedures stricter than the federal ones. The *Sotomayor* court announced a distinction between "those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character," and announced that it would apply the former but not the latter. 592 F.2d at 1225. In *Sotomayor,* however, the court found the sealing rule *procedural* and declined to suppress the wiretap: the alleged deference to privacy-regarding state rules, on which Rosner's argument depends, is therefore so much dictum.

Most later decisions that mark the distinction, such as *Vasquez* and *United States v. Ragusa,* 586 F.Supp. 1256, 1258 (E.D.N.Y.1984), *aff'd in part, vacated and remanded on other grounds sub nom. United States v. Aiello,* 771 F.2d 621 (2d Cir.1985), have also found the challenges to wiretaps then being considered to be proce-

dural, consequently upholding the wiretaps. Indeed, the only case Rosner is able to cite in which the fruits of electronic surveillance were suppressed in federal court, on facts analyzed in terms of state law, involved the "exhaustion of alternative investigative techniques" requirement, found both in 18 U.S.C. § 2518(1)(c) (1982) and N.Y.Crim.Proc.L. § 700.15 (McKinney 1984), which the Court of Appeals specifically equated for "practical purposes." *United States v. Lilla,* 699 F.2d 99, 102 (2d Cir.1983). Rosner directs our attention to note 3 in *Lilla,* in which the court observes that *if* the New York exhaustion requirement were stricter than the federal one, "*Sotomayor* would suggest that the validity of the wiretap warrant must be measured with reference to state law." *Id.* Though undoubtedly accurate, this suggestion is dictum on its face, repeating dictum.

This Court has discovered cases in other federal courts that appear to regard our Court of Appeals as establishing an exception to the general proposition that "[t]here is no question that federal law governs the admissibility of wiretap recordings in federal court and any 'complaints that the evidence was obtained in violation of state law are of no effect.'" Government's Memorandum of Law in Opposition to Defendants' Motions of June 30, 1986 at 74–75 (quoting *United States v. Butera,* 677 F.2d 1376, 1380 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983)). *See, e.g., United States v. Bascaro,* 742 F.2d 1335, 1347 (11th Cir.), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1984); *United States v. Barker,* 623 F.Supp. 823, 847 (D.Colo.1985). Such cases are incorrect on this point, based on our analysis of *Sotomayor* and, of course, are not controlling upon this Court.

█ However, even if this Court were persuaded that it should apply New York probable cause standards to the electronic surveillance orders in this case, this would avail Rosner only if the New York standards actually were more stringent than

the federal ones. Rosner has not shown that they are.

Rosner asserts that in *People v. Bigelow*, 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985) and *People v. Johnson*, 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985), the New York Court of Appeals declined to follow the Supreme Court's recent attempt to narrow its exclusionary rule jurisprudence, as fashioned in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In particular, he contends, *Johnson* reaffirms the *Aguilar-Spinelli* test in the wake of *Gate's* abandonment of that test. Rosner is simply mistaken. *Johnson* indeed reaffirms the *Aguilar-Spinelli* test, but specifically notes that the case involved *warrantless* searches and seizures. Indeed, the New York Court of Appeals goes as far as it possibly can, without deciding an issue not before it, to harmonize its decision in *Johnson* with *Gates* by noting that *Gates* involved a warrant and emphasizing that the Supreme Court in *Gates* probably placed great weight on this circumstance, trusting to the safeguard of review by a detached and neutral magistrate; by speculating that the Supreme Court might well agree with the analysis in *Johnson* should it ever have the necessity to consider a warrantless search; and by noting its longstanding policy of trying to interpret N.Y. Const. art. I, § 12, the New York constitutional counterpart of the Fourth Amendment, consistently with the Supreme Court's Fourth Amendment decisions.

Thus, since federal crimes are being tried in a federal court, this Court will apply the "totality of the circumstances" test that is now federal law in all probable cause determinations, including those of informant reliability.

*Rosner's Attack on the Informants*

Rosner argues that the named informants Carbone and Tarantelli, were interrogated in prison while facing serious potential charges, and therefore had a motive to lie. He further argues that neither the named nor the confidential informants are clothed in constitutionally sufficient indicia of reliability and credibility, under either *Gates* or *Aguilar-Spinelli*. In particular, Rosner sharply attacks the credibility of both CI # 1 and Detective Magaletti.

■ Rosner's general proposition that statements of the named informants, Carbone and Tarantelli, are entitled to no weight because made under circumstances under which they had a motive to lie, can be quickly disposed of. Detective Magaletti affirmed, and the Government argues, that they are trustworthy as statements against penal interest. To this Rosner responds with a quote from *People v. Johnson*, 66 N.Y.2d 398, 403–04, 497 N.Y.S.2d 618, 622, 488 N.E.2d 439, 443 (1985), according to which such statements "are not guarantees of truthfulness" and should be accepted only when other circumstances point toward reliability. We find this pronouncement of the New York Court of Appeals persuasive. Taken in its equally persuasive context, however, it does not support Rosner:

> Nevertheless, admissions against penal interest have been held sufficient to support a finding of probable cause even though the informant has little to lose and much to gain by supplying information to the police in which he incriminates himself.... They are accepted because the informant's identity is known to the police and they may use his statement admitting criminal conduct against him if his information is false.... The inculpating admissions thus serve the same purpose as a false statement under oath by placing the informant in jeopardy if he attempts to deceive or mislead the police.

*Id.* (Citations omitted).

Rosner's argument against Tarantelli's veracity throws these observations into sharp relief. Rosner suggests that Tarantelli could have avoided prison only by earning probation by assisting in the prosecution of a narcotics-related felony. *See* N.Y. Penal L. § 65.00(1)(b) (McKinney 1975). But this would benefit Tarantelli

only if his information led to a conviction for such a felony, and, presuming regularity in the workings of the criminal justice system, as we are entitled to do, this would require that the information be *true.* In sum, Rosner's "motive to lie" argument has no force in the context here presented. That snitches, or cooperating individuals are viewed somewhat differently when the court instructs the trial jurors how to assess their credibility is of no moment.

In general, Rosner attacks each of the informants on grounds such as the following: their information is not or does not purport to be based on personal knowledge; they have not been proven previously reliable; their reports are not detailed or specific enough to enable a neutral magistrate to conclude that there is probable cause; the police did not try to verify their information. When the affidavit for Order A is read as a whole, in each case these requirements are seen to be unnecessary.

■ As explained above, there was substantial reason for the issuing judges to credit the named informants. Both Carbone and Tarantelli, moreover, claimed personal involvement with the defendants, which can be an important factor in a probable cause determination. *See Gates,* 462 U.S. at 234, 103 S.Ct. at 2330 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the tip to greater weight than might otherwise be the case."). It is true that Detective Magaletti does not give a detailed statement of Carbone's alleged role as "enforcer" for Farese, but he does mention that Carbone was a longstanding friend of John Cercena. Similarly, Tarantelli, though he does not claim to have met Feola, supposedly got the cocaine *in Feola's apartment* and was told that it came from Feola. The fact that Rosner's reply affidavit annexes an affidavit from Louis Tarantelli affirming that he showed his brother the alleged statements and that Vincent denied ever having been in Feola's apartment or ever being told where Colletti

got the cocaine is of no weight in the absence of evidence that Detective Magaletti knew, or recklessly disregarded the possibility, that Vincent's interrogators were lying to him.

On the whole, then, there is reason to accord weight to the statements of the named informants, though perhaps less to Carbone than to Tarantelli.

■ As for CI # 2 and CI # 3, CI # 2 claims to have dealt directly with John Farese, who offered him a job as an "enforcer." The basis of CI # 2's reliability, the link between the name "Nancy" on Farese's list of cocaine debtors and Nancy Mazza, is admittedly circumstantial but not negligible. CI # 3 personally observed cocaine in Farese's "boathouse," and though Detective Magaletti's affidavit concededly can sustain the reading Rosner would put on it—that CI # 3 dealt entirely with Ernest Iarussi in the marijuana deal he describes—the affidavit is unambiguous that CI # 3 was supposed to help distribute the marijuana *for Farese:* the ambiguity Rosner discerns between distributing it for Farese and distributing it for Iarussi is just not there. As to CI # 3's reliability, Detective Magaletti's description of undercover contacts with Iarussi lends corroboration to his account.

Rosner reserves his most ferocious attack for CI # 1. He tries to impeach CI # 1 on four principal grounds: (1) CI # 1 is known, and known to be highly unreliable; (2) CI # 1's "corroboration" of the workings of Feola and Farese during the 1981 investigation was insufficiently detailed and specific to be probative; (3) the controlled buy from Farese, when CI # 1 claimed to be able to purchase cocaine but returned from the event with only a small quantity of marijuana, undermines rather than enhances his credibility; (4) CI # 1 could and should have been tailed on his trip to Florida, allegedly to obtain drugs for Feola.

Most of these arguments are considered in detail at other points in this opinion. As to CI # 1's reliability, it suffices to remark that even if the allegations discussed in the

context of Rosner's motion for a *Franks* hearing are true—specifically, that CI # 1 is in fact Robert Raimondo, an alleged exhibitionist and drug addict—they in no way impeach CI # 1's ability to give reliable information about Farese's alleged drug operations. CI # 1's 1981 account need not have given specific times, places, and shipment weights, as Rosner suggests: it is sufficient that it provide a general picture of the nature of the enterprise. Even if CI # 1's claims or advanced predictions about the controlled buy proved grandiose, a buy nonetheless occurred, providing probable cause for the belief that John Farese was involved in illegal drug transactions. And finally, for purposes of probable cause it was not necessary to follow CI # 1 and observe him trying to consummate a drug pick-up in Florida. Proof beyond a reasonable doubt of CI # 1's illegal activities might have required such measures, but probable cause deals with probabilities only. Checking on CI # 1's hotel and airplane reservations provided more than enough corroboration for probable cause.

For a probable cause inquiry, indeed, the most Rosner's attack on CI # 1 could establish, viewed most favorably to defendants, is that *CI # 1* was engaged in an elaborate setup of Farese and Feola—that CI # 1 faked the controlled buy and visited Florida for a week at his own expense. There is, at least, no implication in Rosner's papers that the police engaged in any such setup. Absent such an implication, however, the worst an observer can conclude, assuming everything Rosner says to be true, is that the police fell in good faith for a bootless and expensive scheme formulated by CI # 1. That is not enough to negate probable cause.

■■■■ Thus, this Court concludes that under the totality of the circumstances there was sufficient evidence of CI # 1's credibility and reliability to sustain a probable cause determination. Combined with the pen register information and the other informants' reports, the Court concludes that there was more than enough informa-

tion in Detective Magaletti's affidavit to justify the issuance of Order A.

### Rosner's Probable Cause Attack on Later Orders

Rosner is the only defendant who seriously challenges the propriety of any orders subsequent to Order A on anything but poisonous tree grounds. Technically, Rosner must actually attack Order C, because that was the first wiretap on which he was intercepted and thus the first he has standing to challenge. His extended attack on Order A is actually part of an attack on Order C. Second, Rosner attacks Order J, the tap on his own phone. Because this Court has upheld the issuance of Order A, the only ground for invalidating some later order, as noted above, is some independent allegation of impropriety. The only available allegation is that Detective Magaletti's interpretations of the wiretap transcripts are materially false or misleading—so that properly interpreted the intercepted conversations are innocent and do not give rise to probable cause.

### Rosner's Attack on Magaletti's Expertise

Rosner, along with other defendants, offers an argument along exactly these lines. Indeed, Rosner goes so far as to say that "Magaletti's putatively expert interpretations were so unreasonable on their face as to amount to wilful falsehoods." Rosner Memorandum of Law at 60–61.

■■■■ There is little doubt that some of the intercepted conversations, at least, can sustain an innocent interpretation, or at least one entirely different from that Detective Magaletti offers. Discussion of specific interpretations goes to the question of Detective Magaletti's credibility, and is therefore more appropriately taken up below in the context of Rosner's motion for a *Franks* hearing. Here, the question is whether the totality of the wiretaps provided probable cause for the issuance and renewal of orders after Order A, regardless of whether or not Detective Magaletti was mistaken in some or many of his specific interpretations.

Alleged specific mistakes on the part of Detective Magaletti do not negate his contribution to a finding of probable cause. "The fact that an innocent interpretation may [also] be consistent with the facts alleged ... does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985). *See also United States v. Fury*, 554 F.2d 522, 530–31 (2d Cir.), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1977) (weighing comparative plausibility of innocent and inculpatory interpretations).

Our Court of Appeals has long taken note of the reality that narcotics dealers seldom speak openly about their trade. "[The] repeated though guarded use of cryptic expressions by members of a narcotics conspiracy has been aptly described as a 'narcotics code.'" *United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974), quoting *United States v. Manfredi*, 488 F.2d 588, 597 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Such a narcotics code is "supportive of a probable cause finding." *Fury*, 554 F.2d at 530–31; *United States v. Shakur*, 560 F.Supp. 318, 334–35 (S.D.N.Y.1983) (Duffy, J.), *aff'd sub nom. United States v. Ferguson*, 758 F.2d 843 (2d Cir.), *cert. denied*, ——— U.S. ———, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985).

Our Court of Appeals requires that this Court consider the alleged code language in the context of the entire record. *Fama*, 758 F.2d at 838; *Sisca*, 503 F.2d at 1343. In that context, we have no hesitation in concluding that even if Detective Magaletti might have been mistaken as to specific interpretations, he was justified in believing that code language was being used. Indeed, this case closely resembles *United States v. Ramirez*, 602 F.Supp. 783 (S.D.N.Y.1985) (Conner, J.). There, Judge Conner found that the combination of coded conversations that were "enigmatic indeed," 602 F.Supp. at 789, coded conversations that strongly supported the inference that they were about narcotics, and unambiguous drug-related conversations were sufficient to justify Judge Goettel's multiple

extensions of a wiretap order. In light of the persuasive analysis of this recent case, the fact that "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application," *Fama*, 758 F.2d at 838, and the requirement that a court "must give substantial deference to a prior judicial determination that probable cause existed," *Ramirez*, 602 F.Supp. at 789, we hold that Detective Magaletti's interpretations properly contributed to a finding of probable cause.

### Procedural Grounds for Suppression

The Boston defendants—MacLennan, Marrama, and Sullivan—move to suppress the fruits of electronic surveillance on fifteen grounds. In its discussion of probable cause, this opinion has already disposed of all nonfrivolous grounds except for procedural objections to the execution of the wiretaps. Discussion of the remaining grounds follows.

### Sufficiency of the Wiretap Orders

MacLennan, Marrama, and Sullivan argue that the wiretaps must be suppressed because "[t]he orders of authorization or approval ... are insufficient on their face." A comparison of the eavesdropping warrants with New York Crim.Proc.L. § 700.30 (McKinney 1984) shows this contention to be meritless. Section 700.30 prescribes eight formal requirements for an eavesdropping warrant, each of which the orders satisfy on their face. Order A is illustrative:

§ 700.30 Eavesdropping Warrants; form and content

An eavesdropping warrant must contain:

1. The name of the applicant, date of issuance, and the subscription and title of the issuing justice.

*See* Order A at 1, 6.

2. The identity of the person, if known, whose communications are to be intercepted;

*See id.* Para. 1, at 2.

3. The nature and location of the communications facilities as to which, or the

place where, authority to intercept is granted;

*See id.* Para. 3, at 3.

4. A particular description of the type of communications sought to be intercepted, and a statement of the particular designated offense to which it relates;

*See id.* Para. 2, at 3.

5. The identity of the law enforcement agency authorized to intercept the communications;

*See id.* Para. 4, at 3.

6. The period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained;

*See id.* Para. 5, 6 at 3–4.

7. A provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under this article, and must terminate upon attainment of the authorized objective, or in any event in thirty days;

*See id.* Para. 9, 7, 6 at 3–4.

8. An express authorization to make secret entry upon a private place or premises to install an eavesdropping device, if such entry is necessary to execute the warrant.

Apparently surreptitious entry was not necessary to execute the Farese wiretap. *See id.* at 5 (authorizing New York Telephone Company to cooperate with law enforcement officials in installing wiretap). When it was necessary, it was expressly authorized as the statute requires. *See, e.g.,* Order F, Para. 7, at 6 (authorizing secret entry into Gary Feola's apartment to install bug, which installation was never effected).

In the absence of any colorable support for defendants' contention of facial inadequacy, this Court can only uphold the orders.

*Minimization*

Various defendants attack the orders on grounds of inadequate minimization of monitored conversations. Sullivan and Marrama claim that the applications, affidavits, and warrants fail to require minimization; Tarantelli asks the Government to explain how monitoring was minimized; Dratch, MacLennan, and Acevedo claim that there was no minimization, and move for suppression or an evidentiary hearing.

██ The first contention is refuted by the face of the warrants, which specifically call for minimization, enumerate the persons whose conversations are to be intercepted, and list the topics that are to be monitored. Because these are state warrants, their adequacy insofar as concerns form and content may be determined by state law. *United States v. Manfredi,* 488 F.2d 588, 598 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Carubia,* 377 F.Supp. 1099, 1106 (E.D.N.Y.1974). These warrants patently comply with the minimization requirements of N.Y.Crim.Proc.L. § 700.30(7) (McKinney 1984); *cf. Losinno v. Henderson,* 420 F.Supp. 380, 384–86 (S.D.N.Y.1976) (Weinfeld, J.) (warrant satisfied New York requirements even though it lacked express minimization clause, in virtue of containing specifications as to persons and topics to be monitored). Thus, Sullivan's and Marrama's contention is meritless.

The conclusory allegation that these warrants' minimization directive was not complied with is little more compelling:

A mere perusal of the logs of the wiretaps indicate that proper minimization was not had here, as required by Federal and New York State law. Overhearing of conversations that should have been terminated early were not done on numerous occasions, all in violation of the various orders themselves requiring minimization.

Dratch Memorandum of Law at 88.

The Government responds that defendants have failed to raise an issue of fact about minimization because they "have nei-

ther demonstrated nor explicitly asserted that the officers violated any specific limitation listed in the orders," Government Memo at 101. Undeniably, defendants have not made such a showing. This Court is not convinced, however, that this is the showing required. *United States v. Shakur*, 560 F.Supp. 318 (S.D.N.Y.1983) (Duffy, J.), *aff'd sub nom. United States v. Ferguson*, 758 F.2d 843 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985), which denied a minimization hearing for lack of a showing of an "ongoing, frequent, and bad faith attempt to obtain ... privileged conversations that could amount, arguably, to a due process violation," 560 F.Supp. at 326, dealt explicitly with *privileged* matter. The Government's other citation, *United States v. Principie*, 531 F.2d 1132, 1139–41 (2d Cir.1976), *cert. denied*, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977), discusses a split in authority in the circuits about whether to admit any wiretap evidence at all, once it is established that minimization has not occurred, a point the Government scarcely concedes here.

■■■■ The Court has thus reviewed the wiretap logs, as well as a copy of the investigative log kept by Westchester County Assistant District Attorney Mary Anne Harkins, and concludes that these documents provide abundant evidence of compliance with both state and federal minimization standards. The Court has been guided in its analysis by the factors suggested by the Supreme Court in *Scott v. United States*, 436 U.S. 128, 139–41, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978). The intercepting agents must make reasonable efforts at minimization, judged in light of their actions rather than their motives. *Id.* at 139, 98 S.Ct. at 1724. The inquiry "will depend on the facts and circumstances of each case." *Id.* at 140, 98 S.Ct. at 1724. The percentage of non-pertinent calls intercepted is not dispositive:

> Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or appar-

ently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

*Id.* at 140, 98 S.Ct. at 1724.

The circumstances of the wiretap can be at least as important:

> For example, when the investigation is focusing on what is though to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators. *Id.*

■■■■ Other important factors include the use to which the telephone is typically put ("[I]f the phone is located in the residence of a person who is thought to be the head of a major drug ring," interception of virtually every call may be legitimate, *id.*) and the stage of the investigation (if patterns of nonpertinent calls emerge, their interception, legitimate at first, may become illegitimate). In *Scott*, the Supreme Court found that there was adequate minimization where forty percent of the intercepted calls were clearly drug-related and many of the remainder were very short:

> In a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed. A large number were ambiguous in nature, making characterization virtually impossible until the completion of these calls.

*Id.* at 142, 98 S.Ct. at 1725 (footnote omitted).

With these standards in mind, an examination of the materials before the Court shows that the agents were well aware of the statutory minimization requirements. Although the logs do not contain a convenient breakdown of the percentage of pertinent to nonpertinent calls, they do reveal a

high percentage of the non-minimizable calls noted in *Scott:* wrong numbers, busy signals, no answers, and conversations too short to determine their pertinence while they last. Most significantly, the logs clearly reveal that the agents did turn off the machine as soon as they made a determination of non-pertinence: a very substantial number of interceptions contain the notation "NPMTO," meaning "non-pertinent—machine turned off." As the Harkins log shows, the agents were instructed in spot monitoring. Indeed, the log shows painstaking attempts to secure minimization: Ms. Harkins notes a series of minimization briefings with the intercepting agents, and records specific inquiries into such matters as the boundaries of privileged conversations. Finally, the Harkins log provides concrete evidence of judicial supervision of the surveillance, as it records Ms. Harkin's regular oral reports to the issuing judges.

The Court concludes that there is more than enough evidence that the Government has met its burden of showing *prima facie* compliance with federal minimization requirements. Defendants' conclusory allegations of failure to minimize, unsupported by specific conversations that were not minimized, are insufficient to defeat that showing.

The result is the same under New York law: the New York Court of Appeals has stated that the Government's "burden may be satisfied by demonstrating that procedures were established to minimize interception of non-pertinent communications and that a conscientious effort was made to follow such procedures." *People v. Floyd,* 41 N.Y.S.2d 245, 250, 392 N.Y.S.2d 257, 262 (1976) (citations omitted). The logs sufficiently indicate that such procedures were established and adhered to.

### Allegations of Improper Sealing

■ MacLennan, Marrama, and Sullivan move to suppress the wiretaps because they allege that "[t]he tape recordings of the intercepted conversations were not sealed in a manner consistent with the requirements of Title 18 United States Code

§ 2518(8)(a)." *See, e.g.,* MacLennan Motion to Suppress the Contents of Intercepted Wire and Oral Communications Para. 12. As Marrama puts it, "no evidence exists to support the conclusion that any state court judge or judge of competent jurisdiction entered an order sealing the tapes in accordance with the mandate of [§ 2518(8)(a) ]." Defendant Marrama's Motion to Suppress Fruits of Electronic Surveillance Para. 8.

18 U.S.C. § 2518(8)(b), however, provides that "[a]pplications made and orders granted under this chapter shall be sealed by the judge.... Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction...." Thus, the ground for this motion seems to be that defendants are simply unaware that any sealing orders or applications exist. This Court has examined such applications and orders for each wiretap *in camera* and finds no infirmity in them.

Section 2518(8)(a) of Title 18, which governs this point, specifies that "[immediately] upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." The orders and affidavits this Court has examined indicate sufficiently that all wiretap tapes were immediately turned over to the New York Supreme Court at the expiration of the relevant wiretap orders and sealed.

### Attack on Wiretap Disclosure Orders

MacLennan, Marrama, and Sullivan challenge Justice Dachenhausen's December 4, 1985 Amendment and Disclosure Order as violating 18 U.S.C. § 2517(5) (1982) and "void on its face," Defendant Marrama's Motion to Suppress Fruits of Electronic Surveillance Para. 9.

Section 2517(5) provides:

When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to

offenses other than those specified in the order of authorization or approval, the contents thereof, and the evidence derived therefrom, are to be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

Justice Dachenhausen's order amends the prior eavesdropping orders to authorize the interception of communications relating to federal as well as state offenses *nunc pro tunc*, and further authorizes, *nunc pro tunc*, the disclosure of evidence derived from intercepted conversations relating to the federal offenses in federal proceedings. This latter authorization is pursuant to § 2517(3):

Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath of affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

■ The Court discerns potential concern about retroactivity in the fact that the arrests occurred on or about November 26, 1985, but the disclosure order was not signed until December 4th. This concern, however, is groundless. No authorization by a judge of competent jurisdiction was necessary for the arresting officers to use the eavesdropping information: they are authorized to do so by § 2517(1) and (2):

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

Defendants may be concerned that someone other than an investigative or law enforcement officer, defined in § 2510 as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses," had unauthorized knowledge of the contents of the wiretaps in making the arrests. If and when they come forward with evidence to this effect, the Court will consider whether they have established a violation of § 2517, which the order would not have cured. *Cf. United States v. Watchmaker*, 761 F.2d 1459, 1470 n. 6 (11th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986); *United States v. Orozco*, 630 F.Supp. 1418, 1530–31 (S.D.Cal.1986).

Of more concern is the possibility that wiretap information might have been used by the grand jury—the situation contemplated by § 2517(3)—before the issuance of the disclosure orders. Inasmuch as the grand jury convened on December 3rd (returning its indictment on December 5th) and Justice Dachenhausen's order did not issue until December 4th, defendants no doubt would argue that the order is of the retroactive kind criticized in *Watchmaker* and *Orozco*.

It must first be observed that this argument can at most apply to Orders E, I, and

J—authorizing surveillance, respectively, of McGuire, "R. Smith," and Rosner. The remaining orders were either originating orders for surveillance on Feola and Farese or renewals of those orders. In its controlling case interpreting § 2517, *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976), our Court of Appeals found that a judge of competent jurisdiction had approved disclosure of evidence of federal offenses for § 2517 purposes *without issuing an amendment and disclosure order*, in virtue of renewing an eavesdropping application while on notice that federal offenses might be implicated:

> [T]he affidavit of [the] Assistant District Attorney clearly provided the state judge—who had initially authorized the first ... wiretap one month before—with notification that possible federal offenses might be implicated. And we presume ... that in renewing the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied.

535 F.2d at 703.

 Detective Magaletti's original affidavit, as well as his affidavits in support of the renewal orders and the later surveillance, clearly revealed that federal offenses might be implicated. Some of the offenses, such as criminal possession of a controlled substance, have the same or nearly the same elements as similar state offenses; others, such as importation of a controlled substance, are so closely related to the state offenses as to make it implausible that one would occur without the other. The Court concludes that under *Marion* the renewal orders served the function of implicit authorization to disclose the contents of communications intercepted pursuant to those orders in a federal grand jury proceeding.

As for Orders E, I, and J, even supposing that their fruits had been presented to the grand jury before the disclosure orders had issued, so that those orders were retroactive and thus of no effect, see *Marion*, 535 F.2d at 704 n. 14 ("In all events, ... approval of the serendipitous communications must be obtained *before* their contents or fruits are used, pursuant to § 2517(3), in any criminal or grand jury proceeding."), those fruits would be inadmissible under § 2517(3) only if they "[relate] to offenses other than those specified in the order of authorization or approval"—that is, only if the federal offenses are so distinct from the state offenses as to be "other" for § 2517(3) purposes. The dissent in *Marion* accused the majority of requiring "exactly similar elements in both the state and federal crimes," an interpretation the majority opinion does not reject. 535 F.2d at 705. Even if this is the holding of *Marion*, however, and even if it is construed strictly, the narcotics offenses for which defendants have been indicted—conspiracy to distribute and possess marijuana and cocaine in violation of 21 U.S.C. § 846 (1982), and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 821 and 841 (1982)—do have similar elements to the New York statutory offenses of conspiracy, attempt, and criminal sale and possession of controlled substances, including marijuana, that were specified in the disclosure orders. The "relating to" requirement of § 2517(3) is not to be read hypertechnically. *See United States v. Harvey*, 560 F.Supp. 1040, 1060–66 (S.D.Fla.1982) (careful discussion of § 2517 requirements, holding that description with particularity of narcotics offenses in terms of Florida narcotics statutes obviated need for § 2517 order to use wiretap evidence in 21 U.S.C. § 848 prosecution, observing that the congressional intent behind § 2517 was to prevent governmental subterfuge of seeking wiretap order for one crime and using fruits to prosecute for another, for which wiretap order could not have been secured), *aff'd sub nom. United States v. Van Horn*, 789 F.2d 1492 (11th Cir.1986).

Thus, the Court holds that Justice Dachenhausen's disclosure order is valid. If indeed, wiretap evidence was presented to the grand jury before that order was issued, in apparent violation of our Court of Appeals' *Marion* doctrine, the Court concludes that the error waa harmless, for the reasons given above.

1102

*"Judge of Competent Jurisdiction"*

■ Thus, if the order is void as contended, it must be for facial insufficiency. The only potential facial objection to the order this Court discerns is that Justice Dachenhausen is not a judge of competent jurisdiction, as defined in 18 U.S.C. § 2510(9):

"Judge of competent jurisdiction" means—

(a) a judge of a United States district court or a United States court of appeals; and

(b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications.

Patently, Justice Dachenhausen is a judge of competent jurisdiction under § 2510(9)(b). *See* N.Y.Crim.Proc.L. § 700.-15 (McKinney 1984) (authorizing justices to issue interception orders); *id.* § 700.05 (defining "justice" as, among other things, "any justice of the supreme court of the judicial district in which the eavesdropping warrant is to be executed"; the Court takes judicial notice of the fact that Mahopac, New York, where John Farese's house is located, is within the Ninth Judicial District and that Justice Dachenhausen is a justice of the Supreme Court in that district).

There may once have been uncertainty about whether our Court of Appeals believed that a state court judge could be a judge of competent jurisdiction when the disclosure order relates to federal offenses. Apparently the defendants in *United States v. Aloi*, 449 F.Supp. 698 (E.D.N.Y. 1977) thought that *Marion* implied that state court judges were not of competent jurisdiction in this situation. In *Aloi*, Judge Bramwell ably refuted defendants' contention. The facts of *Aloi* were close enough to those presented here that this Court adopts Judge Bramwell's reasoning and holds that Justice Dachenhausen is a judge of competent jurisdiction.

*Exhaustion of Normal Investigative Techniques*

Dratch, Fernandez, Neuringer, Rosner, and Tarantelli urge suppression of the wiretap evidence because Detective Magaletti's affidavits failed to make a showing of exhaustion of normal investigative techniques, as required by 18 U.S.C. § 2518(1)(c) (1982). Defendants allege two kinds of infirmity in the affidavits. Rosner alleges that Magaletti failed to follow normal investigative techniques in specific respects in his dealings with CI # 1, such as failing to tail CI # 1 when he went to Florida, allegedly to obtain drugs for the Farese-Feola organization, and failure to record a conversation between CI # 1 and Feola in which Feola was allegedly expected to discuss a drug buy. Other defendants claim that the affidavit contains mere boilerplate assertions that normal investigative techniques were followed. For example, Neuringer says that although the affidavits claim that Farese was surveilled there are no details of the surveillance, and that there is no support for the claim that he was difficult to tail. Neuringer Memorandum of Law at 9. *See also id.* at 10 ("[T]he ... affidavit ... only shows an unwillingness to do some old fashioned leg work.").

*Facial Sufficiency of the Allegations*

■ Magaletti's first affidavit asserts that physical surveillance of John Farese, attempts to infiltrate his alleged organization, and pen register monitoring of his telephone had all been tried and had failed to delineate the scope of his alleged activities. It is true that courts hold that "boilerplate recitation of the difficulties of gathering usable evidence ... is not a sufficient basis for granting a wiretap order," *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975), and that "[a]n affidavit composed solely of conclusions unsupported by particular facts" or one "containing an unsupported assertion that general police experience indicates that ordinary investigative techniques 'reasonably appear unlikely to succeed if tried

or to be too dangerous' " will not suffice, *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977). An examination of the Magaletti affidavit, however, clearly shows that it recites more than conclusions or unsupported assertions about general police experience. Each of Magaletti's grounds for despairing of ordinary investigative techniques is supported by specific allegations of their inadequacy for this particular investigation.

For example, Magaletti states that physical surveillance of Farese is deficient because Farese lives in a garden apartment with no good vantage point and drives defensively. Defendants object that Magaletti has not shown why he has not done extra legwork in connection with the physical surveillance, or why he has not shown that trying harder with informers wouldn't help. There is, however, no authority in this Circuit that Magaletti needed to make a more detailed showing than he has.

Thus, for example, defendant Fernandez cites *Spagnuolo,* in which the Ninth Circuit did suppress certain wiretaps for failure to meet the exhaustion requirement. The standard set out in *Spagnuolo,* however, clearly would be satisfied by the Magaletti affidavit:

> [T]he affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case in a reasonable period of time.

549 F.2d at 710 (footnote omitted).

This practical, common-sense approach is shared in the Second Circuit. *See United States v. Napolitano,* 552 F.Supp. 465, 474–75 (S.D.N.Y.1982) (Sweet, J.) (quoting *Spagnuolo* in explication of standard adopted in *United States v. Fury,* 554 F.2d 522 (2nd Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978)). *See also United States v. DePalma,* 461 F.Supp. 800, 812 (S.D.N.Y.1978) (Sweet, J.) (same). Defendants have made no showing that further use of ordinary techniques would have sufficed. Some defendants do indeed suggest further techniques, but do not show how they would have added to the investigation. For example, to point out that Magaletti could have engaged in further physical surveillance does not refute his contention that further physical surveillance would not have revealed the purpose of the defendants' activities.

Those defendants who contend that the recitations of exhaustion of normal techniques are just boilerplate accuse Magaletti of laziness at most, not bad faith. Our examination of affidavits our Court of Appeals has upheld against attack for failure to satisfy the exhaustion requirement shows that far weaker documents than Magaletti's have passed muster. For example, in *United States v. Steinberg,* 525 F.2d 1126 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the affidavit did little more than recite the well known fact that drug dealers are generally wary and suspicious and therefore hard to follow. The court, reluctant to impose "impossibly burdensome" requirements on law enforcement officials to engage in the difficult business of proving a negative, upheld the affidavit. "We are satisfied that the Government has substantially complied with the statutory mandate, and we note that on oral argument appellants could advance no logical alternative to wiretapping to ascertain the details of Steinberg's operation." *Id.* at 1130. Here, defendants certainly advance alternatives, but do not show that they are logical ways to obtain the information the government sought. They do not even show that the burden is on the government to show why such measures were unnecessary. "The judge ... was supplied with far more than mere conclusions of the affiant—the *shorthand factual statements of the affidavit*

*contained a significance not lost on him.* It would be unreasonable to blink at such proofs and to blind oneself to the realities of urban crime and the layering of its participants." *United States v. Caruso,* 415 F.Supp. 847, 852 (S.D.N.Y.1976) (Pollack, J.), *aff'd without op.,* 553 F.2d 94 (2d Cir. 1977) (emphasis added).

Detective Magaletti's affidavit could perhaps have been more detailed and specific. However, it was sufficiently specific to make clear to the issuing judge that the exhaustion requirement had been satisfied.

*Rosner's Arguments*

Rosner, unlike the other defendants, goes behind the face of the affidavit to accuse Magaletti of unreported failure to exhaust normal techniques, as opposed to failure to show on the face of the affidavit that normal techniques had been tried. Specifically, Rosner alleges that when CI #1 went to Florida, allegedly to buy drugs for Feola, the District Attorney's office could have sent someone down to tail him; instead they merely checked with his airline and hotel to see whether he had in fact reservations. Similarly, when CI #1 said that Feola asked him to call concerning a drug deal, the government failed to monitor the call.

The courts have made clear that wiretapping is not a first investigative resort: it is "not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974). Equally clearly, it is not just a last resort, as held in *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978):

> [T]he purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.1974), *cert. denied,* 421 U.S. 909, 95

S.Ct. 1558, 43 L.Ed.2d 774 (1975); ... [T]he requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 982 [n. 12], 39 L.Ed.2d 225 (1974).

 The Magaletti affidavit shows sufficiently that conventional techniques had been tried and that they involved practical difficulties. Defendants do not show that the wiretap request was the initial step in this investigation. Thus, Detective Magaletti was not under an affirmative obligation to exhaust the possibilities of CI #1. If, for example, CI #1 had been wired for sound when he made the controlled buy at Farese's, he might well have been exposed to great personal danger had the device been discovered. Not every snitch will willingly wear a wire. The personal danger could have been even greater if, as Rosner suggests, the Westchester County law enforcement officials had actually sent somebody to Florida to spy on CI #1's alleged buy for Feola in August 1985. "[T]he more traditional surveillance techniques need not be exhausted first if they are 'impractical' or 'costly and inconvenient.'" *Fury,* 554 F.2d at 530 (quoting *United States v. Robertson,* 504 F.2d 289, 293 (5th Cir.1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975)). "Nor must ordinary investigative procedures have been completely unsuccessful. They need only to have reached a stage where further use cannot reasonably be required." *Spagnuolo,* 549 F.2d at 710 n. 1.

Rosner suggests that if CI #1 'had been tailed, the drugs he would have brought back from Florida would have provided probable cause for the immediate arrest of Farese and Feola. Rosner Memorandum of Law at 71. This neglects the Government's contention that Feola and Farese were members of a larger drug conspiracy of unknown proportions. The Government's purpose was not merely to arrest Feola and Farese, but to determine the

extent of the conspiracy and catch all the participants. Thus, any move to arrest Feola or Farese at that point, so far from being a normal investigative technique, would have compromised the entire investigation.

■ The Government's theory of prosecution shows further why wiretaps were appropriate in this case. First, the pen register information showed that much of the alleged criminal activity took place over the telephone. "[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Steinberg*, 525 F.2d at 1130; *see Caruso*, 415 F.Supp. at 852 ("[T]he investigation of a criminal enterprise widely understood to be largely and routinely conducted over the telephone may reasonably require electronic surveillance in conjunction with more traditional techniques."). Second, the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques. A court is more likely to find normal techniques wanting when the target is a "far-flung conspiracy ... impenetrable except by sophisticated electronic means." *United States v. Wilkinson*, 754 F.2d 1427, 1434 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), *aff'g United States v. Shipp*, 578 F.Supp. 980 (S.D.N.Y.1984) (Weinfeld, J.).

The Government's burden in showing satisfaction of the exhaustion requirement is lighter than the defendants would have it. This Court finds that the burden has been amply met.

### Failure to Inform Issuing Magistrate of Previous Wiretap Applications

Defendants MacLennan, Marrama, and Sullivan claim that the wiretap authorizations violate 18 U.S.C. § 2518(1)(e) (1982), which requires that the application contain a "full and complete statement of the facts concerning all previous applications known to the individual making the application ... involving any of the same persons, facilities or places specified in the application." The only amplification of this allegation is stated identically by Sullivan and Marrama. Both claim that in the initial application, District Attorney Vergari's representation that "no previous application has been made ... concerning the relief sought herein" is contradicted by Detective Magaletti's observation that conversations were intercepted between February and April 1981, and that Gary Feola was one target, in the early phases of the investigation.

■ Defendants' contention is without a valid basis. The federal courts uniformly interpret § 2518(1)(e) as requiring disclosure of all previous *applications* for electronic surveillance, not disclosure of all previous *interceptions*. *See United States v. Martorella*, 455 F.Supp. 459, 460 (W.D.Pa. 1978) (collecting cases). Thus, even though applications have been required to be disclosed even for unrelated investigations, as in the seminal case, *United States v. Bellosi*, 501 F.2d 833 (D.C.Cir.1974), only previous *applications* need be disclosed, and the material cited by defendants is not such. The February-April 1981 tap was of (914) 277–5873, which was not the Farese telephone the application for Order A sought to tap. Gary Feola was indeed a target of surveillance in this early phase of the investigation, but only as to a tap on John Cercena's phone. Therefore, there was no previous application to be disclosed and no violation of § 2518(1)(e).

### Inappropriate Use or Termination of Surveillance

MacLennan and Sullivan offer three obscurely related reasons for suppressing the fruits of electronic surveillance:

9. The government could have achieved its stated objective through other, less intrusive means.

10. The government had achieved its stated objective prior to the issuance of the orders authorizing electronic surveillance.

11. The government wrongfully failed to terminate electronic surveillance despite having achieved the authorized objective.

MacLennan Motion to Suppress the Contents of Intercepted Wire and Oral Communications Para. 9–11.

This Court interprets the objection stated in Para. 9 as a restatement of Para. 7, the claim that the Government failed to exhaust investigative alternatives. That objection has already been treated in this opinion. The objection stated in Para. 10 is somewhat unclear. The Government's "stated objective," from a reading of the orders and applications, is the gathering of evidence that would lead to the arrest and prosecution of all the persons specified in the various orders for the crimes there specified. If the Government had had such evidence in its possession before applying for the orders, we have no doubt that it would have acted on that evidence by arresting the defendants straightaway rather than wasting valuable judicial time by applying for no fewer than eleven eavesdropping orders. If the objection in Para. 10 is that the Government continued to seek eavesdropping orders after earlier orders had garnered enough evidence for arrest and prosecution, it is without force, inasmuch as there is no legal *requirement* that the Government arrest as soon as probable cause is evident. *United States v. Castellano*, 610 F.Supp. 1359, 1430 (S.D. N.Y.1985) (Sofaer, J.).

 Thus, the only objection in this trio that the Court need consider is that the Government failed to terminate after achieving the objective of its surveillance. It suffices to observe that the objective, as mentioned earlier in this opinion, was not simply the gathering of evidence of named individuals, but the delineation of a continuing conspiracy of unknown proportions: "Interception shall not terminate upon the initial acquisition of evidence ... but shall continue until the full scope of the ongoing conspiracy ... can be determined...." Order A Para. 6 at 3–4. The situation here is closely similar to that in *United States v. Orozco*, 630 F.Supp. 1418, 1525 (S.D.Cal. 1986):

Review of the agents' affidavits submitted in support of applications for authorization of wiretaps indicates that the scope of the conspiracy, and consequently the identities of and places of operation of newly discovered co-conspirators, were continuously exposed to be greater than initially estimated. Facts contained within the affidavits, primarily the contents of intercepted conversations, demonstrate that the expansion of the scope of the conspiracy was not artificially manufactured to maintain interception which would have been otherwise discontinued.... In this instance, it is appropriate to give great deference to the issuing judges' determinations regarding achievement of the investigation's objectives.

... [T]he court notes that even though each period of interception provided the FBI with additional information regarding violations of narcotics laws and the extent of the conspiracy, receipt of such information did not foreclose the possibility that the intercepted communications would continue to provide pertinent information, bringing the FBI closer to the achievement of the objectives of the wiretaps.

The grounds for suppression alleged in Para. 9–11 of MacLennan's complaint are rejected.

*Failure to Name Defendant in Application*

 MacLennan objects that "[t]he government failed to name the defendant in any of the applications in support of the original warrant or the extensions thereof." MacLennan Motion to Suppress Para. 14. Factually, this contention is mistaken. MacLennan is the individual referred to throughout Detective Magaletti's affidavits as "Bo" or "Doug," and was named as an interceptible party as early in the investigation as September 24th, in Order D. "The government is not required to identify an individual in a wiretap authorization application unless it has probable cause to believe that the individual is engaged in criminal activity under investigation and that the individual's conversation will be intercepted over the target telephone." *United*

*States v. Baker,* 589 F.2d 1008, 1011 (9th Cir.1979). Thus, the Government satisfied its statutory obligation in this case. As has been observed, "both federal and state law permit the use of communications against persons not named in an eavesdropping warrant, even without amendment of the warrant." *United States v. Lilla,* 534 F.Supp. 1247, 1259 (N.D.N.Y. 1982) (citing Second Circuit, New York Court of Appeals, and United States Supreme Court authority). In light of these considerations MacLennan's contention is without merit.

### Challenge to Nunc Pro Tunc Character of Order B

■ Marrama, Rosner, and Sullivan argue that Order B, which amended Order A to permit interception of conversations had in John Farese's apartment while his telephone was off the hook, "is overly broad and violates the provisions of Title 18 § 2518 et seq. ... entered ... allegedly *nunc pro tunc* on August 26, 1985 [the conversation that precipitated Order B was intercepted on August 25] ... facially invalid, overbroad and unsupported by probable cause." Marrama and Sullivan Motions to Suppress Para. 10. The Court finds this contention unpersuasive. Even if, as Rosner urges, this Court should regard *People v. Basilicato,* 64 N.Y.2d 103, 111, 114–15, 485 N.Y.S.2d 7, 9, 11–12, 474 N.E.2d 215, 217, 219–20 (1984) (finding conversation illegally intercepted when intercepted not in course of telephone conversation but heard because the telephone was taken off hook) as controlling, we find *Basilicato* factually distinguishable on several grounds. First, in *Basilicato* the telephone was taken off the hook not to make an uncompleted outgoing call, as here, but to prevent incoming calls: there is thus arguably a legitimate privacy interest implicated in *Basilicato* that is absent here. Second, in *Basilicato* the State made no application for an amendment to the warrant to authorize the interception retroactively. Here, just such an order is at issue: and the *Basilicato* court noted that it is permitted under N.Y. Crim.Proc.L. § 700.65(4) (McKinney 1984)

(amendment permits disclosure of "communication which was not otherwise sought and which constitutes evidence of any crime"), 64 N.Y.2d at 115 n. 2, 485 N.Y.S.2d at 12 n. 2, 474 N.E.2d at 220 n. 2. Because the *Basilicato* court declined to decide whether such an amendment would validate interception of conversations over a different medium than the one authorized, we are not bound by its exclusion of such evidence where no amendment was applied for. Consequently, this ground for suppression of the August 25 conversation is rejected.

### Challenges to Neutrality of Issuing Judges

■ Finally, Rosner attacks Orders C and J, the initial orders for wiretaps on Feola's and his own phones, on the ground that the issuing judge could not have been detached and neutral, because in neither case did he have enough time to review the materials submitted to him to make a detached and neutral determination of probable cause. (In each case the order was issued at about noon of the day the application and affidavit was executed.) Although complaints about the volume of material submitted in a case such as this have an inherent appeal for any Court, the argument must be rejected. The supporting documents for Order C amount, by this Court's count, to about 50 pages, the bulk of which is Detective Magaletti's Order A affidavit—material easily reviewable in a morning. As for Order J, as the Government notes, Rosner's alleged role in the conspiracy was not new to the issuing judge. Rosner had been an interceptible party ever since Order G, issued on October 11th, and the issuing judge had had occasion to review the record in the course of executing Order H, the second Feola renewal, on October 31st. Thus, the only *new* material to be reviewed on November 4th for Order J was, by the Government's count, about 80 pages of supporting documents, mostly transcripts of intercepted calls. This is insufficient to rebut the pre-

sumption of regularity in the issuing judge's performance of his duties.

For all the foregoing reasons, the Court concludes that there was probable cause for the issuance of all the orders.

## III. MOTION FOR *FRANKS* HEARING

Rosner and Dratch move for an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), on whether the affidavits of Detective Magaletti contain the following deliberate falsehoods or reckless misstatements: (1) reckless disregard of the falsity of information furnished by CI # 1; (2) failure to inform the issuing judge of evidence of the unreliability of CI # 1; (3) ungrounded interpretations of code words in the wiretap transcripts and failure to explain those interpretations; (4) ungrounded claims to have exhausted alternative means of investigation before making an application for electronic surveillance; (5) ungrounded characterizations of Dratch as a high-level drug dealer and financier.

### Criteria for a Franks Hearing

*Franks* held for the first time that when an affidavit provides probable cause for the issuance of a warrant, the defendant may request an evidentiary hearing on whether the affiant's statements are deliberately false or made with reckless disregard for the truth. In opening this newly discovered Pandora's box, Justice Blackmun described the factual showing a defendant must make to trigger a *Franks* hearing:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and these allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affi-

> davits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

438 U.S. at 171–72, 98 S.Ct. at 2684.

### Magaletti's Alleged Misrepresentations; Alleged Disregard for CI # 1's Unreliability

Rosner claims, and the Court assumes, that CI # 1, whose information about having participated in drug-dealing activities with Farese and Feola was reported in Magaletti's affidavit in support of the Farese wiretap application, is actually one Robert Raimondo. Rosner's reply affidavit includes exhibits—both affidavits and unsworn statements—reporting that Robert Raimondo, like many involved in the illegal drug trade, uses Quaaludes, is an exhibitionist, and is generally psychologically unstable. The two unsworn statements, which Rosner's private investigator James Bolte says "fairly and accurately reflect" his conversations with the speakers, are not "[a]ffidavits or sworn or otherwise reliable statements of witnesses" although we assume for present purposes that they should be treated as such. The submissions do not allege that Robert Raimondo lied to Detective Magaletti. At most they establish that he is an evil and untrustworthy person. Most importantly, these submissions in lieu of affidavits concern *Raimondo,* and as *Franks* explicitly says, it is only the warrant *affiant* who can be impeached. *See United States v. Barnes,* 604 F.2d 121, 152–53 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64

L.Ed.2d 260 (1980) ("Thus, the rule is clear that absent a showing that [the government agent] himself had knowingly included false statements in his affidavit, there is a basis neither for a hearing nor for suppression itself."). That is, even assuming Raimondo to be CI # 1 and all of defendants' allegations about him to be true, the only relevant claim is that *Magaletti* knowingly or recklessly made false statements in his affidavit.

 Defendants have made no showing that Magaletti knew that the statements of CI # 1 he reported in his affidavit were false. Nor have they shown that he recklessly disregarded the possibility that those statements were false. Even if defendants' material is taken to establish that Magaletti knew or should have known of CI # 1's reputation for drug abuse, exhibitionism and instability, or general untrustworthiness, this is insufficient to show that CI # 1 would reasonably be thought unbelievable in a particular case. *See, e.g., United States v. Shakur,* 560 F.Supp. 318, 331–32 (S.D.N.Y.1983) (Duffy, J.), *aff'd sub nom. United States v. Ferguson,* 758 F.2d 843 (2d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985). Other district courts such as *United States v. Dorfman,* 542 F.Supp. 345, 366 (N.D.Ill.), *aff'd,* 690 F.2d 1217 (7th Cir.1982), have held that

> [E]ven when there is an allegation that the affiant knew the informant was lying, was reckless in reporting the story, or deliberately or recklessly misreported the informant's story to the court, the allegation must be accompanied by the required offer of proof. For example, a claim that the informant did not exist, or did not report the information attributed to him in the warrant affidavit, if unsupported by substantial corroborating evidence, does not entitle a defendant to a *Franks* hearing.

Here, the affidavits and unsworn statements appended to Rosner's papers, being treated by the Court as affidavits, do not rise to the level of "substantial corroborating evidence" to show Magaletti's recklessness in believing CI # 1. Rosner's allegations about CI # 1 do not require a *Franks* hearing.

*Alleged Failure to Inform the Issuing Judge*

 Similarly, Magaletti's alleged failure to inform the issuing judge of CI # 1's alleged instability and untrustworthiness is insufficient to compel a *Franks* hearing. Omissions are governed by the same *Franks* standards as misrepresentations. *United States v. Mankani,* 738 F.2d 538, 546 (2d Cir.1984). Agents necessarily pick and choose in drafting their affidavits: what must be shown is intentional or reckless omission. Even if the issuing judge had been so informed, he could still have been justified in issuing the warrant. *Id.* at 546.

*General Attack on Magaletti's Qualifications*

 Rosner attacks Magaletti's general qualifications to interpret narcotics code language on two grounds. He takes issue with the Government's contention that our Court of Appeals, in *United States v. Young,* 745 F.2d 733, 760 (2d Cir.), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1984), certified Magaletti as an expert in interpretation of narcotics code language. And he refers to an affidavit by defense attorney William Aronwald containing a representation that a DEA agent is willing to testify that he would not have permitted Magaletti to seek an eavesdropping warrant if Magaletti had presented the affidavit for Order C to him.

Neither of these arguments has force. Rosner contends that Detective Magaletti

> deliberately or with reckless disregard for the truth misled the issuing judges when he indicated that he had been qualified as an "expert" in *United States v. Young....* There, Magaletti was not qualified as a code language expert, but was merely permitted to testify concerning supposedly narcotics related activity which he had personally observed. Rosner Reply Aff. Para. 20, at 21 (citation omitted).

Rosner is right if by saying that the Court of Appeals did not "qualify" Detective Magaletti as an "expert" he means that the court did not issue him some kind of certificate of expertise, the way it issues certificates that license attorneys to appear before it. No federal court has any such procedure. Rosner is simply wrong, however, if he means that the Court of Appeals did not uphold Judge Sand's determination that Detective Magaletti could properly give opinion testimony under Fed.R.Evid. 702. The court specifically notes that "detective Magaletti, one of the agents who witnessed the incident, *testified as an expert* 'that it was a narcotics transaction that took place,'" 745 F.2d at 744 (emphasis added). The court went on to reject a challenge to the testimony of Detective Magaletti and another officer: "The qualifications under Rule 702 of neither are questioned, and each offered his opinion as to the nature of events that he had viewed personally. Such opinions are admissible both under Rule 702 as expert opinions and under Rule 701 as lay opinions based on perceived events." Thus, though the court did not "qualify" Detective Magaletti, it unequivocally asserted that his opinion testimony about the nature of the transaction he observed was admissible as expert testimony and also as lay opinion.

Rosner asserts that Detective Magaletti committed a *Franks* violation by asserting that "tiles" meant cocaine in interpreting an intercepted conversation in the course of the 1981 investigation that led to Gary Feola's arrest and incarceration. "If Magaletti chose to interpret 'tiles' to mean narcotics, he was required to input the factual bases of his 'expertise' which led to his conclusion that the conversations were really drug-related." Rosner Memo of Law at 38. Presumably Rosner wishes to make the same point about Detective Magaletti's fresher 1985 interpretations.

Presumably the point is that Detective Magaletti must give some explanation for his belief that particular terms have particular code meanings. But there is simply no basis in law for any such requirement. Detective Magaletti's affidavits begin by recounting his years of experience in undercover and other investigative narcotics work. These recitations amount to a curriculum vitae, which is all any federal court would require of any expert witness under Rule 702. The Federal Rules of Evidence do not even apply to affidavits submitted in support of eavesdropping warrant applications, as is manifest from the fact that such affidavits can contain hearsay, even multiple hearsay. *See e.g., United States v. Kuntz,* 504 F.Supp. 706, 711 (S.D.N.Y. 1980) (Sweet, J.) (multiple hearsay acceptable in warrant affidavit if "reasonably trustworthy" under the circumstances). It would be absurd to impose upon a warrant affidavit the immeasurably more stringent requirement that every alleged use of code language have been registered as such by Eric Partridge. Rosner's "input his expertise" suggestion is, accordingly, without force.

Attorney Aronwald's affidavit citing a DEA agent who disagrees with Detective Magaletti's view of the case is, similarly, unpersuasive. In *United States v. Orozco,* 630 F.Supp. 1418, 1508–09 (S.D.Cal.1986) the court was invited to consider the affidavit of an ex–DEA agent in the context of the exhaustion requirement of § 2518(1)(c). The court rejected the agent's suggestions of alternative investigative techniques that were not used as "offered in hindsight, employing the 'retrospectroscope' with its distorting lens, and without a complete knowledge of all the factors that went into the investigating agents' assessments of the case," *id.* at 1509, and concluded that the fact that the agent "would have conducted an investigation differently does not now make insufficient what was otherwise sufficient compliance with § 2518(1)(c)." *Id.* This Court agrees with this general analysis and specifically applies it to the code language context. Mr. Aronwald's DEA agent is in no position to appreciate the complexities of the ongoing investigation as they unfolded themselves to Detective Magaletti. If the agent is indeed an expert in the interpretation of code language, and his expertise entered into his

low estimate of Detective Magaletti's affidavit, this shows no more than that experts can disagree—a fact all too well known to every court—not that a particular expert's controvertible opinion cannot provide probable cause for the issuance of a warrant. Indeed, almost any obscure noun can be used as a euphemism for drugs, as we observe below.

*Challenges to Specific Interpretations*

A reading of the wiretap transcripts opens a window onto a strange and ambiguous world of shadowy transactions involving "presents," "shapes" (or as Rosner has it "tapes"), "golf courses," "property," "turkey sandwiches," "roast beef sandwiches," and no fewer than "six broads." This opinion has already held that Detective Magaletti presented sufficient evidence that *something or other* in this language was in code. It is true that many of Detective Magaletti's interpretations may surprise the lay observer, who naturally wonders how Detective Magaletti can know that a conversation ostensibly about "pottery," for example, is really about marijuana. Many, perhaps all or almost all, of the intercepted conversations are open to innocent interpretations. Some, indeed, are open to alternative *inculpatory* interpretations as plausible as those Detective Magaletti offers. For example, Farese several times asks Tarantelli to bring "greenies" to his house, which Magaletti and this Court interpret to mean money, although it is well known that "greenies" is also slang for illicit amphetamines. An even more striking instance is the "six broads" conversation discussed at length by Rosner. Instead of discussing all possible interpretations other than that selected by Magaletti, this opinion will consider two that Rosner discusses at length in his papers, and that the Court perceives as being most favorable to him, inasmuch as he advances fairly detailed innocent explanations for each.

*"Shapes" or "Tapes"?*

 Rosner makes heavy weather of a call he made from Feola's phone to Arthur Torsone intercepted on October 15th. Torsone tells Rosner to tell "him" that, as the Government would have it, "we're willing to take the shapes out." Detective Magaletti interpreted "shapes" to mean the woody stems of marijuana plants, which Torsone was offering to remove from a shipment of marijuana, so as to improve its quality. Rosner claims now, and this Court agrees, that Torsone referred to "tapes," rather than "shapes". Rosner now explains that Torsone's brothers own a video store in Poughkeepsie, New York, in this District, and that Feola had asked one of them to lend him some videotapes to view at home. Torsone, according to Rosner, was only asking Rosner to tell Feola that his brothers were willing to do so.

The Government steadfastly contends that Torsone said "shapes" rather than "tapes," but maintains that even if he said "tapes" the conversation is still narcotics-related.

Assuming that Rosner is correct in maintaining that the Torsones indeed own a video store in Poughkeepsie, the Court's task is to determine whether the alternative story about Feola wanting to acquire tapes from that store is so plausible that Detective Magaletti's failure to acknowledge it to the issuing judge constitutes falsity or reckless disregard sufficient to require a *Franks* hearing. In discharging this task, we must look to the whole context of this conversation, not the conversation in isolation as Rosner would apparently have us do. We notice that the preceding day, October 14th, was occupied by a series of conversations between Torsone, Farese, Feola, and Cercena. At about 11 A.M. on October 14th, Feola and Torsone discussed surveying three "golf courses" from which they would choose one to have a "tournament." In the absence of any other evidence in the record before us that either Feola or Torsone had anything to do with golf tournament organization, let alone a tournament requiring "the most impressive course, because these are some golf players," it would not be reckless disregard for the truth to interpret this con-

versation as relating to something other than golf.

Torsone and Feola then went on to discuss an ostensible wholesale deal for "watches" that are "not an imitation," mentioning the brand name "Rolex" in passing. Although there is no evidence before this Court that Torsone and Feola were engaged in any kind of legal wholesale business, this conversation can bear an innocuous interpretation—at least until it is compared with a conversation about twelve hours later between Farese, Cercena, and Feola. Farese told Feola that Cercena was with him and wanted "1500 for the interior of the Mercedes" because otherwise he couldn't pick it up from his father (Ralph Feola Sr.). Feola said that he didn't have the $1500 and suggested that Farese "borrow the money from the old man"; "just sell the fucking Rolex you're getting and you'll definitely have the money." After further conversation including phrases that Detective Magaletti has suggested are code (such as "shirts," known to this Court to be a common code word for drugs, and "ham sandwiches"), Farese complains that Cercena is "smoking all my pot." Feola responds angrily: "Hey John, that's not my fuckin' life, don't tell me about this shit on the telephone.... I'm trying to talk cars, and fuckin' jewelry and you're talking that shit." Cercena then comes on the line and Feola admonishes him for his marijuana consumption: "Whatta you think you're in Jamaica?"

It is perfectly clear that this conversation refers at least to personal consumption of illegal drugs. More significant is Feola's reaction to the topic being mentioned over the phone. Feola's statement that he wants to talk about cars and jewelry could, given an appropriate background context, mean that he wanted to talk about legitimate freelance business enterprises rather than Farese's concern, whatever its nature, with marijuana. But it could equally well mean that he is reminding Farese not to use the word "pot" over the telephone, sticking instead to the code words they had developed involving jewelry and cars. Indeed, in the absence of some background

context that would explain why Feola wanted to talk about cars and jewelry in general—a context defendants have failed to supply—the inference that Feola is telling Farese to stick to the code is compelling. Consequently, had Rosner challenged this specific conversation, he would not have presented grounds for believing that Detective Magaletti's affirmations were false or recklessly disregarded the truth. This particular conversation, indeed, is plausibly construed as vindicating Magaletti.

Seen against this context, Detective Magaletti's interpretation of the October 15th conversation does not appear to violate *Franks* although he was mistaken and the word was "tapes" rather than "shapes." "Tapes" could just as well have been a code phrase as "shapes."

Rosner's presentation loses plausibility because of its lack of specificity. Feola lives on East 54th Street in Manhattan, an area undoubtedly glutted with videotape rental stores. If he had indeed wanted to acquire tapes, he could have done so at minimal cost—as little as $2.50 per tape—and avoided inconvenience by patronizing one of those stores. It then appears curious that he would feel compelled to make arrangements with a video store in distant Poughkeepsie, even one run by friends of his, absent some showing that the Torsones had an unusually interesting inventory or that Feola's videotape demands were unusually high in volume. The entire character of the "tapes" conversation is that of concealed meaning shrouded in unjustified hilarity, which stops just at the point when the "tapes" are mentioned. On the record presented, this Court cannot say that Detective Magaletti recklessly disregarded the truth in interpreting the "tapes" conversation as drug-related, or in hearing the word as "shapes".

*"Six Broads"*

The most startling allegation that Detective Magaletti recklessly misinterpreted intercepted conversations relates to a November 19th discussion between Feola and

Rosner about their interactions with "six broads," which Magaletti interprets to mean "six quantities of cocaine, either pounds or kilograms." Rosner Memorandum of Law at 102, quoting Magaletti Complaint at 7. Rosner surprisingly claims that they used "broads" in its literal vulgar sense of "women," and explains that he and Feola were trying to line up six "escorts" for others, whom they would have liked to have "auditioned" themselves, buttressing this interpretation by claiming that in a passage the Government says is inaudible, Feola can be made out to say that the "broads" have "[b]odies like you wouldn't believe, models, like you see in the magazine *Hustler.*"

■ Because "broads" does have the vulgar connotation of women, especially loose women, Rosner's interpretation is colorable. It is against his penal interest (and to that extent may even be entitled to extra credibility), but relates to a distinctly less serious crime than those with which he is charged. Indeed, in view of the notoriety recently achieved by Ms. Sydney Biddle Barrows for her escort service activities, Rosner may be speculating that in today's moral climate prosecutors, courts, and public consider this lesser crime *de minimis.* Although Rosner and Feola have criminal histories, their records are clean of any dabbling in the white slave traffic. Certainly there is nothing in the record before us to suggest that Detective Magaletti had any reason to believe that they were pimps, if indeed they were. The explanation proffered is not so plausible as to compel the conclusion that Detective Magaletti recklessly disregarded the truth in failing to offer it.

Here, as elsewhere, the language is consistent with criminal narcotics activity and inconsistent with the normal enjoyments of everyday life. This Court concludes that Detective Magaletti's interpretations of the transcripts, although occasionally mysterious to the lay observer, do not involve deliberate falsehood or reckless disregard of the truth.

Accordingly, defendants' motion for a *Franks* hearing on this issue is denied.

*Failure to Exhaust*

Rosner asks for a *Franks* hearing with respect to Detective Magaletti's statements about exhaustion of ordinary investigative techniques, maintaining that "the failure to exhaust was so patently egregious in this case that Magaletti's contrary sworn statements constitute a *Franks* violation themselves." Rosner Reply Aff. Para. 23 at 26. Inasmuch as this opinion has already demonstrated that the Westchester County law enforcement officials met the exhaustion requirement, there is no need for a *Franks* hearing on this issue.

*Statements About Dratch*

■ Dratch objects to Detective Magaletti's characterization of him in his Order D affidavit as one who "appears to be a high level, highly insulated dealer whose primary function is that of financier." Dratch's complaint is that this unsupported characterization lends unjustifiable credibility to the allegation that there is probable cause to intercept his conversations.

Supposing for the argument, that this characterization is cognizable under *Franks,* if there is probable cause without the characterization there is no infirmity.

Dratch argues, however, that the intercepted conversations do not of themselves show that there is probable cause to make him a named target of surveillance. The August 24, 1985 conversation between Kevin Lubic and John Farese in which Farese berates Lubic for trying to get in touch with Dratch directly, shows at most, Dratch maintains, that Farese knew he did not want to be part of a drug deal.

This Court draws a different conclusion. Although the entire conversation between Farese and Lubic is somewhat opaque, the reason for Farese's anger at the beginning of the transcript is clear. Farese is angry because Kevin Lubic, on behalf of his father (presumably Edward Lubic, mentioned in Detective Magaletti's affidavit as a distributor for Farese), has been calling Mark Dratch's mother, whom he claims to know.

(Possibly Kevin's reference to his father is fictitious. If so that fact is immaterial). Lubic's action makes Farese angry because he is going over the head of Dratch's intermediary Farese, making Dratch anxious. "Mark is freaking out ... he doesn't want you guys calling. I told your father that I would speak to Mark." Dratch's reaction, as reported by Farese, indicates that Dratch was engaged in surreptitious dealings he doesn't want his mother, or anyone else who might be listening in on the phone, to know about. Dratch is reported by Farese as being "not interested in buying the thing," and Farese tells Lubic: "You, don't ruin this because Mark won't do nothing with nobody." These remarks can at most mean, however, that Dratch is not interested in any particular drug transaction Lubic has to offer. Between these remarks, Farese asks Lubic whether he is fronting for Glenn Wagner: "You're not calling for Glenn?" When Lubic answers "No," Farese says: "If Glenn got something I go, I'll go to Mark and you'll get cut." This is reasonably interpreted as telling Lubic not to try to deal with Dratch at all, and conveying the message to Wagner that if he has business with Dratch, he should pursue it through Farese as intermediary; Wagner and Lubic would then each get their "cut," or share of the proceeds. Thus, the exchange is reasonably read as indicating that Dratch is interested in doing drug deals, but only if they are structured in a particular way, one that insulates him from Wagner and Lubic. Moreover, the remark that "Mark won't do nothing with nobody" is not most plausibly read as meaning that Dratch will not participate in any drug deals whatsoever. It can, on its face, equally sustain the reading "Mark won't deal with just anybody off the street," a reading reinforced by Lubic's response: "What the hell is he gonna do something where he doesn't know, he barely knows me and Glenn." That is, Lubic acknowledges that Dratch will only deal with trusted associates.

Furthermore, Dratch fails to mention other conversations that raise reasonable ground to suspect that he is involved in the subject of the investigation. Most prominent among them is his August 29th call to Farese, in which he leaves Farese a phone number at which to call him back but refuses to leave the area code saying that Farese knew it because it was in Dratch's neighborhood. This crude attempt to conceal his whereabouts in a conversation with a target of electronic surveillance is a factor that an issuing judge can reasonably have taken into account in amending his order so as to make Dratch an interceptible party. This Court sees no reason to disregard the issuing judge's determination.

The Court finds no evidence of affirmations by Detective Magaletti that are either false or made in reckless disregard of the truth sufficient to reach the threshold requiring a *Franks* hearing. All defendants' motions for a *Franks* hearing are denied.

## IV. MOTION TO SUPPRESS EVIDENCE FROM SEARCH

Defendants McGuire, Wall, Cercena, Farese, Fernandez, Tarantelli, Gallo and Gumpricht make motions, pursuant to Rule 12(b)(3) of the F.R.Crim.P., to suppress the use as evidence by the Government of all items obtained in the court-ordered searches of the residences of defendants, and any and all leads derived therefrom. In the alternative, some of the defendants seek an evidentiary hearing on their claim that they are aggrieved by such unlawful searches and seizures. As discussed in greater detail in the statement of the facts of this case, *supra*, the premises searched pursuant to the search warrants, issued in November 1985, were the residences of Defendants McGuire, Wall, Cercena, Farese, Fernandez, Tarantelli, Gallo, Feola, Rosner and Neuringer.

*Standing*

 Defendant Gumpricht has moved to suppress the introduction into evidence of certain slips of paper, or testimony concerning same, allegedly making reference to him, obtained during a search of an apartment of co-defendant Wall; or alternately, for an evidentiary hearing concern-

ing the probable cause underlying the search warrant involved therewith. At the outset, the motion of this defendant must be denied because Defendant Gumpricht has no standing to challenge the seizure of this inculpatory physical evidence, including any related testimony, or to request an evidentiary hearing on these grounds.

■ Suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, and not by those who are aggrieved solely by the introduction at trial of damaging evidence. Co-defendants and co-conspirators are accorded no special standing, and cannot prevent the admission against them of information which is subject to suppression at the instance of another. *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1968). In *Wong Sun v. United States*, narcotics seized from a third party held inadmissible against one defendant as the product of statements made by him at the time of his unlawful arrest, were found to be admissible against the co-defendant because "[t]he seizure of this heroin invaded no right of privacy of person or premises which would entitle [him] to object to its use at his trial." 371 U.S. 471, 492, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963), *citing Goldstein v. United States*, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942).

■ Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. *Alderman v. United States*, 394 U.S. at 174, 89 S.Ct. at 966; *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). As held by the Supreme Court in *Alderman:*

> There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim can and very probably will object for himself

when and if it becomes important for him to do so. 394 U.S. at 174, 89 S.Ct. at 967.

As noted below, defendant Wall, owner of the premises from which the materials were seized, does challenge the possible violation of his own rights.

In order to have standing to assert the claim discussed herein, defendant must demonstrate a legitimate expectation of privacy in the premises searched and the items seized. *United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–4, 99 S.Ct. 421, 424–5, 58 L.Ed.2d 387 (1978); *Alderman v. United States*, 394 U.S. at 171–2, 89 S.Ct. at 965; *United States v. Riquelmy*, 572 F.2d 947, 950–1 (2d Cir.1978). Defendant Gumpricht conceded that the narcotics records seized were not in his apartment, but in that occupied by Daniel Wall; he does not contend that he had any legitimate expectation of privacy in the Wall apartment. This defendant has also failed to demonstrate, or even assert, that he had either a property or a possessory interest in the property seized. Therefore, Defendant Gumpricht clearly has no standing to challenge the constitutionality of the search and seizure. *See, e.g., United States v. Salvucci*, 448 U.S. at 86–87, 100 S.Ct. at 2550; *United States v. Pinto-Mejia*, 720 F.2d 248, 255 (2d Cir.1983), *reh. denied* 728 F.2d 142 (2d Cir.1984); *United States v. Streifel*, 665 F.2d 414, 419 n. 6 (2d Cir.1981), *cert. denied sub nom. Pauth-Arzuza v. United States*, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983).

In denying this motion of Defendant Gumpricht, the Court notes that no defendants, other than those whose residences were the subject of a search or who have otherwise demonstrated a legitimate expectation of privacy in the premises searched or a property interest in the objects seized, can demonstrate standing to join in the within motions of defendants to suppress evidence obtained during the searches.

*Validity of the Searches*

■ Having determined that Defendants McGuire, Wall, Cercena, Farese, Fer-

nandez, Tarantelli and Gallo do have standing under the above-enunciated standard, the Court will proceed to evaluate their claims. As grounds for the requested relief, these defendants contend that the probable cause for the search was based on the wiretap interceptions, which interceptions were themselves illegally obtained with invalid warrants (*see supra* discussion of the wiretap issues and standards for lawful search). Seeking application of the "fruit of the poisonous tree" doctrine, defendants argue primarily that, if the information obtained from the wiretap interceptions is excluded from the supporting affidavit of Detective Magaletti, the warrants for the searches must be held to be facially invalid. *See United States v. Butts*, 729 F.2d 1514 (5th Cir.1984), *cert. denied*, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984), and ── U.S. ──, 106 S.Ct. 2246, 90 L.Ed.2d 693 (1986).

The Court need not address this argument to the extent that the fruit of the poisonous tree doctrine is invoked, because of its ruling, *supra*, that the wiretap orders were in fact valid. Simply put, there is no "poisonous tree", and hence no tainted "fruit" derived therefrom. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The remaining arguments of defendants raise essentially the same issues previously disposed of by this Court in its determination that the wiretap warrants were sufficiently supported by probable cause. Defendant Fernandez contends that the search warrant fails to establish probable cause on its face because the affidavit of Detective Magaletti was based upon stale information, and that the search was unlawful because of the failure to use other investigative measures. Defendant Farese further argues that Detective Magaletti deliberately withheld information as to the legitimate construction business activities of Defendant Farese, information which he alleges would aid in interpreting certain of the intercepted communications; and facts which pertain to the credibility of Robert Raimundo, said to be referred to as "CI #1" in Magaletti's Order A Affidavit. To

the extent these arguments are substantially similar to those previously rejected by this Court in connection with the wiretap motions, they will receive only a cursory discussion here.

■■■ Defendant Fernandez claims that *"much of* the information recited by Detective Magaletti was months and more often, several years old" (emphasis added). This statement neglects to mention that the Order A Affidavit enumerates more recent inculpatory information as well, facts which the Court determines to constitute a sufficient showing of present probable cause. *See United States v. Vasquez*, 605 F.2d 1269 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). Further, the courts have held that where, as here, a search warrant was sought at the culmination of a major investigation into ongoing, long-term criminal activity, a time lag will generally not affect probable cause. *See, e.g., United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985); *United States v. Foster*, 711 F.2d 871, 878–9 (9th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). Our Court of Appeals has noted that:

> A common sense view of all the circumstances belies the contention that the ... interval precluded an objectively reasonable belief in probable cause to search. *United States v. Fama*, 758 F.2d at 834; *Cf. United States v. Beltempo*, 675 F.2d 472, 477–8 (2d Cir.1982), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982).

Under the circumstances of the instant case, the inclusion of past information from this extensive, ongoing investigation did not preclude an objective reasonable belief in probable cause to search.

As for the contention that the affidavit failed, other than in the most conclusory terms, to show that "traditional", "normal" law enforcement techniques would be unavailing, the Court notes that such a showing was in fact made in support of this search warrant. The danger endemic to narcotics cases that evidence will be de-

stroyed quickly necessitates that such crucial, direct evidence must be seized forthwith, once a proper finding of probable cause has been made by the judge authorizing the requisite search warrant. *See United States v. Tucker*, 380 F.2d 206, 208 n. 1 (2d Cir.1967) (where narcotics agents had probable cause for arresting defendant for possession of narcotics, search without warrant not improper because the agents were required to move quickly to arrest defendants and "obtain the narcotics which could have been easily removed or secreted"). Thus, the Court finds this claim to be utterly lacking in merit.

■ Defendant Farese contends that, had the fact that his occupation involved the construction industry been stated, an innocent interpretation of his intercepted conversations concerning "property", "lots" and "working in the house", may have been reached. While that may be so, the possibility of such an interpretation would not be determinative here, because our Court of Appeals has ruled that the fact that an innocent explanation may be consistent with the facts alleged neither negates probable cause, nor should it preclude a good faith belief in probable cause. *United States v. Fama*, 758 F.2d at 838; *United States v. Ivic*, 700 F.2d 51, 57 (2d Cir.1983); *United States v. Webb*, 623 F.2d 758, 761 (2d Cir.1980). In response to Defendant Farese's objection to the search warrant based upon Detective Magaletti's failure to include facts pertinent to the credibility of "CI #1" in his wiretap affidavit, the Court notes that this concern is indistinguishable from the "fruit of the poisonous tree" rationale, held not to apply herein. In addition, this matter has been discussed in great detail above, as affecting the validity of the wiretap warrants.

■ Moreover, this finding of probable cause is probably not required in any event, because the Court concludes that, under the circumstances of this case, the good faith exception to the exclusionary rule clearly applies. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *United States v.*

*Leon*, the Supreme Court held that evidence obtained by an agent who acts in objective good faith in reliance on a search warrant issued by a neutral and detached judge or magistrate may not be suppressed under the search and seizure clause of the Fourth Amendment, even if the warrant is ultimately determined to be invalid. A reviewing court must defer to the issuing court's initial determination of probable cause to support a warrant, and evidence obtained pursuant to a search warrant may not be suppressed, unless: (1) the court was misled by information that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the court wholly abandoned its neutral and detached judicial role; (3) the warrant was based on an affidavit " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " and no officer could manifest objective good faith by relying on the warrant; or (4) the warrant is so facially deficient that the executing officers could not reasonably presume it to be valid. *Id.* at 923. *See United States v. Fama*, 758 F.2d at 835–7; *United States v. Gomez*, 495 F.Supp. 992 (S.D.N.Y.1979), *aff'd* 633 F.2d 999 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981) (defendant has burden to establish that false statements were knowingly and intentionally made or made with reckless disregard for their truth, and were necessary to finding of probable cause). The Court concludes that *Leon* requires denial of this motion, even assuming the validity of the defendants' conclusory allegation that the warrants are "entirely lacking in probable cause."

As urged by the Government, there can be no question that the officers held an objectively reasonable belief that there was probable cause to search the premises at issue in this case. Before applying for the search warrants, Detective Magaletti sought the expertise of an Assistant District Attorney and an Assistant United States Attorney. The Assistant District Attorney drafted the affidavits based on

Detective Magaletti's information. New York State Supreme Court Justice Dachenhausen, Judge Ackerman of the District of New Jersey and Magistrate Tyler of the Southern District of New York reviewed the affidavits and found probable cause to arrest the respective defendants for suspected involvement in a drug trafficking conspiracy and to issue the search warrants for the defendants' homes. This Court concludes that the expertise of the prosecutors, the judicial findings and the issuance of search warrants supported an objectively reasonable good faith belief in probable cause to search the defendants' residences.

The search warrant applications in this case clearly met the New York state standards as well, as enunciated in *People v. Bigelow*, 66 N.Y.2d 417, 422–3, 497 N.Y. S.2d 630, 488 N.E.2d 451 (1985) and *People v. Johnson*, 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985) (*see supra* wiretap motion). The informants relied upon by the Government gave detailed, personal accounts of defendants' long-term ongoing narcotics organization which were independently corroborated by the conversations intercepted pursuant to the eavesdropping orders and surveillance.

Accordingly, defendants' motion to suppress the evidence uncovered pursuant to these search warrants is denied.

■ Defendants' request for an evidentiary hearing, as to the search warrants, under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), is also denied. The Court finds that no such hearing is required because defendants have failed to meet their burden as set forth therein by the Supreme Court, and quoted *supra.*

Defendants have failed to support their allegation of deliberate falsehood or reckless disregard in connection therewith. From its review of the affidavit of Detective Magaletti and the materials regarding the execution of the search warrants, this Court determines the warrants to be valid both on their face as sufficiently supported by probable cause, and in their good faith

execution, for each of the defendants and their residences searched pursuant thereto.

Accordingly, the motions to suppress the seized items are denied in all respects.

## V. MOTIONS FOR *MIRANDA* HEARINGS

Defendants Cercena, Gumpricht, and Tarantelli have moved for hearings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to determine the voluntariness of statements made, or possibly made, by them under custodial interrogation. For reasons set out below, Gumpricht's motion is granted and Cercena's and Tarantelli's are denied.

### *Tarantelli*

■ Tarantelli's affidavit affirms merely that

[i]n the event the prosecution will offer in evidence against the defendant any statements ... [a] hearing is required to determine whether the statement was taken in the absence of defendant counsel; whether it was made before or after the defendant's arraignment, and whether the giving of any statement was preceded by the *Miranda* warnings.

Tarantelli Aff. Para. 9–10.

This mere hypothesis that the Government has statements of Tarantelli is insufficient as a matter of law to require a *Miranda* hearing. As Judge Duffy said of a similar request,

Herbert Kornblau moves to suppress "any such statements" that were ... obtained in violation of *Miranda v. Arizona* ... or that were obtained involuntarily. He submits no memorandum and no affidavits to shed light on the particulars of his claim. Kornblau's submission is wholly inadequate to even raise an issue as to the propriety of his arrest or interrogation and clearly fails to "state sufficient facts which, if proven, would [require] the granting of the relief requested by [Kornblau]."

*United States v. Kornblau*, 586 F.Supp. 614, 621 (S.D.N.Y.1984), *quoting United States v. Culotta*, 413 F.2d 1343, 1345

(2d Cir.1968), *cert. denied*, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970).

By letter to this Court the Assistant United States Attorney has said that "the Government is unaware of any statements by defendant Louis Tarantelli to any person known by him to be a Government agent. The Government will not seek to introduce any such statement against him at trial." Letter of Franklin H. Stone, Esq., December 9, 1986. There is, therefore, no possible *Miranda* problem as to Tarantelli, and his motion is denied.

### Cercena

Cercena, by an attorney's affirmation, claims that he was interrogated by Assistant United States Attorney Stone after his arrest and that "at the time of the interrogation he was experiencing withdrawal symptoms from his heroin addiction, that he was obviously in severe physical and emotional distress and that consequently his waiver of his Fifth and Sixth Amendment rights was involuntary." Affirmation of D. Porco, Esq., Para. 7, at 5.

■ The Supreme Court has not foreclosed the notion that a waiver of *Miranda* rights is involuntary, in the absence of governmental coercion. *Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly*, the respondent confessed to a murder impelled to do so, as he thought, by the voice of God. The Supreme Court reversed the Colorado Supreme Court's holding that the confession was involuntary: "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' ...." *Id.*, at —, 107 S.Ct. at 522. By necessary implication, a confession offered under the pangs of heroin withdrawal, in the absence of coercive police activity, is not involuntary for *Miranda* purposes. Cercena's attorney's affirmation contains no real allegation of such police coercion. Cercena does allege that he was "obviously in severe physical and emotional distress," and might hope to tease from this an argument to the effect that Assistant Stone reasonably could have noticed that he was in a condition in which his will could be

overborne, so that her questioning was coercive.

The Court finds this hypothetical line of argument unconvincing. Most people who are arrested and charged with crimes, especially if they know they are guilty, can be expected to look distressed. If, as sometimes happens, they are not guilty, they will naturally wonder about the mistake that led law enforcement officials to focus attention on them. Possibly scenes of fiction from television and the movies will have led them to expect undeserved harsh treatment. If they *are* guilty, they have every reason to look distressed and to be nervous about their risk of conviction.

An Assistant United States Attorney is not required to possess any special expertise in distinguishing these natural and obvious symptoms of physical and emotional shock and distress from the symptoms of drug withdrawal, such as Cercena alleges he was suffering. The goals of *Miranda*, if there are any, would not be served by granting a *Miranda* hearing to every defendant who, after receiving his *Miranda* rights, confessed under questioning while looking distressed.

■ In view of the doctrine clearly enunciated in *Connelly*, this Court, therefore, will not find official coercion in the mere fact of questioning an arrested suspect who is visibly distressed, if he was. Cercena's motion for a *Miranda* hearing is denied.

### Gumpricht

Gumpricht alleges that he was arrested by agents of the Federal Bureau of Investigation. In the presence of said officers, the defendant made various oral statements relative to the investigation. Defendant was in custody when making the statements. Subsequent to making the statements, the defendant was informed of his rights under *Miranda v. Arizona....* Memoranda of Law of Defendant Sol Gumpricht Para. 1.

■ Our Court of Appeals has held that a trial court is "required as a matter of law to hold an evidentiary hearing if appellant's moving papers ... state sufficient facts which, if proven, would have required the granting of the relief requested by appellant." *United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970). Gumpricht has stated such facts. He has said, in effect, that he was in custody, having been arrested, and made statements before he was read his *Miranda* rights. Under these circumstances this Court will grant Gumpricht an evidentiary hearing. There is a line of authority according to which allegations made by an attorney without personal knowledge, rather than by a defendant, do not raise factual issues to be resolved at an evidentiary hearing. *See, e.g., United States v. Gillette,* 383 F.2d 843, 848 (2d Cir.1967). However, relying on the good faith of Gumpricht's attorney and in the interests of justice, this Court will exercise its discretion and grant the hearing. Counsel shall confer and suggest a mutually convenient date for such hearing, and advise the Court.

## VI. MOTION FOR SEVERANCE

Five defendants—Acevedo, MacLennan, Marrama, Sullivan, and Tarantelli—move to sever their trials. Six defendants—Dratch, Farese, Fernandez, Gallo, Neuringer, and Tarantelli—move to sever various counts in the indictment.

### The Firearms Counts

All defendants move to sever Counts Four, Five, and Six of the indictment, which charge Stephen Gallo with possession of three firearms. Defendants argue that Gallo's possession of firearms is related to them only insofar as he is named in the first conspiracy count along with them, and that the indictment does not even plead that the firearms were used in furtherance of the conspiracy. They argue that there is therefore misjoinder under Rule 8(b), F.R.Crim.P., or in the alternative that this Court should grant a severance under Rule 14, F.R.Crim.P. Gallo further maintains that conviction for a firearms possession charge requires proof of a previous felony. "To justify the joinder of the firearms charges and the cocaine conspiracy, the Government is required to demonstrate that [his] prior drug conviction would be independently admissible, absent joinder, in the present conspiracy trial." Gallo Memorandum of Law at 2. Because there was no allegation of a common scheme, Gallo urges, evidence of his prior conviction would be inadmissible.

### Joinder of Counts Against Gallo—Rule 8(a) Analysis

"It is well established that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses, whereas Rule 8(b) governs in cases involving multiple defendants." *United States v. Kopituk,* 690 F.2d 1289, 1312 (11th Cir. 1982) (footnote omitted), *cert. denied sub nom., Turner v. United States,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983). Analysis of the joinder of the firearms counts and the conspiracy count against Gallo can therefore proceed, at least by analogy, under Rule 8(a), whereas Rule 8(b) pertains to the joinder of the firearms counts as against the other defendants.

Gallo argues that Counts Four, Five, and Six are misjoined as to him with respect to the other counts. Because it is not alleged that he used the firearms in connection with the Count One conspiracy, proof of his possession of the guns merely "has the effect of branding him as a violent or dangerous individual." Gallo Memorandum of Law at 2. More importantly in Gallo's view, the firearms counts require the prejudicial proof that he has a prior felony conviction.

■ Gallo's first argument does not provide grounds for a finding of misjoinder under Rule 8(a). Our Court of Appeals has held consistently that evidence of firearms possession is admissible in a narcotics trial, noting that "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost

to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). The Second Circuit does not appear to have extended this reasoning to the joinder of a firearms possession count with a narcotics count, but the Eleventh Circuit, relying on the language quoted from *Wiener*, has done so. For example, in *United States v. Montes-Cardenas*, 746 F.2d 771 (11th Cir.1984), the court observed:

> The same logic used to admit weapons into evidence at drug trials directs us to conclude that, especially when, as here, weapons and drugs are found during the same search, joinder of a weapons offense with drug charges is proper under Rule 8(a). Indeed, several courts have upheld joinder of drug charges with weapons violations under Rule 8 when the weapons were found during the same search that produced the drugs. *Id.* at 777 (footnote omitted).

Thus, it does not matter that the Government does not allege that the weapons were not used in furtherance of the conspiracy. As the Eleventh Circuit observed in explanation of *Montes-Cardenas:*

> Although *Montes-Cardenas* did not decide it would be proper to join drug and gun charges arising in completely different factual contexts, since here Davis gave the gun to his co-conspirator and it subsequently was found in the co-defendant's room with drugs and other weapons, the charges do not arise from sufficiently distinct factual contexts to necessitate resolution of the issue in *Montes-Cardenas.*

*United States v. Davis*, 773 F.2d 1180, 1181 (11th Cir.1985).

As in *Davis*, the search of Gallo's residence turned up drugs and drug paraphernalia in juxtaposition with firearms. This fact, especially when combined with Gallo's intercepted conversations with Feola, provides a sufficient factual nexus to make joinder proper under Rule 8.

This Court finds an unfortunate gap in logic in the *Wiener* line of cases. Of course, almost all drug dealers keep guns for self-protection, but so does an ever increasing number of the law-abiding population, disgusted with the inability of society to protect them from marauders and outlaws. However, we must take the case law as we find it.

*Joinder of Counts Against Gallo—Rule 14 Analysis*

 If joinder is not improper under Rule 8, severance is within the discretion of the trial court under Rule 14, to be exercised to assure a fair trial. *See, e.g., United States v. McGrath*, 558 F.2d 1102 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Herrera*, 584 F.2d 1137, 1143 (2d Cir.1978).

 Of the three kinds of prejudice courts recognize as grounds for severance, see *Drew v. United States*, 331 F.2d 85, 88 (D.C.Cir.1964), Gallo alleges only one—that proof of his prior marijuana conviction, necessary to the firearms counts, will prejudice him in the trial of the drug counts. Essential to this argument is the claim that the prior conviction would be inadmissible in a separate trial on the drug counts. Gallo Memorandum of Law at 2–3, citing *United States v. Busic*, 587 F.2d 577, 584–85 (3d Cir.1978), *rev'd on other grounds*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). Gallo does not argue that the prior conviction does not fall under any of the familiar exceptions to prior crimes evidence. In particular, Gallo does not argue that the prior conviction would not be probative as to knowledge, motive, or intent. Faced with a similar fact pattern, the Fifth Circuit concluded that a prior drug conviction required to prove a firearms violation would have been admissible in a separate trial of a joined narcotics charge to show knowledge or intent. The court concluded that no prejudice would result from joinder. *United States v. Park*, 531 F.2d 754, 762–63 (5th Cir.1976). Persuaded by the Fifth Circuit's analysis, this Court declines to grant a severance on Gallo's motion. Be-

fore leaving the issue, the Court notes that Gallo, or any other defendant, may propose in advance of trial a limiting instruction to the jury concerning the prior conviction, and may offer any other procedure to attenuate possible prejudice, short of a severance. Included, but not by way of limitation, are a stipulation by Gallo as to the existence of the prior felony conviction, together with a cautionary jury instruction, or a redacted certificate of conviction, also with an instruction. So much of Gallo's argument that he will be perceived by the jurors as a violent or dangerous individual is arrant nonsense. A majority of our jurors have firearms in their homes, not because they are violent and dangerous, but to protect themselves and their loved ones from those that are.

### Joinder Against the Other Defendants—Rule 8(b) Analysis

■ Defendants other than Gallo urge that joinder of his weapons counts prejudices them by raising an association in the minds of the jurors between them and a man shown by those charges to be a disreputable or violent character. This spillover effect, they maintain, could not be cured by jury instructions.

Defendants' arguments to this effect, even if jurors would assume such bad character merely from firearm possession, which this Court regards as unlikely, do not raise grounds for severance as a matter of law under Rule 8(b). Although Rule 8(b) permits joinder of defendants only "if they are alleged to have participated in the same act or transaction or in the same series of acts of transactions constituting an offense or offenses," even granting defendants' contention that Gallo's possession of the firearms is not part of the same series of acts or transactions as his participation in the conspiracy, there is no misjoinder. The conspiracy count itself provides a basis for joinder. "Here joinder of a conspiracy count and the substantive counts arising out of the conspiracy count is proper since the charge of conspiracy provides a common link and demonstrates

the existence of a common plan." *United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). *See also, e.g., United States v. Luna*, 585 F.2d 1, 4 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978) ("A conspiracy count can be a sufficient connecting link between co-defendants and separate substantive offenses to permit their joinder in a single indictment...."). *See also, United States v. Miley*, 513 F.2d 1191, 1209 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 75, 46 L.Ed.2d 62 (1975) (Friendly, J.) (noting that joinder would have been improper in absence of conspiracy count). Thus, the question of severance is again addressed to the discretion of this Court under Rule 14.

■ There is no basis presented here for the Court to exercise its discretion so as to grant a severance of the weapons counts under Rule 14. The burden to show prejudice is upon the defendants, *United States v. Haim*, 218 F.Supp. 922, 931 (S.D.N.Y. 1963) (Edelstein, J.), and it is heavy, requiring a showing not just of prejudice but of substantial prejudice, *United States v. Werner*, 620 F.2d 922, 928 (2d Cir.1980).

Here, defendants have merely offered the conclusory assertion that there will be an incurable spillover effect from the inclusion of the weapons counts, coupled with, in Dratch's case, an unsupported allegation of prosecutorial bad faith. Such allegations do not move this Court to exercise its discretion. "[A] general, unsupported claim of prejudice, as asserted by these defendants, is insufficient to warrant the severance of counts that are properly joined." *Haim*, 218 F.Supp. at 932. There is no reason to believe that cautionary instructions could not cure any potential prejudice. *Cf. United States v. Laca*, 499 F.2d 922, 924–27 (5th Cir.1974) (holding that joinder of weapons counts with drug counts, where only two of three defendants were charged with weapons counts, did not prejudice third defendant so as to require severance when drug and weapons offenses occurred simultaneously). Moreover, defendants have not even established,

as a matter of law, that they will be prejudiced by introduction of Gallo's prior conviction into evidence. "Evidence of prior criminal offenses relating only to one defendant does not generate prejudice arising to the level that requires severance." *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir.1980). Accordingly, all motions to sever Counts Four, Five, and Six are denied.

*Severance of the Conspiracy Counts From One Another*

Dratch, Farese, Fernandez, and Neuringer all move to sever Counts One and Two. All suggest that the Count One cocaine conspiracy and the Count Two marijuana conspiracy are so dissimilar that joinder is unwarranted; the Count Two conspiracy includes only four of the Count One defendants, encompasses a different time period, and involves different controlled substances. The Government responds that

> [T]he cocaine and marijuana conspiracies at issue in this case are intimately related. All defendants are charged with conspiring to distribute cocaine and four of them, including key organizers, are charged with also conspiring to distribute marijuana during the same period. In short, some defendants were distributing both cocaine and marijuana, while others were distributing only cocaine. The proof at trial ... is virtually identical for both conspiracies.... Government Brief at 118.

■ Even accepting defendants' characterization of the indictment as charging distinct conspiracies, rather than a conspiracy some of whose members also conspired further to commit an additional crime, defendants present no reason to grant a severance. There is no question that a single indictment may charge more than one conspiracy. "Two or more conspiracies may be joined under Rule 8 so long as they are related as part of a common scheme." *United States v. Persico*, 621 F.Supp. 842, 851 (S.D.N.Y.) (Keenan, J.), *aff'd*, 774 F.2d 30 (2d Cir.1985). Our Court of Appeals takes a broad view of the "common scheme" requirement: "While it

is unusual so to charge, there is no reason why people cannot enter into two separate criminal agreements more or less at the same time.... If they do, they come within the joinder rule, F.R.Crim.P., Rule 8, subject to severance in the interests of justice." *United States v. Papadakis*, 510 F.2d 287, 296 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Thus the presence of common defendants in the two conspiracies connects them sufficiently to permit joinder under Rule 8, and if severance is to be granted it must be under Rule 14.

■ The defendants who are named in both counts will not be able to show prejudice. There can be no spillover effect against a defendant who is part of both conspiracies. *United States v. Scott*, 511 F.2d 15, 19–20 (8th Cir.), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). Indeed, as a practical reality, what person would willingly undergo two separate Southern District narcotics trials when one is more than a sufficient burden? Who, being acquitted of one charge, would willingly submit to another trial before a different jury on congruent facts?

As to the defendants who are named only in Count 1, absent a showing of prejudice their joinder with the Count 2 defendants does not require severance. *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir.1978). Thus, Counts One and Two are not misjoined.

*Motions to Sever Trials*

■ The five motions to sever trials can be dealt with briefly. The Boston defendants—MacLennan, Marrama, and Sullivan—and Acevedo all argue that because they are named in only one count of the indictment and because the bulk of the evidence is against the other defendants, they will be prejudiced by a joint trial. Neither of these contentions has merit. As to the first point, Rule 8(b) specifically provides that "all of the defendants need not be charged in each count," and it is established that failure to charge all defendants in each count does not require severance under Rule 14. As to the second, it is well

**1124**

established that "simply because the evidence against codefendants is stronger or that one defendant's role in the crime is lesser than that of others is not sufficient reason to grant a severance." *United States v. Potamitis,* 564 F.Supp. 1484, 1486 (S.D.N.Y.1983) (Weinfeld, J.), *aff'd,* 739 F.2d 784 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). As Judge Weinfeld held,

> The ultimate question on a motion for severance is:
>
> [W]hether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.
>
> *Id., quoting United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y.1962) (Weinfeld, J.), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

Because defendants MacLennan, Marrama, Sullivan and Acevedo advance no further reasons to believe that a jury could not consider separately the evidence as to them, their motions to sever are denied.

Tarantelli raises several further arguments in favor of severing his trial, none of which is persuasive. He maintains (a) that statements inculpating him made by his codefendants would be inadmissible under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), requiring a severance; (b) that if this Court finds he does not have standing to contest the wiretaps, he has no interest in them and so they are inadmissible against him, requiring a severance; (c) he may want to call some of his codefendants to testify on his behalf, which he could not do in a joint trial.

The claimed *Bruton* problem is wholly speculative at this point. Because Tarantelli has not alleged that some codefendant whose statements will be offered against him will be *unavailable,* he in fact has not even raised a potential *Bruton* problem. In any event, the *Bruton* problem, if it arises, may be met by an objection to the admissibility of any *Bruton*-type hearsay, or redaction thereof to eliminate any possible prejudice.

Because Tarantelli has standing to contest the wiretaps, there is no need to address his second contention, although it might be noted that even if the wiretaps were inadmissible against him this simply would not be enough to require a severance. *See, e.g., United States v. Lyles,* 593 F.2d 182, 190 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

Tarantelli's final consideration deserves closer attention. A severance would be justified if Tarantelli's codefendants would offer exculpatory testimony at a separate trial. However, Tarantelli has not made the necessary showing to support a severance on this ground. He has not demonstrated that (1) any co-defendant's testimony would be exculpatory; (2) the co-defendant would in fact testify; or (3) the testimony would bear on defendant's case, *United States v. Melton,* 689 F.2d 679, 686 (7th Cir.1982). Tarantelli has alleged only that he *may* try to call some of his co-defendants. This is insufficient to raise an issue as to severance.

### Dismissal of Count One Due to Alleged Multiplicity

Dratch urges that Count One should be dismissed because it charges multiple conspiracies in one count. Dratch relies on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) to argue that the Government alleges a "wheel" conspiracy without a rim, necessitating dismissal. Our Court of Appeals has held that "the question whether one or multiple conspiracies are present is a question of fact, to be resolved by a properly instructed

jury." *United States v. Orozco-Prada*, 732 F.2d 1076, 1086 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984). The prior issue of whether the indictment itself is duplicitous—that is, that it *charges* multiple conspiracies in one count—was well addressed in *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir.1977), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977):

> Appellants assert that the Government swept several discrete conspiracies into a single conspiracy count, and that this was a misjoinder which worked to their prejudice, effecting "guilt transference" by associating them with co-defendants involved in other criminal acts. In so contending, appellants confuse *separate acts at separate times* with *separate conspiracies.* Almost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal. The standard for determining the existence of a single conspiracy, however,
>
> "... is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy...."
>
> *Id.* (emphasis in original), quoting *United States v. Hobson*, 519 F.2d 765, 775 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975).

The *Kearney* court continued:

> Here, the evidence is clearly sufficient to show one overall scheme. The Government proved that each defendant knew, or had reason to know, that others were involved in a broad project for the transportation of illegal narcotics, and that his benefits were probably dependent upon the success of the entire operation.... Proof that an alleged co-conspirator knew that he was plotting in concert with others to violate the law is sufficient to raise the necessary inference that he joined in the overall agreement.... It need not even be shown that an alleged co-conspirator knew all of the purposes and all of the participants in the conspir-

acy.... Once the existence of a conspiracy is independently shown, only slight evidence is necessary to connect a defendant to it. *Id.* (citations omitted).

■ Thus, the Government's burden in avoiding a charge of misjoinder of conspiracies is not as heavy as Dratch would have it. Moreover, even if the Government were to fail to meet that burden, the proper remedy would be not dismissal of the count but an election by the Government of the charge on which it will rely. *See, e.g., United States v. Saporta*, 270 F.Supp. 183, 185 n. 1 (E.D.N.Y.1967).

*Dismissal of Count Three on Venue Grounds*

■ Fernandez argues that because the substantive offense recited in Count Three occurred in the District of New Jersey, its prosecution in the Southern District of New York would violate F.R.Crim.P. Rule 18's requirement that "the prosecution shall be had in a district in which the offense was committed." 21 U.S.C. § 846 (1982), the narcotics conspiracy statute under which Count One is drawn, "permits the government to bring the conspiracy charges in any district where an overt act is alleged to have been committed," *United States v. DeLeon*, 641 F.2d 330, 336 (5th Cir.1981). The indictment alleges that overt acts were committed in the Southern District of New York. Thus, the Count One conspiracy charges are properly triable against Fernandez in this district.

The occurrence of the alleged substantive cocaine possession in the District of New Jersey, however, does entitle Fernandez to a change of venue as to Count Three if Fernandez desires that relief.

This would seem to represent a Pyrrhic victory, for, as observed heretofore, one federal narcotics trial is burden enough. The New Jersey possession will be admissible in evidence in this Court in all events on Count One, and the Court cannot understand why anyone would willingly have the experience replicated. We note that acquittal on the Count One conspiracy charge in

this district would not bar a trial in New Jersey on the Count Three substantive charge, on double jeopardy grounds. *See, e.g., United States v. Praetorius,* 462 F.Supp. 924, 927 (E.D.N.Y.1978), *cert. denied,* 444 U.S. 869, 100 S.Ct. 145, 62 L.Ed.2d 94 (1979); *United States v. Cheung,* 555 F.2d 1069, 1072 (2d Cir.1977). Ms. Fernandez may, if so advised, act within ten (10) days to waive the improper venue with respect to Count Three, in her sole discretion. If Ms. Fernandez does not waive the venue within that time, this Court will order Count Three severed as to her, and transferred to the United States District Court for the District of New Jersey, for trial following the trial of this case.

*Dismissal of Count Three on Other Grounds*

■ Finally, both Neuringer and Farese suggest that Count Three be severed from the indictment. Neuringer's reason is that there is insufficient connection between the New York-centered conspiracy and the New Jersey possession. (Neuringer also urges that he is not named in Count Three, a contention considered generally, and rejected *supra*). The discussion of severance of the firearms counts applies here.

Farese contends that if Count Three is not severed there will be prejudicial spillover in the jury's consideration of Count One. The Government, however, will certainly try to prove that the Count Three substantive possession was in furtherance of the Count One conspiracy. Farese offers no reason to believe that if the Government fails to prove that aspect of its case, a cautionary instruction would be inadequate to cure any potential prejudice.

The federal courts have long observed "[t]he general rule in conspiracy cases ... that defendants indicted together should be tried together. This rule is particularly appropriate when the conspiracy may be proved against the defendants by the same or similar evidence resulting from the same or a similar series of acts." *United States v. Wolfson,* 289 F.Supp. 903, 908 (S.D.N.Y.) (Palmieri, J.), *aff'd* 405 F.2d 779 (2d Cir.

1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). This policy should of course be abrogated and severance allowed upon a showing of genuine prejudice to an individual defendant, amounting to the denial of a fair trial altogether. *Id.; United States v. Kirk,* 534 F.2d 1262, 1269 (8th Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977). Defendants, however, have simply made no showing of such prejudice.

Accordingly, defendants' motions for severance are denied in their entirety.

## VII. MOTIONS TO EXCLUDE PRIOR CONVICTIONS

*For Impeachment Purposes*

Defendants Acevedo and MacLennan have moved *in limine* for an order prohibiting the Government from introducing evidence of their prior convictions should those defendants elect to testify. They argue that the prior convictions have no bearing upon the truthfulness of these defendants, and that the introduction of these convictions into evidence will have a chilling effect on defendants' ability to testify on their own behalf.

Pursuant to Rule 609(a)(1) of the F.R. Evid., the Court may allow cross-examination concerning a prior felony conviction if "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant." Rule 609 provides in pertinent part as follows:

(a) For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

In the exercise of the Court's discretion under this rule, a predominant factor is whether the crime, by its nature, is probative of a lack of veracity. *See, e.g., United States v. DiLorenzo,* 429 F.2d 216 (2d Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971) (prior conviction involving a crime which "reflect[s] on honesty and integrity and thereby on credibility ..." might be used to impeach a witness).

The Second Circuit has held a prior conviction for the type of narcotics conspiracy involved herein to be highly probative for the purpose of impeachment of the defendant if he takes the stand. In *United States v. Ortiz,* 553 F.2d 782, 784 (2d Cir.1977), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977), the court held that the trial judge is:

> entitled to recognize that a narcotics trafficker lives a life of secrecy and dissembling in the course of that activity, being prepared to say whatever is required by the demands of the moment, whether the truth or a lie. From this he could rationally conclude that such activity in a witness' past is probative on the issue of credibility.

*See also United States v. Hayes,* 553 F.2d 824, 327–328 (2d Cir.1977), *cert. denied,* 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977) (prior conviction for importation of cocaine ranks relatively high on the scale of veracity-related crimes; probative and properly admitted in court's discretion under Rule 609(a)(1)). *But see contra, United States v. Puco,* 476 F.2d 1099 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973), decided prior to the adoption of the Federal Rules of Evidence.

In order to perform the necessary balancing contemplated in Rule 609, this Court defers its determination of this issue until trial, when the record has been more fully developed and it becomes more apparent whether the defendants do indeed plan to testify in their own behalf.

As the Second Circuit has instructed, the defendant must inform the trial judge of the substance of his testimony with a degree of precision sufficient to allow the trial judge to balance the probative value of the testimony against the prejudicial effect of the conviction:

> Without adequate notification of what defendant's testimony will reveal, the trial judge cannot "compare the relevance of the prior conviction to credibility with the importance to [defendant's] defense of having him testify free from the prejudice which might be created by reference to it." *United States v. Washington,* 746 F.2d 104, 106 (2d Cir.1984), *quoting United States v. Costa,* 425 F.2d 950, 954 (2d Cir.1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 272 (1970).

Thus, this Circuit has adopted the procedure outlined by the Ninth Circuit Court of Appeals in *United States v. Cook,* 608 F.2d 1175, 1186 (9th Cir.1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980):

> [T]o preserve the issue for review, a defendant must at least, by a statement of his attorney: (1) establish on the record that he will in fact take the stand and testify if his challenged prior convictions are excluded; and (2) sufficiently outline the nature of his testimony so that the trial court, and the reviewing court, can do the necessary balancing contemplated in Rule 609 ...

*See also United States v. Pedroza,* 750 F.2d 187, 202–203 (2d Cir.1984), *cert. denied sub nom. Osorno v. United States,* ⸺ U.S. ⸺, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986).

■ The Court has no duty to rule regarding such a motion *in limine* until the defendant takes the stand, even if the refusal to do so prevents a defendant from testifying in his own behalf. *See, e.g., United States v. Pfingst,* 477 F.2d 177, 193 (2d Cir.1973), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *United States v. Kahn,* 472 F.2d 272, 281–282 (2d Cir.1973), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

Moreover, the defendants in this case do not present facts so far outside of the ordinary situation in a drug conspiracy

case as to require an advance ruling on the motion *in limine. See, e.g., United States v. Burkhead,* 646 F.2d 1283, 1286 (8th Cir. 1981), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981).

Accordingly, the Court declines to rule on the admissibility of defendants' prior convictions under Rule 601 in the present stage of the proceedings. The motion is denied without prejudice to defendants' right to renew the motion in the course of the trial.

### *For Government's Case in Chief*

In addition, defendant Cercena makes a motion at this stage of the proceedings to exclude the 1981 convictions of Cercena and co-defendant Feola for conspiracy in the fourth degree under New York Penal Law § 105.10, a Class E felony, for which they served a one-year prison sentence, from the Government's case in chief as inadmissible prior bad acts under Rule 404(b) of the F.R.Evid.

Rule 404(b) provides in full that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.* (emphasis added).

Under the well-established precedent of this Circuit, the Court must perform a two-step analysis of other crimes evidence in order to determine its admissibility. First, the evidence must be relevant to some issue at trial other than "to prove the character of a person in order to show that he acted in conformity therewith," as required by Rule 404(b). Second, even if the evidence is relevant, the Court must determine that the probative value of, and the Government's need for, the evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence", as required by Rule 403 of the F.R.Evid. *See*

*United States v. Smith,* 727 F.2d 214, 219–220 (2d Cir.1984); *United States v. DiGeronimo,* 598 F.2d 746, 753 (2d Cir.1979), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979).

Among the purposes for which this kind of evidence may be introduced in the Government's case-in-chief are to establish identity, *see, e.g., United States v. DiGeronimo,* 598 F.2d at 753–754; common scheme or plan, *United States v. Reed,* 639 F.2d 896, 906 (2d Cir.1981); *United States v. Wexler,* 621 F.2d 1218, 1225 (2d Cir. 1980), *cert. denied sub nom. Angrist v. United States,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980); or knowledge, intent and state of mind, *Smith,* 727 F.2d at 220—where those considerations are placed in issue in the case.

On the present state of the record, the Court cannot know or anticipate what factors are in issue in the case, as the trial has not yet commenced. Since the determination both of relevancy and of the potential prejudicial impact of this evidence hinges on the context established during trial, the Court must defer until such time, if any, as this evidence is offered in order to perform its requisite balancing function.

■ Defendants have not demonstrated that these prior convictions of defendants Cercena and Feola for conspiracy bear no relationship to this indictment, or more specifically, that the potentially relevant issues of identity, common scheme or intent will not be presented at trial. As noted above, circumstances might render such evidence admissible in the course of trial.

Thus, the motion is denied without prejudice to renewal at trial at such time as the prosecution seeks to introduce evidence of this nature to which an appropriate objection is made. No such evidence of prior similar acts is to be elicited by the Government at trial until specific prior notice is given on the record, in the absence of the trial jury, so as to permit ample opportunity for hearing and deliberation upon any objections thereto.

## VIII. MOTION TO PRECLUDE STATEMENT

Defendant Marin makes a motion for the Court to preclude the Government from offering in evidence at trial a certain written statement which was seized in the apartment of co-defendant Fernandez by agents of the Government during the execution of the appropriate arrest and search warrants. This one-page, handwritten statement, annexed as Exhibit A to the affidavit of counsel Barry Asness, appears to be signed by Rubiel Marin and contains his Colombian and American registration/identification numbers. It reads, in part:

"I have been involved in traficking cocaine bussines from Colombia, S.A. [sic] ..."

and makes reference to his apparent debts.

Defendant moves for this order to hold the document "in its present form" inadmissible, on the following grounds: (1) that the document is not authenticated, pursuant to Rule 901, F.R.Evid.; (2) that, even if its relevance can be shown, its prejudicial and misleading impact will far outweigh any arguable probative value, Rule 403, F.R.Evid.; (3) that admitting it would be tantamount to permitting the Government to prove a prior, similar, uncharged act solely to demonstrate Defendant Marin's propensity to engage in narcotics offenses, in contravention of Rule 404, F.R.Evid.

▮ The Court finds the issue of the admissibility of this statement to be premature, substantially for the reasons detailed in the preceding motion to exclude evidence of prior convictions as inadmissible under Rule 609 and Rule 404, F.R.Evid.

It would be improper for this Court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation which will be set forth for the purpose of authentication, the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at that time.

Accordingly, this motion *in limine* of Defendant Marin is denied without prejudice to its renewal at such time, if any, as the Government seeks to introduce this handwritten statement at trial. As with the prior similar act evidence, no reference shall be made thereto in the presence of the jury without a prior ruling, following an opportunity for defendants to be heard.

## IX. MOTION FOR *JAMES* HEARING

▮ Defendant Dratch moves for a pre-trial hearing on the admissibility against him of any statements made by his alleged co-conspirators, pursuant to *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Under *United States v. James*, the Fifth Circuit requires a pre-trial hearing before hearsay statements of co-conspirators may be received as against one another.

In our Circuit, however, "the matter is admissible upon the trial court's determination, made at the close of the government's case, of the sufficiency of the evidence, independent of the hearsay testimony, that the alleged co-conspirator participated in the conspiracy." *United States v. Wilson*, 565 F.Supp. 1416, 1437 (S.D.N.Y.1983), *aff'd* 750 F.2d 7 (2d Cir.1984), *cert. denied*, —— U.S. ——, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986). In this Circuit, the functional equivalent of what the Fifth Circuit calls a *James* hearing and requires before trial is provided by a *Geaney* ruling, which is provided only during trial, and relies for its basis on the facts adduced at trial, including evidence received subject to a motion to strike at the close of the Government's case. *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). *See also United States v. Margiotta*, 688 F.2d 108, 136–7 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Mastropieri*, 685 F.2d 776, 786–90 (2d Cir.1982), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982); *United States v. Persico*, 621

F.Supp. 842, 867 (S.D.N.Y.), *aff'd* 774 F.2d 30 (2d Cir.1985).

At this late date, a motion for a *James* hearing in this Circuit must be regarded as frivolous. Defendants who want *James* hearings should so conduct their business as to be tried in the Fifth or Eleventh Circuits.

Thus, defendant's motion is denied. As per its request, the Government will be permitted to offer out of court statements "subject to connection" without such a pretrial hearing. *United States v. Stanchich,* 550 F.2d 1294, 1298 (2d Cir.1977); *See also United States v. Mastropieri,* 685 F.2d at 788; *United States v. Geaney,* 417 F.2d at 1120. The Court will, of course, make all required *Geaney* rulings at the proper time in the course of trial.

## X. MOTION TO SEQUESTER TRIAL WITNESSES

■ Defendants MacLennan, Marrama, and Acevedo move to sequester witnesses at trial. This is a matter of right under Fed.R.Evid. 615, and is granted as to all witnesses on either side, except that the Government is permitted to have one agent present at trial who may also be a witness. The Court notes that Rule 615 only requires that witnesses be excluded "so that they cannot hear the testimony of other witnesses," *United States v. Brown,* 547 F.2d 36, 37–38 (3d Cir.1976), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977). The witnesses need not be sequestered during pretrial proceedings, or after their testimony; they can speak freely to anybody and if they do so, may be cross-examined with respect thereto insofar as may relate to bias or credibility.

## XI. PROSECUTORIAL MISCONDUCT

Rosner moves to dismiss the indictment on the ground of prosecutorial misconduct. Dratch joins in Rosner's motion and speculates that the prosecutor must have engaged in the same claimed misconduct with respect to him.

■ Rosner charges that the prosecutor presented falsely incriminating information to the grand jury, in the form of the wiretap transcripts as decoded or interpreted by Detective Magaletti, some of which are discussed earlier. In a disputed interpretation, not discussed above, there is disagreement between Rosner and Magaletti as to what was said. Magaletti claimed that Rosner asked for "two," which he interpreted to mean two quantities of some drug; Rosner claims he said "I'll bet I know who," referring to a woman he thought was with Feola. Granting Rosner's claim of scribal error, there was still sufficient evidence in the other two conversations to support a probable cause determination.

Because this opinion has determined that the transcripts as interpreted supported a probable cause determination, they could not have been falsely incriminating. *Cf. United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir.1979) ("The main function of a grand jury is to determine whether or not probable cause exists to believe that a crime has been committed, and, if so, to file charges against such persons as are reasonably believed to have committed it."). The Court need consider this aspect of Rosner's motion no further.

■ Rosner also charges, however, that the prosecutor failed to present exculpatory evidence to the grand jury. He relies on two principal matters. First, he notes that surveillance at various meetings did not confirm Detective Magaletti's interpretation of those meetings as drug-related; in particular, there was no evidence of drug transactions on November 26th, the day of the arrests. Second, he argues that there is no evidence that he acted as Feola's go-between with "Uncle." Although "[a]lmost every case [of alleged prosecutorial misconduct] presents a novel set of facts," 1 C. Wright, *Federal Practice & Procedure: Criminal 2d* § 111.1, at 325 (1982), we are confident that under controlling precedent Rosner has not provided evidence of misconduct that would justify dismissing the indictment.

It is true that our Court of Appeals has said, in dictum, that "where a prosecutor is aware of any substantial evidence negating guilt he should, in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the jury not to indict." *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979). It has also cautioned that

> [W]e have upheld the dismissal of an indictment only in very limited and extreme circumstances. In such cases, there was a need either to eliminate prejudice to a defendant in a criminal prosecution, where it was impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct.... [W]e emphasize here ... that the sanction is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases.

*United States v. Broward*, 594 F.2d 345, 351 (2d Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979).

Rosner is far from showing that this is one of the "truly extreme cases." Rosner does not dispute that evidence of the conversations, including those in which he referred to "Uncle," of Detective Magaletti's interpretations of those conversations, of the meetings, and of the arrests was presented to the grand jury. It was for the grand jury to draw inferences from the conversations mentioning "Uncle" about how closely Rosner was connected to "Uncle"; it was for the grand jury to draw inferences about Detective Magaletti's credibility and the weight of his testimony in asserting that certain meetings of the defendants were drug-related, in the absence of evidence that they were not. In *Ciambrone*, the court was careful to emphasize that "a prosecutor is not ... obligated to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury." *Id.* at 622. *Ciambrone* makes clear that here the prosecutor was not obliged to point out affirmatively, for example, that the meetings

turned out not to involve drugs, unless the grand jury, in the exercise of its investigative powers, asked her to do so. Rosner alleges that the prosecutor's failure to make such affirmative representations to the grand jury is an omission of "essential facts" that, had the grand jury known them, would have made it less likely to indict. The Court finds this unpersuasive. Even if such representations had been made, there was abundant evidence of connections between Rosner, Feola, and the other defendants, sufficient to support a determination of probable cause.

Rosner also relies on *United States v. Hogan*, 712 F.2d 757 (2d Cir.1983), as setting forth our Court of Appeals's standards for prosecutorial misconduct. *Hogan* must be limited to its highly unusual facts. The Court of Appeals dismissed the indictment in that case only with reluctance, because a prosecutor grossly overstepped the bounds of permissible conduct, by characterizing the defendant as a "real hoodlum," which he apparently was, who ought to be indicted "as a matter of equity," also tried to palm off hearsay as higher-quality proof, speculated about defendant's possible involvement in unrelated crimes, and presented false and misleading testimony by DEA agents. Rosner's specific allegations of prosecutorial misconduct in this case do not accuse the prosecutor of misconduct that even approximates the "flagrant and unconscionable" misconduct found in *Hogan*.

This motion is denied.

## XII. MOTION FOR BILL OF PARTICULARS

Defendants Tarentelli, Dratch, Marrama, Sullivan, MacLennan and Farese seek a bill of particulars. The Court has considered all of the separate demands, which are not uniform, and declares this motion granted in part, and denied in part, as set forth below.

▉ The proper scope and function of a bill of particulars is not to obtain disclosure of evidence or witnesses to be offered by the Government at trial, but to

minimize surprise, to enable movant to obtain such ultimate facts as are needed to prepare his defense, and to permit a defendant successfully to plead double jeopardy if he should be prosecuted later for the same offense. *Wong Tai v. United States,* 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); *United States v. Salazar,* 485 F.2d 1272, 1278 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Persico,* 621 F.Supp. 842 (S.D.N.Y.), *aff'd,* 774 F.2d 30 (2d Cir.1985); *United States v. Nelson,* 606 F.Supp. 1378 (S.D.N.Y.1985). Because a bill of particulars confines the Government's proof to particulars furnished, requests for a bill of particulars should not be granted where the consequence would be to restrict unduly the Government's ability to present its case. *United States v. Massino,* 605 F.Supp. 1565 (S.D.N.Y.1985), *rev'd on other grounds,* 784 F.2d 153 (2d Cir.1986); *United States v. Cafaro,* 480 F.Supp. 511 (S.D.N.Y.1979). A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused. *United States v. Leonelli,* 428 F.Supp. 880 (S.D.N.Y.1977); *United States v. Goldman,* 439 F.Supp. 337 (S.D.N.Y.1977); *United States v. Ramirez,* 602 F.Supp. 783 (S.D.N.Y.1985). Thus, courts have refused to treat a bill of particulars as a general investigative tool for the defense, or as a device to compel disclosure of the Government's evidence or its legal theory prior to trial. *See, e.g., United States v. Salazar,* 485 F.2d 1272 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974); *United States v. Shoher,* 555 F.Supp. 346, 350 (S.D.N.Y. 1983); *United States v. Abrams,* 539 F.Supp. 378 (S.D.N.Y.1982).

■■■ The granting of a bill of particulars rests within the sound discretion of the district court. *United States v. Panza,* 750 F.2d 1141 (2d Cir.1984); *United States v. Cohen,* 518 F.2d 727, 734 (2d Cir.1975), *cert. denied sub nom. Duboff v. United States,* 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *United States v. Massino,* 605 F.Supp. at 1582. Such discretion, however, must be informed by considerations of whether the requested particularization is necessary to defendant's preparation for trial and avoidance of unfair surprise at trial. *United States v. DeFabritus,* 605 F.Supp. 1538, 1547 (S.D.N.Y.1985); *United States v. Payden,* 613 F.Supp. 800, 816 (S.D.N.Y.), *aff'd,* 768 F.2d 487 (2d Cir. 1985). That the requested information would be useful to the defendant is not enough; if the defendant has been given adequate notice of the charges against him, the Government need not be required to disclose additional details about its case. *United States v. Payden,* 613 F.Supp. at 816; *United States v. DeFabritus,* 605 F.Supp. at 1547; *United States v. Ramirez,* 602 F.Supp. at 793.

■■ As a general rule, the defendant does not "need" detailed evidence about the conspiracy in order to prepare for trial properly. It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts. *See United States v. Carroll,* 510 F.2d 507, 509 (2d Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378 (1976) (no general requirement that government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge); *United States v. Persico,* 621 F.Supp. at 868; *United States v. Politi,* 334 F.Supp. 1318, 1321 (S.D.N.Y.1971), *aff'd without op.* 516 F.2d 897 (2d Cir.), *cert. denied,* 423 U.S. 801, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial. *United States v. Persico,* 621 F.Supp. at 868; *United States v. Cafaro,* 480 F.Supp. at 518; *United States v. Wolfson,* 289 F.Supp. 903, 912–14 (S.D.N.Y.1968), *aff'd* 405 F.2d 779 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

Defendants are not entitled to discover through a bill of particulars the locations in addition to those listed in the indictment at which they are alleged to have violated the statute, where the information already made available to defendants is sufficient to enable proper preparation for trial and further discovery would amount to an unnecessary revelation of evidence. *United States v. Massino*, 605 F.Supp. at 1582. Nor are defendants entitled to receive, by way of a bill of particulars, all documents which would in any way tend to verify the meetings or activities described in the overt acts; the exact time and place of each overt act in the indictment; the names and addresses of persons present during the meetings; nor all meetings at which the defendant was present. *United States v. Wilson*, 565 F.Supp. 1416 (S.D.N.Y.1983). Particularly since the Government is not required to charge any overt acts in the indictment, the information provided on the face of count one is, itself, more detailed than defendants have a right to demand with respect to the overt acts enumerated therein. *See, e.g., United States v. Payden*, 613 F.Supp. at 817; *United States v. Wilson*, 565 F.Supp. at 1438–39. *But see also United States v. Orsini*, 406 F.Supp. 1264 (E.D.N.Y.1976) (information needed to prepare an alibi defense).

Specific items which have been held to be properly disclosed by the Government by way of a bill of particulars include: the names of all persons the Government will claim to have been co-conspirators, to the extent such persons are known to the Government; the locations of acts set forth in the counts, to the extent performed by principals; and the place where the principal offense charged allegedly occurred. *See, e.g., United States v. Mannino*, 480 F.Supp. 1182, 1185 (S.D.N.Y.1979); *United States v. Chovanec*, 467 F.Supp. 41, 46 (S.D.N.Y.1979). However, in *Mannino* the Government was not ordered to particularize the names of government witnesses; to specify which defendants would be charged as principals and which as aiders and abettors; and to detail all acts committed by the alleged aiders and abettors, as this would reveal the Government's theory underlying those counts. *See also United States v. Leonelli*, 428 F.Supp. at 882; *United States v. Lam Lek Chong*, 544 F.2d 58, 63 (2d Cir.1976), *cert. denied sub nom. Liganoza v. United States*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977). The court in *Payden* also denied defendant's request for detailed information regarding the items listed in the indictment for forfeiture, where defendant had adequate notice of the items the Government sought. 613 F.Supp. at 819.

Where a defendant is named in only one count and particular information as to him has not been provided, his request for the time, location and persons present at the time of the alleged transaction may be granted so that he may properly prepare his defense. *See United States v. Payden*, 613 F.Supp. at 819; *United States v. Ramirez*, 602 F.Supp. at 793.

In deciding whether the bill of particulars is needed, the court must determine whether the information sought has been provided elsewhere, such as in other items provided by discovery, responses made to unobjected requests for particulars, prior proceedings, and the indictment itself. *United States v. Payden*, 613 F.2d at 816, *citing* 1 C. Wright, *Federal Practice and Procedure (Criminal) 2d* § 129 (1982); *see also United States v. Persico*, 621 F.Supp. at 868–869. The Government contends that the indictment, the wiretap materials and the discovery already produced adequately provide information to satisfy the demands of *Wong Tai* and its progeny.

While the Court is pleased that substantial materials have already been disclosed, it finds that some of the additional information requested herein must be furnished to defendants by the Government. There should be little prejudice to the Government in having to divulge those limited facts determined by this Court to be crucial to the preparation of the defense.

Therefore, the Government shall set forth a single bill of particulars, to be provided as soon as conveniently possible to all defendants except where therein noted, with the information set forth below. Any request of the defendants not specifically ordered herein is denied.

1. The Government shall specify and shall keep its specification current, the names of all persons whom the Government will claim at trial were co-conspirators. The Government shall not be required to provide the addresses of said co-conspirators; however, if any are in federal custody or protective custody, this fact must be revealed.

2. The Government shall state whether or not any individual present during the commission of the alleged overt acts was acting for the Government, and shall give the names, or names then used or similar identification, but not the addresses, of any such persons.

3. Also disclosed shall be the names, to the extent known, of any persons present when the overt and substantive acts allegedly took place.

4. Defendants' request for the exact dates the Governments will claim the defendants joined and ended the conspiracy is granted, to the extent presently known by the Government; and if the Government will at trial contend any defendant joined after the inception of the conspiracy, that shall be specified at this time.

5. The request for disclosure of the statements the Government intends to rely on to show the agreement between the conspirators is granted, but more appropriately as a discovery request. Rule 16, F.R. Crim.P.

6. The quantity of cocaine distributed and possessed must be provided to defendants to the extent this information will be presented by the Government at trial.

7. Defendants' demand for the names and addresses of those to whom narcotics were allegedly distributed and the amounts of money exchanged for each transaction is denied as to these names and addresses, and granted as to the amounts of money, if known.

8. The Government shall specify whether it will be claimed that Defendant Farese was an aider and abettor or was a principal.

9. In connection with Counts I and II, the Government shall particularize as to Defendant Dratch whether he is claimed to have had actual physical possession of marijuana or hashish, or constructive possession, or was an aider and abettor; and if actual possession is claimed, the Government shall specify the quantities, dates and location, to the extent known.

10. With regard to Count 13, the Government shall specify the manner in which Defendant Farese used the 1985 Jeep to facilitate the conspiracy.

11. For the listed overt act 3B, the Government shall set forth the place in Carmel, New York, and the names of or names used by the persons with whom Defendant Dratch met on September 9, 1985, to the extent known, but not the substance of the activity which took place therein.

12. Concerning Defendants Marrama and MacLennan, who have been charged in only one count and not in any overt act, the Government shall particularize the time, place and manner in which the Government will claim at trial that Defendants Marrama and MacLennan became members of the conspiracy.

## XIII. MOTIONS FOR DISCOVERY

Defendants make numerous requests for discovery from the Government of certain documents and other items, each of which will be considered in turn by the Court. Although individual motions for discovery were filed solely by Defendants Marrama, Sullivan, MacLennan, Acevedo, Tarantelli and Dratch, the Court considers the motions herein to be applicable to all defendants, in accordance with this Court's concurrent ruling on the motion of defendants to join in all motions of co-defendants, as discussed herein. Accordingly, the Govern-

ment is directed to produce to *all* defendants those materials which are so ordered.

### Exculpatory Materials

Defendants call upon the Government to provide exculpatory evidence as mandated by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Included in their request for exculpatory material are defendants' specific motions for disclosure of promises of preferential treatment, and of impeachment information pertaining to government witnesses.

The Government acknowledges its obligation to produce such information, and represents to this Court that it has already agreed to do so "in a fashion that will not prejudice the rights of the defendants." It contends, however, that to the extent defendants demand disclosure of information other than that which is exculpatory in nature, their demands plainly fall outside the scope of *Brady*.

■ To reiterate that obligation, the Supreme Court in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. *See also United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). As asserted by the Court of Appeals for this Circuit, "the heart of the holding in *Brady*" is the impermissibility of withholding evidence "favorable to the accused and material to the determination of guilt or to the appropriate punishment." *United States v. Leroy*, 687 F.2d 610, 618 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). *See United States v. Sternstein*, 596 F.2d 528 (2d Cir. 1979). Moreover, the Government is under a *continuing* duty to preserve and disclose such *Brady* materials. *See, e.g., United States v. Konefal*, 566 F.Supp. 698 (N.D.N.Y.1983).

■ In addition, it has been determined that the failure of the prosecution to disclose information that would impeach a government witness may also deprive the defendant of a fair trial under the *Brady* rule. *Cantone v. Superintendent, New York Correctional Facility at Green Haven*, 759 F.2d 207 (2d Cir.1985), *cert. denied sub nom. Cantone v. Scully*, —— U.S. ——, 106 S.Ct. 109, 88 L.Ed.2d 89 (1983); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Cody*, 722 F.2d 1052, 1061–63 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). A defendant is entitled to exculpatory or mitigating evidence in the Government's possession, including evidence pertinent to a material witness's credibility or reliability. *Perkins v. LeFevre*, 642 F.2d 37, 40 (2d Cir.1981). Thus, the law requires that exculpatory statements of government witnesses be disclosed to the defendant, and that the jury be informed of all agreements between the Government and accomplice witnesses. *United States v. Buettner-Janusch*, 500 F.Supp. 1285 (S.D.N.Y.1980), *aff'd* 646 F.2d 759 (2d Cir. 1981), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981). Failure of the Government to reveal evidence of an understanding with a witness that the witness will receive lenient treatment for his offenses in return for his testimony will violate due process and result in the need for a new trial. *United States v. Pfingst*, 477 F.2d 177, 191 (2d Cir.1973), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *Richmond v. Fogg*, 434 F.Supp. 310 (S.D.N.Y.1977). *See also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (aids defense in issue of credibility).

The Court deems this request to be sufficiently specific and detailed as to raise no problem under *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, and its progeny (requisite "pretrial request for specific evidence"). *See, e.g., Cantone*, 759 F.2d at 213–216.

■ Accordingly, the motion of defendants is granted and the Government is directed to disclose to defendants all exculpatory material encompassed by *Brady*. The

Court notes that this is a continuing duty, and that the within materials must be provided by a "reasonable time" before trial, which is held to be thirty (30) days prior to the trial, in the context of this case.

Specific types of information which are sought by defendants and do not fall within the scope of the *Brady* rule but are dealt with elsewhere in the Federal Rules of Criminal Procedure, 18 U.S.C. § 3500, and the relevant case law, will be discussed in turn below.

*Preservation of notes*

■ Defendants' motion for preservation of any and all tape recordings or handwritten or typed notes of interviews or communications made in connection with this case by federal law enforcement personnel, and all other state and/or local law enforcement agencies, is hereby granted. The Government must comply with its obligation well established by case law and see to the preservation of such materials by all law enforcement personnel under its direct or indirect control.

In *United States v. Bufalino*, 576 F.2d 446, 450 (2d Cir.1978), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978), the Court of Appeals held that:

> We emphatically second the district court's observation that any resulting costs in the form of added shelf space will be more than counterbalanced by gains in the fairness of trials and also by the shielding of sound presecutions from unnecessary obstacles to conviction.

In *Bufalino*, the Court also announced that it would "look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act 'statement' by reference to 'department policy' or 'established practice' or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law." *Id.* at 449; *United States v. Paoli*, 603 F.2d 1029 (2d Cir.1979), *cert. denied*, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979). *See also United States v. Carrasco*, 537 F.2d 372, 376–79 (9th Cir.1976); *Krilich v. United States*, 502 F.2d 680 (7th Cir.1974), *cert. denied*,

420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 673 (1975); *Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976).

It should be noted in complying with this order that government agencies must keep in mind the broad definition of discoverable "statements" incorporated in the governing texts. *Id.; See* Rule 16(a)(1)(A), F.R. Crim.P.; 18 U.S.C. § 3500; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court in *Bufalino* expressed its concurrence with the District of Columbia Circuit that *Brady* envisions that "in framing their rules for evidence preservation investigative agencies must define discoverable evidence very broadly, including any materials that 'might' be 'favorable' to the accused." *Id.* at 450; *citing United States v. Bryant*, 439 F.2d 642, 652 n. 21 (D.C.Cir.1971); *Cf. United States v. Anzalone*, 555 F.2d 317 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978) (recommending that FBI retain agents' handwritten notes of witness interviews).

■ The Government recognizes this obligation to preserve original notes and writings, as is apparent from reading its Memorandum of Law. However, it brings this Court's attention to certain field notes of the New York State Police Department investigation which the Government believes were destroyed after being fully incorporated into State Police reports in accordance with the practice of that department. The Government represents that no defendant would suffer any prejudice as a consequence.

The Court finds this situation to be regrettable, in light of *Bufalino*, but not likely to be prejudicial to the defendants if the notes were fully incorporated into the State Police reports. There is no evidence that they were not.

In *United States v. Grammatikos*, 633 F.2d 1013 (2d Cir.1980), decided after *Bufalino*, the Court held that the Government's failure to preserve consensual tape recordings of conversations between the

defendant and a paid government informant, material which would have been discoverable, did not entitle defendant to dismissal of the indictment or to a new trial at which testimony of the informant could not be presented. This ruling was made in a situation where the culpability of the Government was not great, the circumstances surrounding the disposal of the tape recording tended to refute any suspicion of evil motive or foul play, and there were compelling reasons to believe that the tapes were inculpatory. The appropriateness and extent of sanctions in such situations depends on a case-by-case assessment of the Government's culpability for the loss (a point which in logic should have no relevance), together with a realistic appraisal of the significance of the lost evidence when viewed in light of its nature, its bearing on critical issues in the case, and the strength of the Government's untained proof.

In the instant case, the destroyed notes did not rise to the level of significance of the evidence in *Grammatikos,* in that the information contained therein was fully incorporated in other materials. There does not appear to be any suggestion of bad intentions on the part of the state officials, nor complicity of the Federal Government, nor have the notes been shown, or even alleged, to be exculpatory in nature.

In similar circumstances, the good faith destruction of materials otherwise producible under § 3500 has been held not to violate this statute. In *United States v. Covello,* 410 F.2d 536 (2d Cir.1969), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969), *reh. denied,* 397 U.S. 929, 90 S.Ct. 897, 25 L.Ed.2d 110 (1969), the destruction of handwritten notes by FBI agents regarding interviews with each of the government witnesses after the contents of these notes had been incorporated into typewritten reports did not violate the rights of a defendant who claimed that he was entitled to not only the typewritten reports but also the original handwritten notes. *See also United States v. Barlin,* 686 F.2d 81 (2d Cir.1982) (where agent's notes were made part of his formal report,

the notes did not have to be preserved and their destruction did not violate any right under § 3500); *United States v. Vila,* 599 F.2d 21 (2d Cir.1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (destruction of rough notes taken by police detective during debriefing of government witness did not constitute willful suppression of evidence favorable to defendant, where notes were not capable of substantially impeaching credibility of witness).

The Government is of course reminded that, notwithstanding the excusability of this previous destruction of the State Police notes which were fully incorporated into formal reports, it must fulfill its obligation under the law to preserve all of the aforementioned materials under its control.

*List of Government Witnesses*

■ Defendants move this Court to require the United States Attorney to furnish defense counsel with a complete list of the names and addresses of the witnesses it intends to call in its case in chief, including "each and every cooperating witness, informant, or cooperating co-defendant who either is prepared to testify at trial or who was present and has relevant information as to the facts of this case which may be favorable to the defendant."

Such a sweeping request must be denied by this Court as far beyond the scope of Rule 16 and the precedential authority. However, the motion is granted as to any witnesses who are in federal custody or protective custody; such witnesses, if any, should be identified in order that defense counsel if they wish can make a request for an interview.

Nowhere in the United States Code or the Federal Rules of Criminal Procedure are the courts explicitly authorized or forbidden to order pre-trial disclosure of government witnesses in non-capital cases. The general discretion of district courts to compel the Government to identify its witnesses is widely acknowledged. *See, e.g., United States v. Cannone,* 528 F.2d 296, 301–2 (2d Cir.1975); *United States v. Richter,* 488 F.2d 170, 173–74 (9th Cir.

1973); *United States v. Turkish,* 458 F.Supp. 874 (S.D.N.Y.1978). The disclosure of the identity of the prosecution's witnesses is desirable on the one hand, to aid the defense in its preparation for trial and to mitigate against the detriment of surprise. On the other hand, especially in narcotics cases, the dangers of intimidation of witnesses, subornation of perjury, and even actual injury of witnesses, may necessitate concealment of their identities. *See, e.g., United States v. Percevault,* 490 F.2d 126, 131 (2d Cir.1974); *United States v. Goldman,* 439 F.Supp. 337 (S.D.N.Y.1977). It is the task of the court to perform this balancing function under the special circumstances of each case.

The Circuit Court in *United States v. Alessi,* 638 F.2d 466 (2d Cir.1980), found the prosecution to be under no obligation to give the defendant advance warning of the witnesses who would testify against him and not precluded from introducing evidence of a "surprise witness," particularly in light of the fact that the Government had furnished to defendant all impeachment-related material concerning the witness after the direct examination.

Moreover, the courts in this district have widely found that the defendant is not entitled to a witness list absent a particularized showing of need. *See, e.g., United States v. Wilson,* 565 F.Supp. 1416 (S.D.N.Y.1983), *aff'd* 750 F.2d 7 (2d Cir.1984), *cert. denied,* — U.S. —, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986); *United States v. Cafaro,* 480 F.Supp. 511 (S.D.N.Y.1979); *United States v. Sherman,* 426 F.Supp. 85 (S.D.N.Y. 1976). Where defendants make only an abstract, conclusory claim that disclosure is necessary to prepare for trial, the defendants fail to meet their burden and it would serve no legitimate purpose to require the Government to disclose the names of, and impeachment materials concerning, persons whom it intends to call as witnesses. *United States v. Konefal,* 566 F.Supp. 698 (N.D. N.Y.1983).

As asserted by the Government, the dangers inherent in the disclosure of the names of government witnesses in the context of a narcotics case have been considered to be quite serious. *See United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274 (2d Cir.1975), *cert. denied,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975) (interest of the state and of the witnesses in preserving the confidentiality of undercover agents in narcotics cases justified exclusion of public during witness testimony). In his concurrence, Circuit Judge Lumbard emphasized the danger to witnesses peculiar to narcotics cases: "In no area of law enforcement have murder, mayhem and terror more frequently been used against disclosure and testimony." *Id.* at 1275. The danger inherent in the very nature of the within narcotics case must of course be given serious consideration.

Here this Court is presented with very real dangers to the witnesses of the Government, while defendants do not make a particularized showing of the need for this information. The abstract, conclusory claim of defendants that such disclosure is necessary to the proper preparation of defense for trial will not suffice. Absent a strong showing that the benefits would outweigh the risks, and finding that such a showing has not been made by the moving defendants, this Court shall not order the disclosure of the Government's witnesses, except as to those who may be in federal or protective custody.

*Identity of Informants*

As for the specific request for disclosure of the identity of government informants, this motion must also be denied, except as to informants who are in federal custody or protective custody.

■ The defendant bears the burden of establishing the need for disclosure of the identity of informants, *Socialist Workers Party v. Attorney General,* 565 F.Supp. 19, 23 (2d Cir.1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); and this requires some demonstration that in the absence of such disclosure the defendant will be denied a fair trial. *See Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1

L.Ed.2d 639 (1957); *United States v. Lilla,* 699 F.2d 99, 105 (2d Cir.1983).

As stated in *United States v. Russotti,* 746 F.2d 945, 949–50 (2d Cir.1984), *cert. denied sub nom. Marotta v. United States,* —— U.S. ——, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986):

> It has consistently been held that an informant's identity need not be disclosed unless 'essential to the defense.' ....
> Disclosure has been required at trial where the informant is a key witness or a participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence.

*Citing Scher v. United States,* 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938); *United States v. Ortega,* 471 F.2d 1350, 1359 (2d Cir.1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973), *United States v. Roberts,* 388 F.2d 646, 648–50 (2d Cir.1968).

 Unless the informer's testimony would be relevant and helpful to the defense, or essential to a fair trial, the defense motion for the identification of the whereabouts or production of the informer can be summarily denied. *United States v. Turbide,* 558 F.2d 1053 (2d Cir.1977), *cert. denied sub nom. Perez v. United States,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977) (identity of informant who had arranged introduction to suspected drug dealer had conversations with defendant that were not overheard by any other witness "was hardly essential to a fair trial"). The Second Circuit in *United States v. Hyatt* held that, where it was not clear before trial that an informant's testimony would be relevant and helpful to the defense or essential to a fair trial, the trial court did not abuse its discretion in failing to require the pretrial disclosure of the informant's identity. 565 F.2d 229 (2d Cir.1977).

 Furthermore, disclosure is not appropriate to test the credibility of the testifying agents. *United States v. Russotti,* 746 F.2d at 950 (disclosure to probe witness' credibility is "an insufficient basis to overcome the informant's privilege"); *United States v. Soles,* 482 F.2d 105, 109–

110 (2d Cir.1973), *cert. denied,* 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973).

It must be remembered that "the privilege of nondisclosure exists to further and protect the public interest in effective law enforcement." *United States v. Van Orsdell,* 521 F.2d 1323, 1326 (2d Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976).

 The Court finds that the defendants have made no showing to suggest that disclosure of such informant information is essential to a fair trial in this case. The standard for requiring such disclosure was not met, for there is no indication that informants were key witnesses to any of the alleged offenses or participants in those offenses. Defendants offer no basis upon which to outweigh the informant's privilege which is so essential to the public interest in effective law enforcement.

Accordingly, this Court will only require disclosure of identity information concerning those informants, if any, who are in federal or protective custody.

*Early Production of Section 3500 Materials*

 Defendants move for the entry of an order directing the Government to furnish all reports and statements of government agents, police officers, and government witnesses no less than ten (10) days (fourteen days by request of some of the defendants) prior to trial, pursuant to 18 U.S.C. § 3500. In support thereof, defendants state that such a disclosure order is necessary to prepare and present the defense, to protect the due process rights of defendants, and to prevent undue and burdensome delays at time of trial. Some defendants additionally invoke the arguments of effective assistance of counsel, equal protection, speedy trial, and meaningful access to courts.

As much as this Court would like to assist the defendants in the preparation of their defense and at the same time avoid delays at trial, the Court cannot order the Government to produce these materials prior to trial by virtue of 18 U.S.C. § 3500

(hereinafter "Section 3500"). Section 3500(a) mandates that:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant), shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

The statute (18 U.S.C. § 3500(e)) defines "statement" to be:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Neither the case law nor Section 3500 require the Government to turn over such potential impeachment material at the time of pre-trial motions. *See United States v. Tucker,* 495 F.Supp. 607, 610 (E.D.N.Y. 1980) (Platt, J.); *United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir. 1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975). Moreover, *United States v. Sebastian,* 497 F.2d 1267 (2d Cir.1974), and *United States v. Covello,* 410 F.2d 536 (2d Cir.1969), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969), both construe the word "trial" in Section 3500 to mean only what one would suppose it to mean. *See generally United States v. Kearney,* 436 F.Supp. 1108 (S.D. N.Y.1977).

As discussed also in *United States v. Wallace,* 272 F.Supp. 838, 840 (S.D.N.Y. 1967), a pre-trial motion for production and inspection of statements or reports made by government witnesses or prospective government witnesses to an agent of the Government is premature since such material does not have to be produced by the Government until the conclusion at trial of direct testimony of the witnesses with respect to whom discovery is sought. The relevance to the subject matter of the direct examination is then determined by the court, after gathering the necessary materials, at the appropriate point in the trial.

Although this Court may not require the Government to provide defendants with such Section 3500 materials, it concurs with the encouragement of pre-trial disclosure of Section 3500 materials suggested by the Second Circuit in *United States v. Percevault:*

> Although we hold that the government cannot be compelled to disclose statements of prospective witnesses prior to the time prescribed by the Jencks Act, we note that in most criminal cases, pre-trial disclosure will redound to the benefit of all parties, counsel, and the court. Indeed, sound trial management would seem to dictate that Jencks Act material should be transmitted prior to trial, especially in complex cases, so that those abhorrent lengthy pauses at trial to examine documents can be avoided ... and also, we should emphasize, to protect the government against post-conviction claims of prejudicial surprise ... or claims of suppression of material and favorable evidence. 490 F.2d 126, 132 (2d Cir.1974). *See* 8 J. Moore, Federal Practice, para. 16.10[1], at 16–117 (1973).

Accordingly, this Court encourages the Government to meet this request with a spirit of cooperation.

*Defendant's Statements*

 Defendants request that the Court order the Government to disclose any written or recorded statements made by the defendants or copies thereof, within the possession, custody or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the Government. The Court notes that, in its letter to this Court dated December 9, 1986, the Govern-

ment represents that it is unaware of any statements by defendant Tarantelli to any person known by him to be a Government agent, and that the Government will not seek to introduce any such statement against him at trial. It also states that statements were made by defendants Gumpricht, Acevedo and Cercena to law enforcement agents, and that these statements have been disclosed to their respective counsel.

This motion is granted as to those statements to which each defendant is entitled under Rule 16(a) of the F.R.Crim.P. Rule 16(a) provides in pertinent part, that:

Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government....

The case law has expanded upon this rule to authorize broad pre-trial discovery of the defendant's statements, whether made during or after the commission of the crimes charged; to a government agent, to a grand jury, or to anyone else; and whether obtained surreptitiously or voluntarily. *United States v. Percevault*, 490 F.2d 126, 129 (2d Cir.1974); *United States v. Crisona*, 416 F.2d 107, 114–115 (2d Cir.1969), *cert. denied sub nom. DeLyra v. United States*, 397 U.S. 961, 90 S.Ct. 991, 993, 25 L.Ed.2d 253 (1970). "Common sense and judicial experience teach that a defendant's prior statement in the possession of the Government may be the single most crucial factor in the defendant's preparation for trial." *Id.* at 130. *See also United States v. Gleason*, 616 F.2d 2 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).

In accordance with its broad scope, courts have liberally construed the term "statement" as not limited to formal statements by defendants, and have held dis-

coverable recordings of statements unwittingly made to government informants or to intended victims that had secured the cooperation of the police. *See, e.g., United States v. Sherwood*, 527 F.Supp. 1001 (S.D. N.Y.1981), *aff'd without op.* 732 F.2d 142 (2d Cir.1984). Tapes of statements made by a defendant in the process of committing a crime are also within the scope of Rule 16. *United States v. Crisona*, 416 F.2d at 114–115.

Such tapes might also constitute Section 3500 material if they included statements by a government witness and were recorded at the Government's instigation. *Id.* at 113; *United States v. Bufalino*, 576 F.2d 446 (2d Cir.1978), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). These Section 3500 portions of course would not be required to be produced until after the direct testimony of such witnesses.

Accordingly, this motion is granted for each defendant as to his *own* statements. Each defendant can discover and inspect copies of his own statements; whether a defendant will allow other defendants to examine his statements is subject to the discretion of that defendant and his counsel. The Government shall not at this stage of the proceedings be ordered to disclose statements of co-defendants, witnesses, or co-conspirators, as discussed below.

*Statements of Witnesses, Co-defendants and Co-conspirators*

Defendants move for an order requiring the Government to produce to defendants all prior statements of government witnesses, co-defendants, and unindicted co-conspirators.

The Government objects to such a request, but agrees to provide such material on the same basis as all defense counsel agree to furnish the Government with "reverse 3500 materials" under Rule 26.2 of the F.R.Crim.P.

The within motion of defendants to compel further disclosure is denied, pursuant to Rule 16(a)(2) of the F.R.Crim.P., which expressly precludes pre-trial disclo-

sure of this information, except as provided in Section 3500. *See United States v. Percevault,* 490 F.2d 126, 129–32 (2d Cir.1974); *United States v. Sebastian,* 497 F.2d 1267, 1268 (2d Cir.1974). Rule 16(a)(2) provides in full that:

> [T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of *statements made by government witnesses except as provided in 18 U.S.C. Section 3500.* (Emphasis added).

In *United States v. Percevault,* the Second Circuit emphasized that neither the rule governing the production of statements made by the defendant, Rule 16(a), nor Section 3500 authorized district courts to compel disclosure, over the Government's objection, prior to trial of written or oral statements or confessions made after a conspiracy terminated by co-conspirators, including co-defendants, whom the Government intended to call as witnesses at trial. *See also United States v. Greater Syracuse Board of Realtors,* 438 F.Supp. 376 (N.D.N.Y.1977) (statements of co-defendants and co-conspirators fell within general exemption from disclosure in Rule 16(a)(2) and Section 3500).

■■■ As for those materials which also fall within Section 3500, defendants are not entitled to pre-trial disclosure of these written and recorded statements of government witnesses, since the Government is not required to disclose information pertaining to the credibility of such witnesses before the witness testifies. *United States v. Abrams,* 539 F.Supp. 378 (S.D.N.Y.1982); *United States v. Kearney,* 436 F.Supp. 1108 (S.D.N.Y.1977); *United States v. Howard,* 426 F.Supp. 1067 (W.D.N.Y.1977).

In *United States v. Bentvena,* 193 F.Supp. 485 (S.D.N.Y.1960), the court specifically dealt with a narcotics conspiracy case such as the present, and found that the defendant was not entitled to inspect copies of statements made by proposed witnesses relative to the overt acts alleged. *See also United States v. Stewart,* 513 F.2d 957 (2d Cir.1975) (Government not required to make witness statements known to defendant who was on notice of essential facts which would have enabled him to call witnesses and take advantage of any exculpatory testimony that witness might furnish).

The ruling of this Court on this motion should not, however, be taken in contravention of defendants' rights to disclosure by the Government of exculpatory information to which they are entitled under *Brady v. Maryland,* in accordance with the Court's ruling on such *Brady* materials noted above.

### Production of Investigative Files

■■■ Defendants make motions for the production of the investigative files of the Government; the interview reports of law enforcement officials; the names and addresses of all persons who have knowledge regarding this case or who have been interviewed by the Government; any information known to government agents and which is not in writing; any statements by non-witnesses not being called by the Government to testify at trial regarding the defenses or the offenses charged; the names and addresses of other people under surveillance at defendants' property; the names and addresses of any government agent who was present or participated in any way; and other requests of the same all-encompassing character.

All motions of this nature must be categorically denied because prohibited from disclosure or inspection by Rule 16(a)(2), F.R.Crim.P., as "reports, memoranda or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case." *See, e.g., United States v. Elife,* 43 F.R.D. 23 (S.D.N.Y.1967); *United States v. Edwards,* 42 F.R.D. 605 (S.D.N.Y.1967).

As announced by the Court of Appeals in *United States v. Pfingst,* a defendant is not entitled to the disclosure of portions of

memoranda prepared by a government attorney which contain summaries, evaluations of evidence and discussions of the legal and practical problems of prosecution. 477 F.2d 177 (2d Cir.1973), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973). To the extent that communications between the United States Attorney and any state or city official with respect to the defendant were embodied in reports, memoranda, or other internal government documents made by a government attorney or agent in connection with the case, these materials were not discoverable. *United States v. Goldman,* 439 F.Supp. 337 (S.D. N.Y.1977) (Duffy, J.). *See also United States v. Warme,* 572 F.2d 57 (2d Cir.1978), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978) (FBI agents' reports on ongoing investigation of person to whom defendant had provided counterfeit money); *United States v. Marshak,* 364 F.Supp. 1005 (S.D.N.Y.1973) (investigative reports of city police department exempt from discovery or inspection).

Even more broadly has this rule been construed by the courts, precluding disclosure of information which is neither expressly authorized by Rule 16 nor otherwise discoverable as exculpatory under *Brady* or as impeaching under Section 3500. "Although Rule 16(a) provides a mechanism for liberal discovery, it was not intended to provide the defendant with access to the entirety of the government's case against him." *United States v. Percevault,* 490 F.2d at 130.

In *United States v. Cafaro,* 480 F.Supp. 511, 520 (S.D.N.Y.1979) (Sweet, J.), the court denied defense requests for all persons whom the Government asked about the narcotics activities of the defendants, as defendants have "no right to be apprised of all investigatory work on a case." *See United States v. Massino,* 605 F.Supp. 1565 (S.D.N.Y.1985), *rev'd on other grounds* 784 F.2d 153 (2d Cir.1986) (where information in witness lists was sought irrespective of whether exculpatory, and disclosure would amount to excessive pretrial display of government's investigative file).

Defendants' requests in effect for all information regarding the defendants must be denied. A criminal defendant is not entitled to know everything that the government investigation has unearthed when such information is not used against him at trial. *United States v. Arroyo-Angulo,* 580 F.2d 1137 (2d Cir.1978), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). Moreover, the Government has "no obligation to 'preview its case or expose its legal theory', nor must it disclose the 'precise manner in which the crime charged in the indictment is alleged to have been committed.'" *United States v. Shoher,* 555 F.Supp. 346, 349 (S.D.N.Y.1983) (Haight, J.); *United States v. Andrews,* 381 F.2d 377, 377–78 (2d Cir.1967), *cert. denied,* 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968).

In sum, the defendants are not entitled to complete disclosure of all evidence in the Government's files which might conceivably assist them in the preparation of their defense, but they are not to be denied access to exculpatory evidence known to the Government and unknown to them. *See United States v. Ruggiero,* 472 F.2d 599 (2d Cir.1973), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973).

*Production of Documents and Tangible Objects*

Also requested by defendants are "such tangible objects which are in the possession, custody, or control of the government and which are material to the preparation of Defendants' defense or intended for use by the government as evidence in chief at the trial." Listed specifically are such items as any and all tangible objects obtained from the person or effects of defendants; documents, instrument, forms or any statements of any kind signed or purported to have been signed by any defendant; books, papers, documents or tangible objects the Government plans to offer into evidence; fingerprint impressions, clothing hair, fiber, or other materials obtained from the scene of the alleged offenses; hotel, motel, airline, other public transportation, telephone and/or other pub-

lic or private communications records which the Government intends to use at trial; any narcotics or drug paraphernalia seized from defendants; and photographs the Government intends to use at trial.

The Government responds that, as it has informed all defendants, "the physical evidence relating to this case has been, and continues to be available for inspection upon reasonable notice."

The requested items are well within the discovery and inspection expressly permitted by Rule 16(a)(1)(C):

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense, or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

*See, e.g., United States v. Turkish,* 458 F.Supp. 874 (S.D.N.Y.1978) (defendants charged with conspiracy were entitled to disclosure of documents which government intended to offer, or to use or to refer to in connection with testimony of any witness, in its case in chief); *United States v. Goldman,* 439 F.Supp. 337 (S.D.N.Y.1977). Thus, defendants are entitled to inspect or copy all of the materials herein which are material to the defense, as those requested appear to be; are intended to be used by the Government at trial; or were obtained from or belong to the defendants.

For instance, in *United States v. Kaminsky,* 275 F.Supp. 365 (S.D.N.Y.1967), the defendants were entitled to inspection of the bonds which were the subject of the indictment and were entitled to see copies of fingerprints of defendants as alleged to appear on some of the bonds, as well as fingerprint reports or analysis of experts who studied the prints and rendered opinions thereon (defendants charged with possessing and pledging of stolen bonds).

Similarly, *United States v. Acarino* held that defendant's counsel and any experts chosen by him were entitled to inspect and test an alleged narcotic belonging to defendant in the Government's possession. 270 F.Supp. 526 (E.D.N.Y.1967). So too should the fingerprint and narcotic information be subject to inspection in the instant case.

Logs of telephone conversations were found to be discoverable in *United States v. Konefal,* where the calls were placed by government agents to defendant at his home; the court ordered that, if such logs were unavailable, the Government was to make every effort to account for their whereabouts and to provide defendant with written explanations for their absence. 566 F.Supp. 698 (N.D.N.Y.1983). *But see United States v. Payden,* 613 F.Supp. 800 (S.D.N.Y.1985) *aff'd* 768 F.2d. 487 (2d Cir. 1985) (requests for analysis performed on toll records and other conclusions of investigative officers denied in that these were internal government documents made in connection with the investigation of the case). Here the telephone logs themselves are discoverable under Rule 16(a)(1)(C), but of course any work product exposing the theory of the Government is not. *See* Rule 16(a)(2).

Photographic identification, pen register tapes, and telephone records are clearly included under this rule as discoverable objects to which defendants are entitled. *See, e.g., United States v. Shakur,* 543 F.Supp. 1059 (S.D.N.Y.1982), *rev'd on other grounds sub nom. United States v. Lumumba,* 741 F.2d 12 (2d Cir.1984), *cert. denied,* — U.S. —, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986).

In granting this motion, the Court holds that the Government should continue to insure that the material herein is made available for inspection and copying by the defendants.

### Notice of Intention to Use

 The defendants additionally request, pursuant to Rule 12(d)(2) of the F.R. Crim.P., that the Government notify all de-

fendants of its intention to use any evidence which defendants may be entitled to discover under Rule 16 particularly as requested herein. Defendants further note that, pursuant to Rule 16(c), F.R.Crim.P., the Government's duty to disclose the materials requested herein which are required or come to the attention of the Government subsequently to the disposition of the present request be properly supplied to all defendants.

The Court hereby grants both requests of the within motion, as clearly enumerated in the F.R.Crim.P. Rule 12(d)(2) provides that:

> [T]he defendant may ... request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations prescribed in Rule 16.

In addition, Rule 16(c) sets forth a continuing duty to disclose, as follows:

> If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional evidence or material.

Henceforth, all parties are under an extended duty to disclose all items to which the other party is entitled under the rules of discovery and inspection and as directed herein by this Court.

*Tape Recordings and Electronic Surveillance*

 Defendants make a motion for any and all tapes, logs and surveillance records in the possession of the Government which evidence the electronic surveillance or wiretapping of any connection of any defendant, to include, *inter alia,* any and all surveillance equipment.

In *United States v. Marshak,* 364 F.Supp. 1005 (S.D.N.Y.1973), tape recordings of telephonic communications made by defendants were discoverable either as

"statements" or as "tangible objects" whose materiality was demonstrated. *See also United States v. Sherwood,* 527 F.Supp. 1001 (W.D.N.Y.1981), *aff'd without op.* 732 F.2d 142 (2d Cir.1984) (treating tape recordings of defendants' statements as tangible objects to which defendants entitled, as long as such recordings were in government's possession, custody, or control). The Second Circuit, too, has recognized the obligation of the Government to produce transcripts of a defendant's conversations prior to trial in response to his explicit discovery requests. *United States v. Cirillo,* 499 F.2d 872, 882 (2d Cir.1974), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Crisona,* 416 F.2d 107 (2d Cir.1969), *cert. denied sub nom. DeLyra v. United States,* 397 U.S. 961, 90 S.Ct. 991, 993, 25 L.Ed.2d 253 (1970). *See also United States v. Terry,* 702 F.2d 299 (2d Cir.1983), *cert. denied sub nom. Williams v. United States,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) (court noted that defendant be provided with copies, not originals, of tapes).

Further, it has been ruled that, recordings of defendant's conversations being discoverable, the devices or machines used for said recordings were material and subject to disclosure. *United States v. Rosenberg,* 299 F.Supp. 1241 (S.D.N.Y.1969) (Frankel, J.).

However, as held by the court in *United States v. Mannino,* 480 F.Supp. 1182 (S.D.N.Y.1979), a motion for disclosure of all recorded conversations of defendants, other defendants, and co-conspirators, whether or not authorized or lawful, and for disclosure of any documents, logs and transcripts relating to such conversations should be denied insofar as it relates to materials other than the conversations of defendants themselves.

Accordingly, these motions are granted for each defendant, but only as to the tape recordings, logs and transcripts of his *own* statements, unless otherwise producible as exculpatory evidence under *Brady* prior to trial, or as Section 3500 material to be provided to defendants at trial. The

Government shall also provide defendants with, or allow inspection of, all electronic recording equipment used in connection therewith, and in its possession or control.

The Court further notes the application of 18 U.S.C. Section 2518(9), which requires that:

The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, ... unless each party, not less than ten days before the trial ... has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved....

It is the Court's belief that such disclosure to defendants has taken place, but the Government is reminded that if such materials have not been provided by the requisite period, the evidence derived therefrom will be excluded at trial.

*Copies of Reports of Examinations and Tests*

 In their motion for an order pursuant to Rule 16(a)(1) of the F.R.Crim.P., defendants ask the Government to provide defendants with copies of any results or reports of physical examinations and of scientific tests or experiments available which are within the possession, custody, or control of the Government, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the Government, and which are material to the preparation to the defense or are intended for use by the Government as evidence at the trial. Among the specific requests are: any such results or reports concerning any and all drugs which are the subject of the instant indictment; the results of all fingerprint tests or experiments performed on any and all materials, objects, or property seized on any defendant's property; any and all comparisons of fingerprints, clothing, hair, fiber, or other materials made in connection with this case; and any and all results or reports of physical or mental examination(s). In a separate motion, defendants seek the report containing the results of any polygraph examination administered to anyone in connection with the Government's investigation of the case; the Court will consider this latter motion to be incorporated into the request herein for reports of examinations and tests.

Pursuant to Rule 16(a)(1)(D), F.R. Crim.P., the Court grants this motion insofar as it directs the Government to provide to defendants all reports of examinations and tests encompassed by this broad rule, which permits a defendant:

to inspect and copy of photograph any results or reports of physical or mental examinations, of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

*See, e.g., United States v. Shakur*, 543 F.Supp. 1059 (S.D.N.Y.1982), *rev'd on other grounds sub nom. United States v. Lumumba*, 741 F.2d 12 (2d Cir.1984), *cert. denied*, — U.S. —, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986) (government under obligation to disclose the results of scientific tests which it had intended to offer at trial as evidence); *United States v. Bel-Mar Laboratories, Inc.*, 284 F.Supp. 875 (E.D. N.Y.1968) (reports of experts, whether such experts were government employees or were specifically retained to test and analyze subject drugs, were subject to disclosure); *United States v. Willis*, 33 F.R.D. 510 (S.D.N.Y.1963) (defendant entitled to photographs, copies of plans of vessels, copies of medical reports, and reports of blood tests).

 However, this motion is denied with respect to the polygraph information, which this Court does not consider to be a "scientific test or experiment" within the contemplation of this rule in that its reliability has not been sufficiently established

in the scientific community, and which is not otherwise discoverable under Rule 16. No mention of such will be permitted at trial by any attorney, without first seeking leave in the absence of the jury.

### Identification Session Information

Defendant Acevedo makes a motion for disclosure of the names and addresses of each person to whom a photograph alleged to be that of any defendant or to whom the person of any defendant was displayed for the purpose of identification; the time, date, and place of such display; the names and addresses of each person then and there present; and a copy of each and every photograph taken or displayed at that time and place.

■■■ The Court determines that the identity information regarding such identification witnesses should not be disclosed to defendants, because pre-trial release of the identity of government witnesses and informants is not required for the preparation of the defense, particularly when balanced against the potential danger to these witnesses in a narcotics case such as this.

In *United States v. Mitchell*, 540 F.2d 1163, 1166 (3rd Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977), the very case cited by movant in support of its motion, the court held that the defendant was not prejudiced by reason of the Government's failure to identify its identification witnesses prior to trial where, even if the Government had said that the photographic spread had been used with one of the witnesses and that three of the witnesses had been present at the preliminary hearing, it would not have been bound to disclose any names. The discovery rules do not permit the defense to obtain the names of witnesses. *Id.;* Rule 16, F.R. Crim.P. Absent a direct confrontation between a defendant and witnesses, such as a lineup, a defendant cannot know of such pre-trial identification procedures as photographic spreads and surreptitious viewings unless the Government chooses to tell him. *Id.; Cf. United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *Kirby*

*v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

*Mitchell* ascertained that the identities of such witnesses could have been discovered only on cross-examination at trial, as did occur there. This Court likewise concludes that if the Government chooses to present identification evidence at trial, defendants will have ample opportunity at that time to confront the witnesses against them.

■■■ Furthermore, the Government is not required to disclose to defendants the results of any photographing of defendants for identification purposes at a "show up" since such photography was not in contemplation of the rule concerning "scientific tests or experiments." *United States v. Callahan*, 300 F.Supp. 519 (S.D.N.Y.1969). Of course if such photographs will be presented by the Government at trial in its case in chief, however, they fall within the discovery and inspection of "tangible objects" mandated by Rule 16(a)(1)(C), above.

### Writings to Refresh Memory

■■■ Also the subject of a motion for discovery by Defendant Acevedo are "all writings used to refresh the memory of any informant or co-conspirator", pursuant to Rule 612 of the F.R.Evid. The Court considers this motion to be premature, for it remains to be seen, at the testimony of such witnesses at trial, whether their memories will need to be refreshed, and what writings, if any, will be utilized therewith. This motion is denied without prejudice to its being renewed at the appropriate time at trial.

### Prior Convictions of Defendants

■■■ Defendants request any information possessed by the Government regarding prior or subsequent "bad acts" or prior or subsequent criminal conduct of the defendants which is not charged in the indictment, and disclosure of the names and addresses of each witness who will testify to said activity.

Under the F.R.Crim.P, each defendant is permitted only to receive a copy of the

record of his prior criminal convictions, pursuant to Rule 16(a)(1)(B):

> Upon request of the defendant, the government shall furnish to the defendant such copy of his prior criminal record, if any, as is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.

Except as to a copy of his conviction record, if any, which must be provided to each defendant, this motion is denied. The identity of any witnesses to any prior bad acts need not be revealed to defendants in view of the prevailing risks associated with such disclosure. The bad acts which are not the subject of a prior conviction will not be ordered to be produced. Such information may be held inadmissible at trial, thereby rendering the within request premature. *See United States v. Deardorff,* 343 F.Supp. 1033 (S.D.N.Y.1971) (defendants under indictment for bribery were entitled to discover reports in custody of the Government setting forth the prior criminal records of persons named in the indictment as defendants, but would be denied discovery regarding the investigation made by the Government as to those persons). *See also Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Percevault,* 490 F.2d 126, 130 (2d Cir.1974) (defendants have no right to be apprised of all investigatory work on a case).

*Prior Bad Acts of Co-defendants and Co-conspirators*

Defendants further request the criminal records and prior bad acts of any unindicted co-defendants or co-conspirators in these matters. To the extent not required to be produced in respect of a witness, such a request is hereby denied by this Court.

*Record of Grand Jury Proceedings*

 Finally, defendants seek extensive details concerning the grand jury proceedings in this case, including, *inter alia,* the transcript testimony of any and all persons who testified before the grand jury; the identity of each of the grand jurors, and of those who voted to indict the defendants; the dates evidence was presented to any grand jury considering the offenses charged in the instant indictment; the names of witnesses who testified; the identities of any government attorney presenting evidence; any and all documents introduced; and any and all testimony of co-defendants or unindicted co-conspirators.

This Court categorically declines to order the release of any of this information beyond *Brady* material, and grants this motion only insofar as it requests the "recorded testimony of the defendant before a grand jury which relates to the offense charged", discoverable under Rule 16(a)(1)(A), F.R.Crim.P., as to each defendant. Of course, the testimony of witnesses may subsequently be available to the defendants pursuant to 18 U.S.C. Section 3500. *See United States v. Goldman,* 439 F.Supp. 337, 349–50 (S.D.N.Y.1977).

Rule 6 prohibits disclosure of matters occurring before a grand jury, except "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Rule 6(e)(3)–(C)(ii). A defendant is not entitled to disclosure of grand jury proceedings unless a showing of "particularized need" is made. *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *United States v. Shoher,* 555 F.Supp. 346, 454–55 (S.D.N.Y. 1983); *United States v. Cafaro,* 480 F.Supp. 511, 519 (S.D.N.Y.1979). This Court finds that no such showing has been made with respect to any of the herein requested discovery of the grand jury proceedings.

## XIV. MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defendants Cercena, McGuire, Marrama, Dratch, Wall, Gumpricht, Fernandez, Acevedo, and Marin seek leave of the Court to file additional motions and memoranda at some later time, based upon continuing discovery and investigation. Movants Cerce-

na, Marin, Fernandez, Wall and McGuire include in their request the restriction that the leave to make or renew certain applications be based upon a showing that the movant in question is in possession of new or different information of which he could not reasonably be aware as of the date of the present motion. Defendant Marrama instead restricts the requested extended filing period to within twenty days from the date upon which the Government complies with any and all discovery motions.

In support thereof, Defendant Marrama (and presumably all of these movants) contends that the defendant cannot determine whether grounds exist upon which to file certain pre-trial motions until receipt and review of the responses of the Government to the defendants' previously filed discovery and other motions.

The Government, in turn, opposes this motion on the grounds that defendants have already had time to review discovery, and had numerous extensions in which to file their pre-trial motions. The Government does, however, concede that it would not oppose an appropriate motion in the event that a new issue presents itself to the Court.

This Court finds the issue sought to be presented by this motion to be academic at the present time. When and if any defendants receive additional information of which they could not previously have been aware, which provides a good faith basis for an appropriate motion not heretofore made, the Court will dispose of it as Justice may require.

### CONCLUSION

The foregoing constitutes the final resolution of the pending motions by this Court. All matters not specifically referred to herein shall be considered denied. Counsel shall consult with the Clerk of the Court for the scheduling of the required *Miranda* hearing.

Pending completion of that hearing, and pending the final resolution of the request of Defendant Fernandez for a change of venue, this Court directs that excluded time be continued under the Speedy Trial Act for all defendants. 18 U.S.C. § 3161(h).

So Ordered.